Stephen M. Sansom (10678)
HOLLAND & HART LLP
222 Main Street, Suite 220
Salt Lake City, UT 84101
Telephone: 801.799.5800
smsansom@hollandhart.com

Timothy P. Getzoff (*pro hac vice*)
HOLLAND & HART LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, CO 80302
Telephone: 303.473.2700
Fax: 303.473.2720
tgetzoff@hollandhart.com

*Attorneys for Defendant / Counterclaim Plaintiff Elevations Credit Union*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, DIVISION**

| | |
|---|---|
| ELEVATE FEDERAL CREDIT UNION,<br><br>Plaintiff / Counterclaim Defendant,<br><br>vs.<br><br>ELEVATIONS CREDIT UNION,<br><br>Defendant / Counterclaim Plaintiff. | DEFENDANT'S MOTION AND MEMORANDUM TO EXCLUDE OPINIONS OF JUSTIN R. ANDERSON<br><br>Civil No. 1:20-cv-00028-DAK-PMW<br><br>Judge Dale A. Kimball<br>Magistrate Judge Jared C. Bennett |

Defendant Elevations Credit Union ("Elevations") respectfully moves for an order excluding opinions of Plaintiff Elevate Federal Credit Union's ("Elevate") rebuttal expert, Justin R. Anderson, and in support states as follows:

## I. Introduction and Relief Requested

Elevate retained Justin Anderson as an expert to provide rebuttal opinions regarding the report provided by Elevation's expert, Hal Poret (the "Poret Report"), and the likelihood of confusion survey conducted by Mr. Poret (the "Poret Survey"). In an attempt to discredit the Poret Report and the Poret Survey, Mr. Anderson's report includes opinions regarding the relative use of Bing compared to Google and bases his opinions on a website he found, *Search Engine Market Share United States of America*, Apr 2020 – Apr 2021 (the "SEMS Website").

In offering these opinions, Mr. Anderson exceeded the bounds of his own admitted areas of expertise (surveys, consumer behavior, and marketing), and nowhere in his report does he explain how his background provides a foundation for his opinions about the relative prevalence of Bing compared to Google or how search engines function in general. Indeed, Mr. Anderson flatly admitted during his deposition that he is not an expert on internet search engines. Furthermore, both in his report and his deposition, Mr. Anderson failed to demonstrate sufficient factual and methodological foundation for his opinions based on the hearsay information contained on the SEMS Website. As such, his opinions regarding the internet search engines fail to meet the reliability standard set forth by the Supreme Court in *Daubert*.

Elsewhere in his report, Mr. Anderson asserts that the Poret Survey is improper because it allegedly asks a leading question. Despite acknowledging that the question includes elements that make it nonleading (such as the option to select "none" or "don't know"), Mr. Anderson

nevertheless argues the question is leading because the survey allegedly failed to ask a filter question for the measurement of confusion as to source. Even if the survey does not include such a filter question, Mr. Anderson failed to show that the question is "leading" as a matter of law as applied to consumer confusion surveys, and therefore his opinion on this issue also should be excluded.

For reasons explained more fully below, Mr. Anderson's opinions regarding the relative use of search engines and Mr. Poret's alleged use of leading questions, and the conclusions drawn therefrom in Parts I, III, and IV of his report, should be excluded.

## II.     Factual Background

Elevate retained Mr. Anderson as an expert to provide rebuttal opinions regarding the Poret Report (attached as Ex. 1) and the Poret Survey. Rebuttal Report of Dr. Justin R. Anderson (attached as Ex. 2), at ¶¶ 1-2. In his report, Mr. Anderson claims to have "training in survey research methods, statistics, marketing, and consumer psychology," *Id.* at ¶ 5, and in his curriculum vitae, he claims to have "[e]xpertise in marketing and survey research." *Id.* at Exhibit 1.

In his report, Mr. Anderson asserts that the Poret Survey "suffers from significant flaws," in part, because Mr. Poret used Bing instead of Google to show proximity between the parties' marks. *Id.* at ¶ 26.i. and 26.iii. Citing and relying upon the SEMS Website—an internet website for which he provides no discussion or foundation—Mr. Anderson opined that because the SEMS Website asserts that a majority of searches are conducted on Google instead of Bing (88.8% vs. 5.5%, according to Mr. Anderson), Mr. Poret failed to show sufficient proximity between Elevate and Elevation's marks to represent a typical marketplace context. *Id.* at ¶¶ 26.i.,

26.iii, 34-38, 89-92. Further, he conducted his own search on Google and used that search in conjunction with his opinion based on the SEMS Website to bolster his conclusions. *Id*. at ¶¶ 34-38.

When questioned during his deposition (attached as Ex. 3), Mr. Anderson admitted that he is not an expert on internet search engines:

> Q: Dr. Anderson, do you consider yourself an expert on Internet search engines?
> A: I wouldn't characterize it that way, no, not in the abstract.
> Q: Do you consider yourself an expert on how search engines work?
> A: No.

Ex. 3, at 58:9-59:4. When pressed during a discussion of relative uses of search engines based on the SEMS Website, Mr. Anderson stated that he relied on his "knowledge in fields such as surveys, consumer behavior, and marketing" to reach his conclusions. *Id.* at 62:13-21. He also admitted that he did not test the veracity of the information contained on the SEMS Website:

> Q  How did you determine the reliability of the source, [SEMS,] that you cited in footnote 40?
> A  I don't recall what information I looked at at that point.
> Q  Did you do anything to confirm or vet the numbers or data that you saw in the source that you cited in footnote 40? . . .
> A  I don't know because it would be my standard practice to do that. But I don't recall what steps I took when I retrieved this on May 9th of this year.
> Q  . . . And you didn't – and your report doesn't cite or describe any sort of checking or vetting or other sources that you relied upon for what you said in paragraph 35, right?
> A  I don't believe it does.

Ex. 3, at 62:22-64:22.

Elsewhere in his report, Mr. Anderson asserts that the Poret Survey is improper because it asks a leading question. Ex. 2 at ¶ 95.[1] Specifically, Mr. Anderson takes issue with a portion of

---

[1] Although phrased as including multiple questions, it appears that Mr. Anderson complains only about one question being allegedly leading. *See, e.g., id.* at ¶¶ 99-100.

Mr. Poret's survey in which respondents were asked to "imagine that you have seen or heard about a credit union named ELEVATE CREDIT UNION and you would like to do an internet search for that credit union." Ex. 1, at 18-19. Then, respondents were told that they will see a page of search results. *Id.* at 20-22. The test group was shown a real search result Mr. Poret obtained searching Bing for "elevate credit union," which included "Elevations Credit Union" as the seventh result down from the top of the page. *Id.* at p. 16. The results also included a number of results for "Elevate Credit Union," as well as results for unrelated entities, like "ratezip.com" and "Payday Loans." *Id.* at 15. A control group was shown the exact same search results as the test group, except the "Elevations Credit Union" result was replaced with "UofC Federal Credit Union." *Id.* at 17-18. Finally, to round out this portion of the survey, respondents were asked:

> Please click on the image below to highlight every search result that you think is for the credit union that you searched for, if any. You may select one or more search results by clicking on a search result to highlight it. Or you may also select the none or don't know option at the bottom of the page.

*Id.* at 22. Mr. Anderson claims that in this section, Mr. Poret failed to ask a "filter question" for the measurement of confusion as to source, making this question leading. Ex. 2 at ¶¶ 96-103.

**III.   Argument**

    **A.   Applicable Legal Standard**

The proponent of expert testimony bears the burden to establish its admissibility. *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*). To determine admissibility, the district court must first determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id*. at 1241 (quoting Fed. R. Evid. 702). Next, "the court 'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Conroy v. Vilsack*,

707 F.3d 1163, 1168 (10th Cir. 2013) (quoting *U.S. v. Rodroquez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006). Additionally, the opinions must be relevant and not be more prejudicial than probative. Fed. R. Evid. 401, 403. If the information relied upon is inadmissible hearsay, the proffered expert must demonstrate that "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

To qualify as an expert in a particular field, the proffered expert is "required to possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.'" *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 918 (10th Cir. 2004) (quoting *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1408 (10th Cir. 1990)) (finding a plaintiff's proposed expert "was not an expert in damages analysis" because he admittedly lacked the requisite training and background in the methods applied). Further, the proffered expert must stay "within the confines of his subject area." R*alston v. Smith & Nephew Richards, Inc*. 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru of America, Inc*., 82 F.3d 1513, 1520 (10th Cir. 1996)) (excluding a proposed experts testimony because, by the expert's own admissions, the subject matter "was not within the reasonable confines of her subject area.").

Assuming "the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Nacchio*, 555 F.3d at 1241. "Reliability questions may concern the expert's data, method, or his application of the method to the data." *Id.* The Supreme Court in *Daubert* identified four factors that a court should consider when evaluating of the reliability of an expert's methodology:

> (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there

are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has 'general acceptance.'

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 152 (1993)). "Under *Daubert*, any step that renders the expert's analysis unreliable . . . renders the expert's testimony inadmissible." *Nacchio*, 555 F.3d at 1241.

### B.  Mr. Anderson's Opinions Relying on the SEMS Website Are Inadmissible.

Mr. Anderson's opinions regarding the use of Bing compared to Google in Parts I and III of his report should be excluded because (1) based on his area of expertise, he is not qualified to opine on this issue and (2) the premises underlying those opinions are unreliable.

#### 1.  Mr. Anderson is Not Qualified to Discuss or Draw Conclusions Based on Internet Search Patterns.

Mr. Anderson is not qualified to discuss the relative usage or superiority between different search engines. Mr. Anderson's training and expertise pertain to survey research methods, statistics, marketing, and consumer psychology. Ex. 2, at ¶ 5, Exhibit 1. On their face, none of these areas provide expertise in search engine usage or results, nor would search engine usage or results "be within the confines" of any of these subject areas. Additionally, during his deposition, Mr. Anderson admitted that he is not an expert on internet search engines, and when asked repeatedly about his foundation for using Google compared to Bing, Mr. Anderson ultimately provided a vague, unilluminating answer that it was based on "knowledge in fields such as surveys, consumer behavior, and marketing." *See, e.g.,* Ex. 3 at 59:5-62:12.[2]

---

[2] Mr. Anderson's opaque response is unsurprising given that he readily admitted his position that "there's no survey format that" would have been appropriate to measure likelihood of confusion in this case. Ex. 3, at 46:16-25. In other words, literally no survey that Mr. Poret could have performed would have satisfied Mr. Anderson.

Had Mr. Anderson simply conducted his own search on Google and used those results in his report to state that he believed there was no proximity between Elevate and Elevation's marks, such an analysis might have been within the purview of his expertise. However, Mr. Anderson's analysis stepped outside of those bounds when he included opinions about the relative use and accuracy of Google compared to Bing. He simply does not have the training and expertise to make these comments. As put succinctly by one court, "Spending a few minutes on the internet does not make one an expert on any 'industry' or on any topic." *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 814 (N.D. Ill. 2005). Allowing Mr. Anderson to opine on topics beyond the scope of his expertise while cloaked in the guise of an "expert" is misleading to the jury and would serve only to obscure the true facts.

### 2. Mr. Anderson's Analysis is Not Reliable Due to His Reliance on Search Engine Market Share.

Putting aside Mr. Anderson's lack of experience or expertise in the relative usage of Internet search engines, Mr. Anderson failed to support his conclusion that Bing was unacceptable and Google is superior with reliable, verifiable information. In his report, Mr. Anderson's assertions that Mr. Poret's use of Bing was inappropriate to test proximity and to represent a typical marketplace, and that Google would have been appropriate, all rest entirely on his review of the hearsay SEMS Website. He provides no analysis of the conclusions and results provided by the SEMS Website, but merely presents the relative use of Google (a claimed 88.8%) compared to Bing (a claimed 5.5%) as accepted fact because the single website he visited said so. There is no indication that the information presented on this website was peer reviewed, what the error rates were for this determination, or that a generally accepted method of calculating relative use of these search engines was used. Mr. Anderson also failed to show that

experts in this particular field would reasonably rely on the SEMS Website—normally inadmissible hearsay evidence—in forming an opinion on search engines. Mr. Anderson's blind reliance on and parroting of information he found on a random website, without any indication regarding its reliability, fails to provide reliable information to the trier of fact.

Mr. Anderson's discussions of the SEMS Website during his deposition underscores these deficiencies, as he clearly acknowledged that his report does not cite or describe any vetting of the SEMS Website and, when given the chance to state how he verified the information provided by the SEMS Website, was unable to do so. *See, e.g.* Ex. 3, at 62:22-64:22. Indeed, elsewhere he simply stated that he relied on his "knowledge in fields such as surveys, consumer behavior, and marketing" in conjunction with the SEMS Website to reach his conclusions. Ex. 3, at 62:17-21. Such vague and general assertions cannot be the basis for reliability under *Daubert*. *See, e.g., Taber v. Allied Waste Sys.*, 642 Fed. Appx. 801, 810 (10th Cir. 2016) (noting, with respect to arguments that an expert's testimony was "based on 'accepted standards and practices,' his 'expertise and training,' and the 'biomechanics of a person,'" that "these generalities do not even approach the specific scientific principles underlying the district court's decision in *Bitler*.").

Because Mr. Anderson's opinions about relative search engine use are unreliable, and because those assertions are so intertwined with his analysis of Elevate's proximity to Elevations (Part I) and of Mr. Poret's representation of a typical market place (Part III), both of these analyses should be excluded from the trier of fact.

     **C.**     **Mr. Anderson's claims that the Poret Survey Asked Leading Questions are Unsupportable and Should be Excluded.**

Mr. Anderson's discussion about leading questions fundamentally misunderstands what

constitutes a leading question in likelihood of confusion surveys and therefore should be excluded. In the context of consumer confusion surveys, as in trial, courts find a question leading when the question suggests the answer. *See, e.g.*, *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir.1997) ("It is elementary that a leading question is one that suggests an answer"); *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2nd Cir. 1984) (noting that an "inquiry was an obviously leading question in that it suggested its own answer."); *see also Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767-768 (E.D. Mich. 2003).

It appears that Mr. Anderson bases his belief that the Poret Survey includes leading questions on the fact that he believes the Poret Survey did not ask a "filter question" for the measurement of confusion as to source. Specifically, Mr. Anderson claims that as a result of not asking such a filter question, "the survey was leading and may have encouraged respondents to select any search result that resembled the search term in any way." Ex. 2, at ¶ 100.

Contrary to Mr. Anderson's assertions, Mr. Poret's question was not leading, as it did not suggest that respondents should answer any particular way. Instead, Mr. Poret's question included characteristics that have been found to be not leading in other cases. For instance, the question was open ended, relying on the respondent to select "every search result that you think is for the credit union you searched for." *See, e.g., Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-cv-00749, 2017 U.S. Dist. LEXIS 57805, at *18 (D. Utah Mar. 2, 2017) ("The questions asked were open-ended questions that were not leading."). It also allowed the responded to select a "none" or a "don't know" option and did not suggest respondents select any particular response. *See, e.g. Express Oil Change, LLC v. Miss. Bd. of Licensure for Prof'l Eng'rs & Surveyors*, No. 3:16-cv-414-HTW-LRA, 2018 U.S. Dist. LEXIS 230383, at *9 (S.D. Miss. Feb.

-10-

1, 2018) (finding questions that allowed respondents a range of answers, including "unsure" to be "not inappropriate because they do not suggest an answer."). Allowing Mr. Anderson to even suggest the question is leading when case precedent and a basic reading of the question demonstrates otherwise would contradict how the term "leading" is used in connection with likelihood of confusion survey questions and be more prejudicial than probative for the trier of fact.[3]

Because Mr. Anderson's claims regarding leading questions do not meet the legal standards for a "leading" question, making any discussion of the topic irrelevant and more prejudicial than probative, Mr. Anderson's claims that questions in the Poret Survey were leading should be excluded.

## IV. Conclusion

For the foregoing reasons, Mr. Anderson's unreliable and unsupportable opinions regarding relative use of search engines and Mr. Poret's alleged use of leading questions, and the conclusions drawn therefrom in Parts I, III, and IV of his report, should be excluded.

---

[3] Further, Mr. Anderson's argument "a filter question for the measurement of confusion as to source" (Ex. 2, at ¶100) should have been used appears contrary to Tenth Circuit law. Mr. Anderson appears to advocate that respondents must first be asked whether they believe that two or more brands are from separate companies or whether they are from the same company or affiliated. Ex. 2, at ¶¶ 97-98. However, in *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136 (10th Cir. 2013), the Tenth Circuit found that "the district court could reasonably view the survey questions as improperly leading" where survey participants were shown three products and "asked whether two or more of the products were made by the same company" or affiliated. *Id*. at 1147. The court found that "[b]y suggesting the possibility that" one product might be connected with one of the other two products, "the survey questions risked sowing confusion . . . when none would have arisen otherwise." *Id*. at 1148. If Mr. Poret had first asked if the brands are a separate company, the same company, or affiliated, Mr. Poret would have had to include only one Elevate search result, which would have misrepresented the actual search results and, based on *Water Pik*, might suggest association between the marks when there is none.

Dated this 13th day of September, 2021

        HOLLAND & HART LLP

        /s/ Timothy P. Getzoff
        Timothy P. Getzoff
        *Attorneys for Defendant / Counterclaim Plaintiff*
        *Elevations Credit Union*

17191887_v3