# Exhibit 3
# Transcript of the Deposition of Justin Anderson



# Transcript of Justin Anderson, PhD

**Date:** July 27, 2021
**Case:** Elevate Federal Credit Union -v- Elevations Credit Union

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF UTAH
 3    - - - - - - - - - - - - x
 4  ELEVATE FEDERAL          :
 5  CREDIT UNION,            :
 6                           :   Civil Action No.
 7    Plaintiff/            :  1:19-cv-00028-DAK-JCB
 8    Counterclaim          :
 9    Defendant,            :
10    v.                    :
11  ELEVATIONS CREDIT         :
12  UNION,                   :
13                           :
14    Defendant/            :
15    Counterclaimant.      :
16    - - - - - - - - - - - - x
17
18        Deposition of JUSTIN ANDERSON, PHD
19             Conducted Virtually
20           Tuesday, July 27, 2021
21               9:56 a.m. CT
22
23  Job No.: 384704
24  Pages: 1 - 136
25  Reported By: Carla S. Kimbrough
```

**Page 2**

```
 1     Deposition of JUSTIN ANDERSON, PhD, conducted
 2  virtually.
 3
 4
 5
 6
 7
 8
 9     Pursuant to notice, before Carla S. Kimbrough,
10  Certified Shorthand Reporter in and for the State
11  of Oklahoma.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1             A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF/COUNTERCLAIM
 3  DEFENDANT:
 4     KIRSTEN R. ALLEN, ESQUIRE
 5     FABIAN VANCOTT
 6     215 South State Street, Suite 1200
 7     Salt Lake City, Utah 84111
 8     801.531.8900
 9
10  ON BEHALF OF THE
11  DEFENDANT/COUNTERCLAIMANT:
12     TIMOTHY P. GETZOFF, ESQUIRE
13     HOLLAND & HART
14     1800 Broadway, Suite 300
15     Boulder, Colorado 80302-5289
16     303.473.2734
17
18  ALSO PRESENT:
19     Matthew Weedon, Technician
20
21
22
23
24
25
```

**Page 4**

```
 1              C O N T E N T S
 2
 3  EXAMINATION OF JUSTIN ANDERSON, PhD      Page
 4    By Mr. Getzoff                          5
 5
 6              E X H I B I T S
 7            (Attached to transcript)
 8  JUSTIN ANDERSON, PhD DEPOSITION EXHIBITS  Page
 9  Exhibit 62  Poret Expert Report,         118
10              March 2021
11  Exhibit 67  Spreadsheet                  119
12  Exhibit 73  Google Searches,              91
13              6-15-2021
14  Exhibit 75  Expert Rebuttal Report        10
15  Exhibit 76  The Trademark Reporter,       52
16              May-June 2019
17  Exhibit 77  Google Search,                96
18              7-26-2021
19  Exhibit 78  Spreadsheet                  121
20
21
22
23
24
25
```

5

```
1            P R O C E E D I N G S
2         THE REPORTER:  Will counsel please
3   stipulate that in lieu of formally swearing in the
4   witness, the reporter will instead ask the witness
5   to acknowledge that their testimony will be true
6   under the penalties of perjury, that counsel will
7   not object to the admissibility of the transcript
8   based on proceeding in this way, and that the
9   witness has verified that he is in fact Dr. Justin
10  Anderson.  Counsel?
11        MR. GETZOFF:  Agree.
12        MS. ALLEN:  Agree.
13        THE REPORTER:  Dr. Anderson, do you hereby
14  acknowledge that your testimony will be true under
15  the penalties of perjury?
16        THE WITNESS:  I'm sorry, I didn't quite
17  hear all that.
18        THE REPORTER:  Do you hereby acknowledge
19  that your testimony will be true under the
20  penalties of perjury?
21        THE WITNESS:  Yes.
22        THE REPORTER:  Thank you.
23        EXAMINATION
24  BY MR. GETZOFF:
25     Q  Good morning, sir.  Can you please state
```

6

```
1   your full name and spell your last name, please.
2      A  Justin Anderson, A-N-D-E-R-S-O-N.
3      Q  And, Mr. Anderson, I understand you have a
4   PhD.  Do you go by Dr. Anderson?
5      A  Yes.
6      Q  Then I will call you Dr. Anderson, and I
7   apologize if I omit that during the deposition.
8         Dr. Anderson, can you tell me your work
9   address, please?
10     A  16501 Ventura Boulevard, Suite 601,
11  (indiscernible), California 91436.
12        THE REPORTER:  I'm sorry, what was the
13  name of the town?
14        THE WITNESS:  Encino, E-N-C-I-N-O.
15        THE REPORTER:  Thank you.
16     Q  (By Mr. Getzoff)  Dr. Anderson, you
17  currently work at MMR Strategy Group?
18     A  Yes.
19     Q  How long have you worked at MMR Strategy
20  Group?
21     A  Since 2014 and I also worked at MMR for
22  approximately for (indiscernible) in a previous
23  role.
24        (Off-the-record discussion due to
25  technical difficulties.)
```

7

```
1         (Break taken from 9:58 a.m. to 10:01 a.m.)
2         (Pending question read.)
3      A  I've worked here since 2014, and prior to
4   that I was here for about a year previously.
5         MR. GETZOFF:  Let's go off the record.
6         (Off-the-record discussion due to
7   technical difficulties.)
8      Q  (By Mr. Getzoff)  Dr. Anderson, you were
9   retained by the plaintiff in this case, Elevate
10  Federal Credit Union.  Is that correct?
11     A  Yes.
12     Q  When were you retained in this case?
13     A  I believe it was early May of this year.
14     Q  And who contacted you?
15     A  Counsel for the plaintiff.
16     Q  Was it Ms. Allen?
17     A  I don't recall.
18     Q  Do you recall which counsel contacted you?
19     A  Not clearly.
20     Q  Had you worked on a litigation matter for
21  the plaintiff's law firm Fabian VanCott prior to
22  this one?
23     A  No.
24     Q  Dr. Anderson, where are you currently
25  sitting, what address?  Are you at the address you
```

8

```
1   gave us previously?
2      A  Yes, I am.
3      Q  Is there anyone in the room with you?
4      A  No.
5      Q  Other than deposition exhibits that we'll
6   be referring to during the deposition, will you
7   agree not to review any notes, e-mails, texts, or
8   any other communications while we are on the
9   record?
10     A  Yes.
11     Q  Dr. Anderson, I understand that during
12  your time with MMR Strategy Group you've been
13  involved in conducting litigation surveys for
14  trademark cases.  Is that accurate?
15     A  Yes.
16     Q  And by that I mean a survey for use in a
17  litigation concerning a trademark issue.  Is
18  that -- is your answer still yes?
19     A  Yes, it is.
20     Q  Dr. Anderson, in your report you say that
21  you have designed -- during your time at MMR you
22  have designed and conducted hundreds of surveys on
23  a variety of topics including likelihood of
24  confusion.  Is that accurate?
25     A  Yes.
```

9

1    Q  I want to -- I want to focus specifically
2  on the likelihood of confusion surveys as opposed
3  to other type of trademark surveys.  And as
4  opposed to other type of surveys that don't have
5  to do with trademark issues at all.  Can you tell
6  me all of the surveys you have conducted in your
7  career how many dealt, either by an estimate of
8  number or percentage, with the likelihood of
9  confusion?
10    A  It may be more than 100.  It's certainly
11  more than 50.
12    Q  Now in your expert report, Dr. Anderson,
13  do you have a copy -- do you have a hard copy of
14  your expert report?
15    A  No.
16    Q  Are you able to get one?  And the reason I
17  ask is I can -- I can send it to you in PDF.  And
18  if you have a second screen you can review it on
19  your own.  But it may be easier for you to have a
20  hard copy of your own report as we go through it.
21  It's up to you.
22    A  Why don't we try sharing a PDF.  And if
23  that don't work, then I will be able to print a
24  copy.
25    Q  Okay.  Let's do this.  Let me -- let me

10

1  mark our first exhibit, which will be -- which
2  we'll mark as 75.  We've been marking exhibits
3  sequentially throughout the depositions, and I
4  think we ended at 74 with Mr. Poret's.
5    (Exhibit No. 75 was marked for
6  identification and is attached to the transcript.)
7    Q  So, Dr. Anderson, I have just put
8  Exhibit 75 in the chat.  Can you retrieve that?
9    A  I've got it.
10    Q  Okay.  Dr. Anderson, is this the expert
11  report that you submitted in this case?
12    A  Yes, I believe so.
13    Q  And, Dr. Anderson, is this your signature
14  on the last page of the body of the report,
15  page 37?
16    A  Yes.
17    Q  And on the very last page of the report in
18  the appendixes at the end is a list of cases where
19  you testified as an expert at deposition or trial
20  in the last four years.  Is that -- is that what
21  this page reflects?
22    A  Or provided an expert report.  That's
23  correct.
24    Q  Okay.  So some of these you didn't
25  necessarily testify in deposition or trial but you

11

1  engaged and you submitted an expert report.
2    A  That's correct.
3    Q  I want to go through these one at a time
4  and just ask you a couple questions about each.
5  Are these in chronological order?
6    A  I think so, yes.
7    Q  Okay.
8    A  Reverse so that the more -- the ones at
9  the top are more recent.
10    Q  Okay.  So the Gaby's Bag versus Mercari,
11  that's the most recent case where you submitted an
12  expert report or testified?
13    A  Prior to this matter, yes, I believe so.
14    Q  And putting this matter aside, is this
15  listing accurate?
16    A  Sorry, can you be more specific?
17    Q  Yeah.  Is this a complete list of all
18  cases where you have issued an expert report or
19  testified in the last four years?
20    A  Yes, I believe so.
21    Q  In the Gaby's Bags case did you testify in
22  that case?
23    A  I provided an expert report.  I was not
24  deposed or at least I haven't been deposed yet,
25  and the matter is still ongoing.

12

1    Q  And when you say -- it says retained by
2  defendant, that doesn't always mean -- like this
3  case, that doesn't always mean the trademark
4  owner.  Or I should say it doesn't always mean
5  accused infringer.  So I'm going to ask you just
6  to clarify.  You were retained by Mercari in that
7  case, correct?
8    A  Yes.
9    Q  And was Mercari being accused trademark
10  infringement?
11    A  I don't believe so.
12    Q  Is Mercari accusing Gaby's Bags of
13  trademark infringement?
14    A  No, I don't believe so.
15    Q  Is that case a trademark case?
16    A  I don't believe it is.
17    Q  Let's go to the next case, Blackstone
18  versus Costco.  Is that a trademark case?
19    A  Yes, I believe so.
20    Q  Did you give testimony in that case?
21    A  Let me just ask you to clarify.  By
22  testimony, what do you mean by testimony?
23    Q  Yeah.  For all of these I know you at
24  least gave an expert report.  So that's assumed.
25  By testimony I mean either a deposition or trial.

**13**

1    A  Okay.

2    Q  So for the Costco case did you give

3  testimony in that case?

4    A  Not to this date, no.  That matter is also

5  ongoing.

6    Q  In that case is Costco being accused of

7  infringement?

8    A  I believe so.

9    Q  Did you do a survey in that case?

10    A  Yes.

11    Q  What was the trademark that's being --

12  what was the trademark of the plaintiff that's

13  alleged to be infringed?

14    A  It's trade dress.  It's the appearance of

15  the product.

16    Q  In that case you said you did do a survey

17  yourself, correct?

18    A  Yes.

19    Q  Did you use an Eveready format or a Squirt

20  format?

21    A  I did not -- it was not a likelihood of

22  confusion survey.

23    Q  What kind of survey was it?

24    A  Survey of measured secondary meaning.

25    Q  The next case, Country Life versus Hain

**14**

1  Celestial Group, was that a trademark case?

2    A  Yes, I believe so.

3    Q  Was that a likelihood of confusion --

4  strike that.

5      Did you do a survey in that case?

6    A  No.

7    Q  Did you critique the survey offered by the

8  expert for the other side?

9    A  Yes.

10    Q  In that case you were retained by Hain

11  Celestial.  Was Hain Celestial being accused of

12  trademark infringement?

13    A  I believe so.

14    Q  Did the plaintiff -- plaintiff's expert do

15  a likelihood of confusion survey?

16    A  Yes.

17    Q  Did that survey use an Eveready format or

18  a Squirt format?

19    A  A Squirt.

20    Q  What was the trademark that the plaintiff

21  alleged to be infringed in that case?

22    A  I don't remember clearly.  I remember

23  there was (indiscernible.)

24      THE REPORTER:  I'm sorry.  I'm sorry, that

25  was not good.  Could you start that again, please?

**15**

1      THE WITNESS:  Yes.

2    A  I don't remember clearly but the -- I know

3  the trade dress was at issue.  I don't recall

4  whether the trade name was also at issue.

5    Q  (By Mr. Getzoff)  Let's go to the next

6  case, the FTC case versus On Point Global.  Was

7  that a trademark case?

8    A  No.

9    Q  The next case Blackboard versus AudioEye

10  for the TTAB, that I assume was a trademark case.

11    A  Yes.

12    Q  You were retained by AudioEye in that

13  case?

14    A  Yes.

15    Q  Did you perform a survey in that case?

16    A  No.

17    Q  Did you critique the survey or a survey

18  offered by the -- by Blackboard in that case?

19    A  Yes.

20    Q  What was the trademark that Blackboard

21  alleged or that Blackboard was asserting in that

22  proceeding?

23    A  I don't remember which party was asserting

24  the trademark.  AudioEye was the applicant.

25    Q  Right.  And so Blackboard as the

**16**

1  registrant typically would be saying that the

2  applicant's mark is creating likelihood of

3  confusion with their preexisting registration.

4  Does that sound familiar?

5    A  I don't -- the survey that I critiqued was

6  not a likelihood of confusion survey.

7    Q  Okay.  What kind of survey was it?

8    A  A survey to measure genericness or I

9  should say a survey to measure the primary

10  significance of the market.

11    Q  The next case Jacobs versus Fareportal, is

12  that a trademark case?

13    A  Yes.

14    Q  Did you provide -- did you a conduct a

15  survey in that case?

16    A  No.

17    Q  Did you critique a survey offered by the

18  plaintiff in that case?

19    A  Yes.

20    Q  Was that a likelihood of confusion survey?

21    A  Yes.

22    Q  Did that survey use an Eveready or a

23  Squirt format?

24    A  I believe it was described as a Squirt

25  survey.

**17**

1     Q  Going back to the Hain Celestial case
2 where you critiqued the plaintiff survey which
3 used a Squirt format, did you -- was part of your
4 critique that the plaintiff used a Squirt format?
5     **A  Not that I recall.**
6     Q  The in Jacobs v Fareportal case, was part
7 of your critique that the plaintiff's expert used
8 a Squirt format?
9     **A  I don't recall.**
10     Q  In the next case Allergen versus
11 Imprimis -- Imprimis Pharmaceuticals, was that a
12 trademark case?
13     **A  No.**
14     Q  Cross Trailers versus Cross Trailer, I'm
15 going to guess that was a trademark case?
16     **A  Yes.**
17     Q  Did you conduct a survey in that case?
18     **A  No.**
19     Q  Did you critique a survey offered by the
20 plaintiff in that case?
21     **A  Yes.**
22     Q  Did that -- did the plaintiff expert use a
23 Squirt format or an Eveready format?
24     **A  I believe it was Eveready.**
25     Q  Then to be clear in that case you did not

**18**

1 perform a survey yourself, right?
2     **A  I think you asked me that but the answer**
3 **is, no, I did not.**
4     Q  The next case Jaguar Land Rover versus
5 Bombardier Recreational Products, is that a
6 trademark case?
7     **A  Yes.**
8     Q  Is that a case concerning the trademark
9 Defender?
10     **A  I don't recall the name.**
11     Q  Did you perform a survey in that case?
12     **A  No.**
13     Q  Did the defendant conduct -- did the
14 defendant expert conduct a survey?
15     **A  Yes.**
16     Q  And so your expert opinion critiqued that
17 survey?
18     **A  Yes.**
19     Q  Did the defendant's expert survey was that
20 an Eveready format or a Squirt format?
21     **A  I believe that was Eveready.**
22     Q  The next case Hain Blueprint versus
23 Blueprint Coffee.  Is that a trademark case?
24     **A  Yes.**
25     Q  Did you conduct a survey in that case?

**19**

1     **A  No.**
2     Q  You critiqued the survey performed by the
3 plaintiff's expert?
4     **A  Yes.**
5     Q  Was that a likelihood of confusion survey?
6     **A  That's how it was described.**
7     Q  That was the topic reportedly being
8 addressed by the survey.
9     **A  That's right.**
10     Q  Did the plaintiff's expert in that case
11 use an Eveready or a Squirt format?
12     **A  It was not an Eveready.  It would be most**
13 **closely described as a Squirt.  I'm not certain**
14 **that it was a Squirt format exactly.**
15     Q  The next case DRL Enterprises versus North
16 Atlantic Operating Company, et al., was that a
17 trademark case?
18     **A  Yes.**
19     Q  Did you perform a survey in that case?
20     **A  Yes.**
21     Q  Is that a likelihood of confusion survey?
22     **A  No.**
23     Q  What kind of survey was it?  What -- what
24 were you attempting to measure in that survey?
25     MS. ALLEN:  Objection, compound.  You can

**20**

1 answer.
2     **A  It was a survey to measure the primary**
3 **(indiscernible) of a mark.**
4     THE REPORTER:  I'm sorry.  I'm sorry.
5 Could you start that over, please?
6     **A  It was a survey to measure the primary**
7 **significance of a mark.**
8     Q  (By Mr. Getzoff)  Did the other side
9 conduct a likelihood of confusion survey?
10     **A  I don't know.**
11     Q  You don't -- you don't remember or not
12 that you know of?
13     **A  Not that I know of.**
14     Q  The last case on your list of cases over
15 the last four years, Titletown Brewing versus
16 Green Bay Packers.  This was also before the TTAB.
17 You were retained by Titletown the petitioner,
18 right?
19     **A  Yes.**
20     Q  Did you perform a survey in that case?
21     **A  No.**
22     Q  But did you critique a survey performed by
23 the -- by Green Bay Packers?
24     **A  Yes.**
25     Q  Is that a likelihood of confusion survey?

21

1      A  No.
2      Q  What kind of survey was it?
3      **A  Survey to measure secondary meaning.**
4      Q  So, Dr. Anderson, if my notes are
5   accurate, for all the cases listed by you the way
6   you submitted a report or testified in the last
7   four years, you did not conduct a likelihood of
8   confusion survey for any of them.  Is that right?
9         MS. ALLEN:  Objection, mischaracterizes
10   the witness' testimony.
11     **A  Would you ask the question again?**
12     Q  (By Mr. Getzoff)  Yes.  For all the cases
13   listed on the last page of your expert report as
14   cases you have provided an expert report in or
15   testified over the last four years, you did not
16   perform in likelihood of confusion survey for any
17   of them.  Is that right?
18        MS. ALLEN:  Same objection.
19     **A  None of these -- I didn't conduct a**
20   **likelihood of confusion survey for any of these**
21   **matters (indiscernible.)  That's correct.**
22        THE REPORTER:  I'm sorry.  I lost part of
23   that.  Could you say that again?
24        THE WITNESS:  I did not conduct a
25   likelihood of confusion survey for the matters

22

1   listed on this list.
2         THE REPORTER:  Thank you.
3      Q  (By Mr. Getzoff)  Dr. Anderson, when is
4   the last time you did conduct a likelihood of
5   confusion survey in a litigation context?
6      **A  I'm working on some presently.  And it**
7   **seems like I -- I would struggle to find a time**
8   **when I'm not working on a likelihood of confusion**
9   **survey for a litigation context.**
10     Q  Well, you haven't issued a written
11   report -- between now and the last four years you
12   have not issued a written report where you
13   conducted a likelihood of confusion survey, right?
14     **A  That's correct.**
15     Q  And so my question is, when is the last
16   time you did issue a written report where you
17   conducted a likelihood of confusion survey in a
18   litigation context?
19     **A  I don't recall the time but it was more**
20   **than four years ago.**
21        THE REPORTER:  I'm sorry, it was more than
22   four years ago?
23        THE WITNESS:  That's correct.
24     Q  (By Mr. Getzoff)  And to be clear, you did
25   not conduct a likelihood of confusion survey in

23

1   this case, right?
2      **A  That's correct.**
3      Q  You didn't conduct -- in this case you
4   didn't conduct any kind of survey, correct?
5      **A  That's correct.**
6      Q  Dr. Anderson, have you ever had an opinion
7   that you submitted in an expert report that
8   excluded either in whole or in part by a court?
9      **A  No.**
10     Q  And you know what I mean by excluded,
11   right?
12     **A  Why don't you tell me what you mean.**
13     Q  Well, in the context of litigation, one
14   side can file a motion to try to exclude the
15   opinion of the other side's expert under what we
16   call a Daubert.  Are you familiar with that
17   process?
18     **A  Somewhat.**
19     Q  Have you ever had an opinion challenged by
20   the other side in a litigation matter?  And by
21   challenge I mean where the other side filed a
22   motion asking that your opinion be excluded either
23   in whole or in part.
24     **A  I believe so.**
25     Q  And it's your testimony that none of those

24

1   challenges have been successful.
2      **A  That's my understanding.**
3      Q  Dr. Anderson, I want to pivot a little bit
4   and talk about the report you submitted in this
5   case, which we've marked as Exhibit 75.  In the
6   course of your work on this case did you ever talk
7   to anybody at the plaintiff, Elevate Federal
8   Credit Union?
9      **A  No.**
10     Q  In the course of your work on this case,
11   did you ever talk to anyone in the credit union or
12   banking industry?
13     **A  Not about this matter.**
14     Q  Right.  You probably have a banking or
15   credit union institution and you may talk to those
16   folks for your personal business.  But for
17   purposes of this case, you never talked to anybody
18   in the credit union or banking industry.  Is that
19   right?
20        MS. ALLEN:  Asked and answered.
21     **A  That's correct.**
22     Q  (By Mr. Getzoff)  For purposes of your
23   work on this case you never talked to any
24   customers or potential customers of credit union
25   or banking services.  Is that right?

---

25

1    MS. ALLEN: Objection, vague.

2    **A I'm sorry, can you repeat the question?**

3    Q (By Mr. Getzoff) Yeah. For purposes of

4 this case, you never personally talked to any

5 customers or potential customers from credit union

6 or banking services.

7    MS. ALLEN: Same objection.

8    **A Your question is, did I talk to anyone?**

9    Q (By Mr. Getzoff) Yeah. Did you talk to

10 any customers or potential customers?

11    **A No.**

12    Q Other than the attorneys for Fabian

13 VanCott, the plaintiff's law firm, did you talk to

14 anybody in the course of the work you performed in

15 this case?

16    **A With the exception of counsel, did I talk**

17 **to anyone about my work in this case?**

18    Q And let me -- I'm not talking to a

19 significant other, hey, I'm working on this case.

20 I mean for purposes of your report and your

21 opinions, did you reach out and talk with anybody

22 other than counsel?

23    **A Not for purposes of my opinions. A**

24 **colleague proofread my report after I was done to**

25 **help check it for, you know, potential errors,**

---

26

1    **that kind of thing, spelling, punctuation, but not**

2    **for my opinion, no.**

3    Q And that colleague is at MMR?

4    **A Yes.**

5    Q Did that colleague also assist you with

6 any of your analysis or performing any of the

7 critiques or opinions that you provided in your

8 expert report?

9    **A No.**

10    Q How many -- I may have asked this question

11 before, but it may have been a different one, so

12 let me just ask it again. In a litigation context

13 how many likelihood of confusion surveys have you

14 performed?

15    MS. ALLEN: Objection, asked and answered.

16    Q (By Mr. Getzoff) And let me -- let me

17 clarify that. That you performed and that you

18 disclosed in any written expert report.

19    MS. ALLEN: Same objection.

20    **A A report where I was the signing**

21 **testifying expert?**

22    Q (By Mr. Getzoff) Correct.

23    **A I don't recall the number.**

24    Q Well, there's been -- just so we're clear,

25 there's been none in the last four years, right?

---

27

1    MS. ALLEN: Objection, asked and answered.

2 Mischaracterizes the witness' testimony.

3    Q (By Mr. Getzoff) Is that right,

4 Dr. Anderson?

5    **A Could you repeat the question?**

6    Q There's been none in the last four years,

7 correct?

8    MS. ALLEN: Same objection.

9    **A I think we -- you asked me that when we**

10 **went through my list on my CV.**

11    Q (By Mr. Getzoff) And you're not -- you

12 can't remember the last time you did submit an

13 expert report where you performed a likelihood of

14 confusion survey, right?

15    MS. ALLEN: Same objections.

16    **A I don't remember the date.**

17    Q (By Mr. Getzoff) Well, if you can't

18 remember a date, can you remember the case or

19 anything about the last time you submitted an

20 expert report that had a likelihood of confusion

21 survey?

22    MS. ALLEN: Asked and answered.

23    **A Yes. As an example I submitted a report**

24 survey (indiscernible.)

25    THE REPORTER: I'm sorry, I didn't get all

---

28

1    that. I submitted a report that what?

2    **A I submitted a report about a likelihood of**

3    **confusion survey that I conducted in a matter**

4    **involving Rimowa or Rimowa about luggage, the**

5    **suitcases. But that was more than four years ago.**

6    Q (By Mr. Getzoff) And you can't remember

7 how many expert reports you had signed where you

8 performed a likelihood of confusion survey.

9    MS. ALLEN: Objection, asked and answered.

10    **A Not offhand.**

11    Q (By Mr. Getzoff) Is it more than ten?

12    MS. ALLEN: Asked and answered.

13    **A I don't know the number. But I don't -- I**

14 **don't believe it's more than ten.**

15    Q (By Mr. Getzoff) Do you think it's more

16 than five?

17    **A I don't recall.**

18    Q Dr. Anderson, you are charging the

19 plaintiff for the time you spent on this case,

20 right?

21    **A No.**

22    Q Who are you charging for the time you're

23 spending on this case?

24    **A I don't charge anyone for my time on this**

25 **case.**

29

1    Q  Are you being paid for the work you're
2  performing on this case?
3    A  No.
4    Q  You're doing this case for free?
5    A  I don't charge for my work on this case.
6  My employer charges for it.
7    Q  Okay.  So your employer is charging the
8  plaintiff for your work on this case, MMR, right?
9    A  MMR charges for my time, that's correct.
10    Q  Do you see those bills when they go out?
11    A  I don't think I've seen the bills in this
12  case.
13    Q  How much -- as of today how much has -- or
14  as of the last time a bill was sent out, how much
15  has MMR charged the plaintiff for your work on
16  this case total?
17    A  According to my report MMR billed $20,000
18  for the rebuttal report.  And I don't know that
19  any additional invoices have been sent.
20    Q  Looking at your report on page 3 it says
21  materials reviewed and compensation.  Do you see
22  that?
23    A  Yes.
24    Q  Is the listing of materials you reviewed,
25  it's paragraph 12 with a number of subparagraphs,

30

1  is that complete?
2    A  I believe that was complete as of the date
3  I signed my report.
4    Q  Have you reviewed additional documents or
5  materials since the time of your report for
6  purposes of this case?
7    A  Yes.
8    Q  What have you?
9    A  I reviewed a transcript of (indiscernible)
10  deposition.
11    THE REPORTER:  I'm sorry, Mr. Port?
12    THE WITNESS:  A transcript of Mr. Poret's
13  deposition in this matter.
14    Q  (By Mr. Getzoff)  Anything else besides
15  Mr. Poret's deposition transcript?
16    A  No.
17    Q  Did you review your report in preparation
18  for today?
19    A  Yes.
20    Q  In reviewing your report in preparation
21  for this deposition, did you come across anything
22  that you realized or believed was inaccurate in
23  any way?
24    A  No.
25    Q  Did you come across anything in your

31

1  report that you would have wanted to change or
2  revise?
3    A  Only in response to some things that
4  Mr. Poret clarified in his deposition.
5    Q  So you upon reading Mr. Poret's
6  deposition, there are things that occurred to you
7  that you'd want to say further on that.  Is that
8  fair?  Is that what you mean?
9    A  Well, what I mean is, for example, I
10  describe a forward likelihood of confusion survey
11  and a reverse likelihood of confusion survey in my
12  report and explain why Mr. Poret's report didn't
13  fit either of those accepted methodologies.
14    Mr. Poret in his deposition said he
15  intended to measure reverse likelihood of
16  confusion.  If I had known that when I wrote my
17  report, I probably wouldn't have addressed the
18  forward example because I would have focused on
19  the reverse that Mr. Poret said he conducted.
20    Q  In order for trademark confusion to be
21  actionable under the trademark clause, do you
22  believe it has to be either forward confusion or
23  reverse confusion?
24    MS. ALLEN:  Objection, calls for a legal
25  conclusion.

32

1    A  I couldn't answer that other than to say
2  those are the only kinds of confusion I've seen in
3  courts accept or rely on the survey to measure.
4    Q  (By Mr. Getzoff)  Are you aware of any
5  scenarios where there could be trademark confusion
6  that's neither forward or reverse?
7    A  I don't know the answer to that.  I've
8  seeing allegations of confusion when a keyword
9  search context and seen surveys that intended to
10  measure that but never a survey that a court would
11  rely on.
12    Q  Well, if I go into a store and look at
13  products on the shelf, say it's drinks or cookies
14  or chips, something like that, and I see two
15  products with very similar names and I think they
16  come from the same company, so I'm confused.  I
17  actually have a mistaken belief that those two
18  products come from the same company.  Is that
19  forward confusion or reverse confusion?
20    MS. ALLEN:  Objection, calls for a legal
21  conclusion.
22    A  I can't -- couldn't (indiscernible) about
23  that.
24    THE REPORTER:  I'm sorry, I couldn't what?
25    THE WITNESS:  I couldn't provide an

**33**

1  opinion about that.
2      THE REPORTER:  Thank you.
3      Q  (By Mr. Getzoff)  Is that because you're
4  not familiar enough with what forward confusion or
5  reverse confusion is or because you're not
6  familiar with other kinds of confusion?  Why can't
7  you answer that question?
8      MS. ALLEN:  Objection, compound.
9      **A  Well, that may be up to a court to**
10  **determine.  And you haven't given me very much**
11  **information to go on in that example.**
12     Q  (By Mr. Getzoff)  What else would you want
13  to know from my hypothetical to enable you to
14  answer?
15     MS. ALLEN:  Same objections.
16     **A  Again, that's up to the court to**
17  **determine.  But I in my -- in my work that I do as**
18  **a survey expert I'd want to know which mark is the**
19  senior (indiscernible) and which mark is the
20  junior.
21     THE REPORTER:  I'm sorry, which mark is
22  what?
23     THE WITNESS:  Which mark is the senior
24  user and which mark is the junior user.
25     Q  (By Mr. Getzoff)  So if -- if the

**34**

1  consumer, in this case it's me in my hypothetical,
2  if I've never encountered either mark before and I
3  didn't know who was junior or senior, is the
4  confusion I just described forward confusion or
5  reverse confusion?
6      MS. ALLEN:  Calls for a legal conclusion.
7      **A  Well, as I said, I think it's up to a**
8  **court to determine that.  And you haven't really**
9  **given me the information that I would need if I**
10  **(indiscernible) to form an opinion.**
11     THE REPORTER:  Excuse me, would this be a
12  good place to take a quick break?  Matt, could we
13  check into getting the Doctor -- I'm having quite
14  a few more problems.
15     MR. GETZOFF:  Let me -- yeah, let me ask
16  just one follow-up question.
17     THE REPORTER:  You bet.
18     MR. GETZOFF:  Then we'll just take a
19  normal break.
20     Q  (By Mr. Getzoff)  Dr. Anderson, is it your
21  understanding that trademark confusion has to be
22  one of two types, either forward confusion or
23  reverse confusion?
24     **A  I think that would be up to a court to**
25  **determine.**

**35**

1      Q  But I'm asking you for your understanding.
2  I'm not asking you for a legal conclusion.  I'm
3  asking you for based on your experience as a
4  survey expert, a marking expert, the other experts
5  that you describe in your report, do you think
6  trademark confusion has to be one of two types,
7  reverse or forward?
8      MS. ALLEN:  Objection, calls for a legal
9  conclusion.
10     **A  What I would say is I haven't seen a court**
11  **rely on survey to measure confusion that wasn't**
12  **forward or reverse.**
13     Q  (By Mr. Getzoff)  And so other than what
14  you've seen from cases you've read, you don't have
15  an opinion one way or the other as to the answer
16  to my question.
17     MS. ALLEN:  Mischaracterizes the witness'
18  prior testimony and asked and answered.
19     **A  Again, it would depend on the court.  It's**
20  **up to the court to determine that.  And my opinion**
21  **is based on the totality of my experience with**
22  **regard to likelihood of confusion survey, not only**
23  **for the surveys that I've read about.**
24     MR. GETZOFF:  Okay.  Off the record.
25     (Break taken from 10:51 a.m. to

**36**

1  11:07 a.m.)
2      Q  (By Mr. Getzoff)  Dr. Anderson, I want to
3  go back to that luggage case that you just
4  provided the spelling on.  Rimowa was one of the
5  parties to that case?
6      **A  Yes, I believe it was Rimowa, the**
7  **Travelers Club luggage.**
8      Q  And which party did you represent?
9      **A  (Indiscernible.)**
10     THE REPORTER:  I'm sorry?
11     THE WITNESS:  Travelers Club.
12     Q  (By Mr. Getzoff)  And, Dr. Anderson, in
13  that case you did perform a likelihood of
14  confusion survey that was presented in a written
15  report signed by you, correct?
16     MS. ALLEN:  Objection, asked and answered.
17     **A  Can you say that again?  Could you repeat**
18  **the question, please?**
19     Q  (By Mr. Getzoff)  In that case you did
20  provide a -- you did conduct a likelihood of
21  confusion survey that was presented in a written
22  report signed by you, correct?
23     MS. ALLEN:  Same objection.
24     **A  Yes.**
25     Q  (By Mr. Getzoff)  And was Travelers, the

**37**

1 party that you were aligned with, were they being
2 accused of infringement?
3    **A Yes.**
4    Q Did your survey find no likelihood of
5 confusion?
6    **A That was my conclusion, my opinion.**
7    Q Did you -- was the format of that survey
8 was it an Eveready format or a Squirt format that
9 you conducted?
10    **A That was an Eveready.**
11    Q Did the plaintiff in that case do their
12 own survey?
13    **A I don't believe so.**
14    Q Did that case go to trial?
15    **A No.**
16    Q What was the trademark at issue in that
17 case?
18    **A It was trade dress for certain visual**
19 **elements on luggage.**
20    Q Did you find -- as part of your opinion in
21 that case did you find that the trade dress
22 elements had sufficient consumer awareness to
23 justify an Eveready format?
24    MS. ALLEN: Objection, calls for a legal
25 conclusion and is outside of the scope of this

**38**

1 expert report.
2    **A What was your question?**
3    Q (By Mr. Getzoff) In the report you
4 submitted in the Rimowa versus Travelers case did
5 you give an opinion that the trade dress elements
6 at issue in that case had sufficient consumer
7 awareness to justify the use of an Eveready
8 format?
9    MS. ALLEN: Same objections.
10    **A I don't recall.**
11    Q (By Mr. Getzoff) Would you agree with me
12 that for an Eveready format survey to be
13 appropriate, that mark at issue has to have a
14 sufficient level of consumer awareness?
15    MS. ALLEN: Objection, just vague.
16    **A When you say -- what do you mean when you**
17 **say the mark at issue?**
18    Q (By Mr. Getzoff) The mark that's being
19 asserted in a case.
20    **A So are you referring to the senior user?**
21    Q Yes. I'm referring to -- yes, I'm
22 referring to the senior user.
23    **A My understanding of court standards for an**
24 **Eveready survey measuring forward likelihood of**
25 **confusion is that the -- there must be sufficient**

**39**

1    **consumer awareness as a senior user's mark to**
2 **justify the use of an Eveready survey.**
3    Q And in the Rimowa case because you used an
4 Eveready format for your survey doesn't that
5 necessarily mean you opined that the senior users
6 trademark, or trade dress in that case, had a
7 sufficient level of consumer awareness?
8    MS. ALLEN: Objection, mischaracterizes
9 the witness' testimony.
10    **A I don't know whether I opined on that.**
11 **Rimowa -- Rimowa argued that its trade dress**
12 **was -- the trade dress at issue was**
13 **(indiscernible.)**
14    THE REPORTER: The trade dress at issue
15 was what?
16    THE WITNESS: Was famous.
17    Q (By Mr. Getzoff) So in that case you did
18 not independently determine or opine that the
19 senior user's trade dress had that sufficient
20 level of consumer awareness. Is that correct?
21    **A What do you mean independent?**
22    Q Well, you just testified I think that you
23 relied on the plaintiff's own allegations to
24 satisfy that prerequisite for using an Eveready
25 format. And my question is, did you do anything

**40**

1 independent of simply relying on what the
2 plaintiff said for satisfying yourself that the
3 senior user's trade dress had the requisite level
4 of consumer awareness?
5    MS. ALLEN: Objection, mischaracterizes
6 the witness' prior testimony.
7    **A I don't recall what other information I**
8 **may have relied on in that matter.**
9    Q (By Mr. Getzoff) How many years ago was
10 that case? How many years ago did you submit your
11 report in that case?
12    **A I think I testified earlier today I don't**
13 **recall but more than four years.**
14    Q Can you name for me another case where you
15 submitted an expert report where you conducted a
16 likelihood of confusion survey?
17    MS. ALLEN: Objection, asked and answered.
18    **A Not offhand, no.**
19    Q (By Mr. Getzoff) So the only case you can
20 identify where you conducted a likelihood of
21 confusion survey, sitting here today, is the
22 Rimowa versus Travelers Club case, right?
23    MS. ALLEN: Asked and answered.
24    **A No, that's not correct.**
25    Q (By Mr. Getzoff) So you can identify

41

1  another case for me where you conducted a
2  likelihood of confusion survey --
3       MS. ALLEN:  Asked and answered.
4       Q  (By Mr. Getzoff)  -- in a written report?
5       **A  Are you asking about surveys I conducted**
6  **or reports that I've provided?**
7       Q  Reports you provided that included
8  likelihood of confusion survey that you conducted.
9       MS. ALLEN:  Objection, vague.
10      **A  I think I've answered that several times.**
11 **That's -- I have given you the example I can**
12 **remember, as I sit here today.**
13      Q  (By Mr. Getzoff)  And that's the Rimowa
14 case?
15      MS. ALLEN:  Same objection.
16      **A  That's the one that comes to mind right**
17 **now.**
18      Q  (By Mr. Getzoff)  Dr. Anderson, have you
19 ever conducted the likelihood of confusion survey
20 that was that presented in a written report where
21 you used a Squirt format?
22      MS. ALLEN:  Asked and answered.
23      **A  Can you ask that again?**
24      Q  (By Mr. Getzoff)  Have you ever performed
25 a survey that was disclosed in a written expert

42

1  report where you used a Squirt format?
2       MS. ALLEN:  Same objection.
3       **A  And you're asking about an expert report**
4  **that I signed as the testifying expert.  Is that**
5  **correct?**
6       Q  (By Mr. Getzoff)  Correct.
7       **A  I don't recall.  Not in the past four**
8  **years.**
9       Q  Right.  And we already know that.  I'm
10 asking ever in your career have you signed an
11 expert report that disclosed a likelihood of
12 confusion survey that used a Squirt format?
13      MS. ALLEN:  Asked and answered, vague.
14      **A  I don't recall today.**
15      Q  (By Mr. Getzoff)  Dr. Anderson, regarding
16 the report you submitted in this case, does your
17 report contain a complete statement of all the
18 opinions that you will express and the basis and
19 reasons for them?
20      MS. ALLEN:  Objection, vague and compound.
21      **A  I'm not sure how to answer.  I don't know**
22 **what questions will be asked of me.  But I don't**
23 **believe I have any other opinions about the Poret**
24 **report that aren't included in my report.**
25      Q  (By Mr. Getzoff)  And does your report

43

1  also include all the bases and reasons for the
2  opinions that you will express in this case?
3       MS. ALLEN:  Objection, vague and
4  ambiguous, calls for speculation.
5       **A  It provides -- my report provides the**
6  **bases and explanations for arguments that I've**
7  **made in that report.  And I don't know, as I said**
8  **before, what else may be asked.**
9       Q  (By Mr. Getzoff)  Well, and I'm not asking
10 you to predict what may be asked.  I'm asking you
11 is your report complete in terms of including all
12 of the opinions that you plan to present as well
13 as the bases and reasonings for those opinions?
14      MS. ALLEN:  Objection, vague, asked and
15 answered.
16      Q  (By Mr. Getzoff)  Dr. Anderson, are you
17 thinking about your answer?
18      **A  I am.  I believe all the explanation and**
19 **justification for my arguments are included in my**
20 **report.**
21      Q  Dr. Anderson, the likelihood of confusion
22 survey that you did in the Rimowa case, was that
23 done over the Internet or was that done by
24 intercepting people in a mall?
25      MS. ALLEN:  Objection, just outside the

44

1  scope of this report, but.
2       **A  It was both.**
3       Q  (By Mr. Getzoff)  Dr. Anderson, in this
4  case you could have done your own likelihood of
5  confusion survey, right?
6       MS. ALLEN:  Objection, calls for
7  speculation.
8       **A  I don't know that I could.  Well, let me**
9  **say that differently.  I don't know that I could**
10 **have done a reliable likelihood of confusion**
11 **survey.  I'm not sure that the circumstances in**
12 **this dispute allow for a likelihood of confusion**
13 **survey that would be reliable to provide a measure**
14 **of likelihood of confusion in this matter.**
15      Q  (By Mr. Getzoff)  Is it your opinion
16 that -- well, in your report you don't -- I think
17 you expressly said you're not giving an opinion as
18 to whether an Eveready survey would be
19 appropriate.  Is that right?
20      MS. ALLEN:  Objection.  The document
21 speaks for itself.
22      **A  Can you --**
23      Q  (By Mr. Getzoff)  Yeah.  I'm looking at
24 footnote 49 of your report.  It's page 18.
25      **A  I see it.**

45

```
 1      Q  And you say, quote, I am not providing an
 2  opinion regarding the level of awareness of either
 3  mark, nor that an Eveready survey would be
 4  appropriate in this matter.
 5      Do you stand by that statement?
 6      A  Since this report, as I mentioned earlier,
 7  I reviewed the transcript of Mr. Poret's
 8  deposition.  I believe that Mr. Poret has
 9  indicated he does not believe that these marks are
10  well known.  So to the extent that Mr. Poret is
11  commenting on awareness, I would reserve the right
12  to rely on his opinion in my matter.  But
13  otherwise I still stand by my statement.
14      Q  So you don't -- you don't have an opinion.
15  You're not offering an opinion that an Eveready
16  format would have been appropriate in this case,
17  right?
18      MS. ALLEN:  Objection, asked and answered,
19  mischaracterizes the testimony.
20      A  Based on Mr. Poret's opinion that the
21  awareness of these marks is low, it seems that an
22  Eveready survey would not be appropriate in this
23  matter.
24      Q  (By Mr. Getzoff)  Other than seeing what
25  Mr. Poret said, did you do any independent
```

46

```
 1  research or investigation yourself to determine
 2  whether either of the marks, either the senior or
 3  junior user's mark, had sufficient consumer
 4  awareness to justify an Eveready test?
 5      A  I described in my report several searches
 6  that I conducted for these marks and the placement
 7  of those marks within search results.  That may
 8  have some bearing on consumer awareness, but I
 9  would say I did not conduct any research to
10  directly measure the awareness of either of
11  (indiscernible.)
12      THE REPORTER:  To measure the awareness of
13  what?
14      THE WITNESS:  Of either of these marks.
15      THE REPORTER:  Thank you.
16      Q  (By Mr. Getzoff)  Is it your testimony
17  that given the circumstances of this case that
18  there is no likelihood of confusion survey of any
19  format that could have been done reliably?
20      MS. ALLEN:  Mischaracterizes the prior
21  testimony.
22      A  If we accept Mr. Poret's opinion that
23  these marks are not well known, then I believe
24  that's correct.  Then I believe that there's no
25  survey format that the courts have relied on to
```

47

```
 1  measure the likelihood of confusion in this kind
 2  of context.  I believe that's correct.
 3      Q  (By Mr. Getzoff)  Is it -- is it
 4  possible -- I want to ask you some questions about
 5  the requirements for consumer awareness of a mark
 6  to justify an Eveready format.  Is it possible for
 7  a consumer to have had a recent exposure to a
 8  mark, say seen an advertisement of a mark, but the
 9  awareness of that mark still is not sufficiently
10  high to justify an Eveready survey format?
11      MS. ALLEN:  Objection, incomplete
12  hypothetical.
13      A  I think a court would have to determine
14  what level of consumer awareness is required.  And
15  I think the question you're asking is rather
16  vague.  I couldn't answer based on what you have
17  provided.
18      Q  (By Mr. Getzoff)  Well, let me ask it a
19  different way.  I mean you would agree that
20  consumers can be exposed to dozens of marks every
21  day based on just walking around and being on the
22  Internet and seeing various types of
23  advertisements, right?
24      A  Yes, they can be.
25      Q  And you would agree that simply seeing an
```

48

```
 1  advertisement from a company that advertises their
 2  mark, that by itself doesn't -- doesn't create the
 3  level of consumer awareness that would justify an
 4  Eveready test, right?
 5      MS. ALLEN:  Objection, vague.
 6      A  I think it could.
 7      Q  (By Mr. Getzoff)  So simply because --
 8  simply because a company advertises, which is to
 9  say that they get their mark out, does that
10  automatically mean that there's a sufficient level
11  of consumer awareness to -- to justify an Eveready
12  format survey?
13      MS. ALLEN:  Vague.
14      A  I think what's relevant in justifying an
15  Eveready survey is whether consumers are aware of,
16  you know, forward likelihood of confusion survey,
17  the senior mark, regardless of how they became
18  aware of it.
19      Q  (By Mr. Getzoff)  And my question is, is
20  mere advertising by the senior user of its mark,
21  does that automatically create sufficient
22  awareness for an Eveready survey?
23      MS. ALLEN:  Asked and answered.
24      A  Once again, the court would have to
25  determine if that is sufficient awareness.  But
```

49

1  advertising can lead to consumer awareness for a
2  mark.
3     Q (By Mr. Getzoff) Have you ever conducted
4  or been involved, whether you signed a report or
5  not, have you ever been involved in an Eveready
6  likelihood of confusion survey where you had to
7  first determine and satisfy yourself that the mark
8  had a sufficient level of consumer awareness?
9     A I don't recall.
10    Q Do you recall for any survey that you've
11 ever been involved in applying any sort of
12 criteria or metric for determining whether the
13 mark had sufficient consumer awareness to justify
14 an Eveready survey?
15    MS. ALLEN: Asked and answered.
16    A Yes.
17    (Simultaneous crosstalk.)
18    A I may have misunderstood the previous
19 question.
20    THE REPORTER: I'm sorry, you guys over
21 spoke. I didn't get all that, Doctor.
22    THE WITNESS: I said I may have
23 misunderstood the previous question.
24    Q (By Mr. Getzoff) So let's make sure the
25 record is clear. So, yes, you do recall using a

50

1  criteria or metric to determine whether a mark had
2  sufficient consumer awareness to justify an
3  Eveready test. Is that right?
4     A Yes.
5     Q In that situation what was the criteria or
6  metric that you applied?
7     A I think there would be more than one
8  situation and more than one type of metric.
9     Q Can you identify any criteria or metric
10 that you've ever applied in that circumstance?
11    MS. ALLEN: Vague.
12    A Yes. For example, a survey measure of
13 consumer awareness for the mark.
14    Q (By Mr. Getzoff) So you're talking about
15 a situation where you actually performed a survey
16 itself on consumer awareness prior to performing a
17 survey on the likelihood of confusion in the
18 Eveready format. Is that right?
19    A I don't recall whether I conducted that or
20 in a survey.
21    Q Can you -- other than relying on a survey
22 of consumer awareness, can you recall any other
23 criteria or metric that you relied upon for
24 consumer awareness to justify an Eveready survey?
25    A Again, there have been different metrics,

51

1  and the metric may be dependent on the context
2  that's under dispute.
3     Q And my question is, can you identify --
4  other than relying on the survey of consumer
5  awareness, can you describe or identify any metric
6  or criteria that you've ever relied upon for doing
7  an Eveready survey?
8     MS. ALLEN: Asked and answered.
9     A I think measures of sales volume or sales
10 revenue or distribution through a retail channel
11 or distribution channel, those are some examples
12 of things that I would have evaluated and I have
13 evaluated in other matters.
14    Q (By Mr. Getzoff) Anything else?
15    A I'm sure there are. They just aren't
16 coming to mind right now.
17    Q Dr. Anderson, you're familiar with an
18 article written by -- in 2019 written by Swann and
19 Henn called Likelihood of Confusion Surveys: The
20 Ever-Constant Eveready Format, The Ever-Evolving
21 Squirt Format.
22    A I believe so. I can't be sure of the
23 title but I believe so.
24    Q You cite that article multiple times
25 throughout your report, don't you?

52

1     A You said likelihood of confusion survey is
2  the ever-constant Eveready format, the
3  ever-evolving Squirt format?
4     Q Correct.
5     A Is that what you said?
6     Q Correct. Published in The Trademark
7  Reporter.
8     A I did cite that multiple times in my
9  report.
10    (Exhibit No. 76 was marked for
11 identification and is attached to the transcript.)
12    Q I have just sent -- distributed that
13 article, which we'll mark as Exhibit 76 to this
14 deposition. It's in the chat. Do you have it,
15 Dr. Anderson?
16    A Would you like me to download it?
17    Q Yes. I'm going to be referring to it.
18    A I have the exhibit.
19    Q Do you recognize this article as being an
20 authority on general guidelines for how to conduct
21 appropriate surveys?
22    A I don't think I agree with the actual
23 question that you asked. But I -- it's a rather
24 vague. I wouldn't say this is an authority about
25 how to conduct surveys in general.

53

1    Q  Do you recognize this article, this paper,
2  as authoritative as to the topic that -- the
3  topics it addresses?
4        MS. ALLEN:  Vague.
5    A  I would recognize this article as
6  authoritative regarding likelihood of confusion
7  surveys and the issues that it addresses regarding
8  those kind of surveys.
9    Q  (By Mr. Getzoff)  I mean it makes sense.
10 You cited it a bunch of times in your own report,
11 correct?
12   A  That's right.  I think the phrasing of the
13 question just gave me pause.
14   Q  This article, I'll call it the Swann
15 article, this article recognizes the usefulness of
16 using Internet search results to conduct a Squirt
17 survey, right?
18       MS. ALLEN:  Vague.
19   A  I don't know that it says that exactly.
20   Q  (By Mr. Getzoff)  Well, if you look at the
21 article starting on page 679 there's a heading
22 that reads, quote, measuring likelihood of
23 confusion on the Internet.  Do you see that?
24   A  I see that.
25   Q  And it talks about measuring likelihood of

54

1  confusion among products or services sold or
2  offered on the Internet, right?
3    A  Sorry, would you repeat the question?
4    Q  It talks about measuring -- the likelihood
5  of using a survey to measure likelihood of
6  confusion of goods or services offered over the
7  Internet.
8    A  I think that's fair, yes.
9    Q  And it talks about the requirement for
10 there to be proximity between the marks or the
11 companies in search results in order to justify a
12 Squirt methodology, right?
13   A  Well, it talks about the standards for
14 conducting a survey that measures likelihood of
15 confusion in an Internet context and it talks
16 about proximity.  But I think it discusses more
17 than what you just said.
18   Q  Of course, it's a much longer article than
19 my one sentence.  But proximity is one of the
20 things it discusses for Internet-based shoppers,
21 right?
22   A  Yes.
23   Q  In this section -- so this section on
24 likelihood of confusion among Internet shoppers
25 starts on page 679, and it continues until we get

55

1  to the conclusion 683.  Does it ever refer to
2  Internet -- these types of Squirt Internet surveys
3  as one-room or two-room?
4    A  I don't see it in that section, no.
5    Q  Now he does talk about it in the prior
6  section in the context of Eveready tests, right?
7    A  I see it in the section discussing Squirt
8  surveys.
9    Q  That's prior to the discussion on
10 measuring likelihood of confusion on the Internet,
11 right?
12   A  Well, it's in Section III that's titled
13 The Ever-Evolving Squirt Format.  I don't know in
14 that excludes Internet surveys.
15   Q  Well, I directed your attention to
16 Section IV, measuring likelihood of confusion on
17 the Internet.  And I think you agreed with me that
18 the authors do not use one-room or two-room in
19 discussing Squirt formats based on Internet
20 searches, right?
21       MS. ALLEN:  Mischaracterizes prior
22 testimony.
23   A  Well, the authors discuss the two-room
24 format.  They discuss Squirt surveys.  And then
25 they get into specific information regarding

56

1  Internet surveys.  I don't know that they're not
2  related, but I don't see the phrase one-room or
3  the phrase two-room in that section that you're
4  referring to.
5    Q  (By Mr. Getzoff)  Looking at the
6  methodology described in Section IV discussed by
7  the authors based on Internet search result, would
8  you characterize the Squirt format described by
9  them as being a one-room or two-room Squirt?
10       MS. ALLEN:  Objection, vague.
11   A  Can you direct me where you're looking or
12 where you're at?
13   Q  (By Mr. Getzoff)  Sure.  I guess first I
14 should ask, are you familiar with this section of
15 the article?  It's only four pages long,
16 Section IV, measuring likelihood of confusion on
17 the Internet.
18   A  Yes, I'm familiar with it.
19   Q  And you're familiar with the methodology
20 described, which is summarized on page 682, where
21 they describe several different scenarios for
22 justifying a Squirt format based on Internet
23 searches?
24   A  Yes.
25   Q  And the authors introduced these four

57

1  scenarios saying, while this article does not
2  purport to outline all possible scenarios for
3  sufficient competitive proximity on the Internet,
4  we believe a Squirt format is most likely
5  appropriate in online situations in which it is
6  typical under normal marketplace conditions for --
7  and then they describe four different scenarios,
8  right, A through D?
9      A  I see that.
10     Q  Would you describe or would you yourself
11  characterize the surveys that they describe in
12  these scenarios as being a one-room type or
13  two-room type?
14     A  I don't think these scenarios describe a
15  Squirt survey.  These scenarios describe the
16  conditions under which a Squirt survey may be
17  deemed appropriate based on an analysis of
18  proximity.
19     Q  Do you believe -- looking at this entire
20  section, Section IV that begins on page 679, that
21  the discussion by the authors of the Squirt format
22  are they describing a one-room Squirt format or a
23  two-room Squirt format?  If you know.
24     A  The way I understand this section I don't
25  think it describes the format of a Squirt survey.

58

1  It describes when a Squirt survey would be
2  appropriate, really discussing whether how to
3  determine whether there is sufficient proximity to
4  justify a Squirt survey.
5      Q  Dr. Anderson, do you consider yourself an
6  expert on Internet search engines?
7      A  I wouldn't characterize it that way, no,
8  not in the abstract.
9      Q  Do you consider yourself an expert on how
10  search engines work?
11     A  No.
12     Q  Do you consider -- do you consider
13  yourself on an expert on the differences between
14  particular search engines?
15         MS. ALLEN:  Objection, vague.
16     A  Well, some differences speak for
17  themselves.  But as an expert, no, I wouldn't say
18  that I would provide an expert opinion about how
19  search engines work or the differences between.
20     Q  (By Mr. Getzoff)  Have you ever -- have
21  you ever provided an expert opinion as to how
22  people or consumers use Internet search engines?
23         MS. ALLEN:  Objection, vague.
24     A  Would you restate your question?
25     Q  (By Mr. Getzoff)  Yeah.  Have you ever

59

1  provided an expert opinion on the topic of how
2  people use Internet search engines?
3         MS. ALLEN:  Same objection.
4      A  I don't recall.
5      Q  (By Mr. Getzoff)  Do you consider your
6  self an expert on that topic?
7         MS. ALLEN:  Objection, vague.
8      A  To the extent that it -- to the extent
9  that it related to the consumer behavior and
10  consumer psychology, yes.
11     Q  (By Mr. Getzoff)  Do you consider yourself
12  an expert as to why a consumer might use one
13  search engine over another?
14         MS. ALLEN:  Objection, vague.
15     A  Again, it depends on the question being
16  asked or the issue being -- being discussed.  If
17  it has to do with consumer behavior and
18  decision-making, consumer psychology, then I may
19  be able to provide an expert opinion about that.
20     Q  (By Mr. Getzoff)  Have you ever given an
21  expert opinion in any context on the topic of why
22  a person might use one Internet search engine over
23  another?
24         MS. ALLEN:  Vague.
25     A  I don't recall.

60

1      Q  (By Mr. Getzoff)  In your report I'm
2  looking at paragraph 35.  It's on page 14.
3      A  Paragraph 35?
4      Q  Correct.
5      A  I see it.
6      Q  You make an assertion regarding the
7  percentage of people that use the Bing search
8  engine versus the Google search engine?
9      A  I don't know that I make that assertion.
10  I cite a source that provides that, yes.
11     Q  Yeah, fair response.  Did you consider
12  yourself an expert as to market share of the
13  available search engines?
14         MS. ALLEN:  Objection, vague.
15     A  I'm not even sure what you mean by that
16  question.
17     Q  (By Mr. Getzoff)  Do you consider yourself
18  an expert on market share of the competing search
19  engines that are available?
20         MS. ALLEN:  Vague.
21     A  That -- if not identical, it's very
22  similar to the question that I just said I really
23  didn't understand.  But I -- I do consider myself
24  to be an expert on marketing.  And market share is
25  a marketing-related topic.  So I'm not -- I'm not

**61**

1 sure how to answer your question.
2 Q (By Mr. Getzoff) Well, you know what
3 market share means, right?
4 **A Yes.**
5 Q And you know what Internet search engines
6 are, right?
7 **A Yes.**
8 Q And fair to conclude that different
9 competing Internet search engines have different
10 market share based on Internet users, right?
11 **A Well, that's according to the source that**
12 **I cited here, that's the case.**
13 Q Are you an expert on that topic?
14 **A On the topic of market share?**
15 Q On the topic of market share for Internet
16 search engines. I'm not -- I'm not asking about
17 marketing generally. I'm not asking about market
18 share as part of marketing generally. I'm asking
19 about the specific topic that you address in
20 paragraph 35 of your report about the market share
21 of Internet search engines, of different Internet
22 search engines.
23 MS. ALLEN: Asked and answered.
24 **A Yeah. I really don't understand your**
25 **question.**

**62**

1 Q (By Mr. Getzoff) Other than --
2 **A I consider myself about market share.**
3 Q -- other than citing an article that
4 you've cited on footnote 40, do you have any
5 independent knowledge or expertise on market share
6 of Bing versus Google search engine?
7 **A Yes.**
8 Q Do you cite that or rely upon that in your
9 report?
10 **A Well, I cited this example. And I've done**
11 **other research regarding the market share search**
12 **engines in the past and found similar results.**
13 Q In your report do you cite or rely upon
14 any basis for the assertion you make in your
15 paragraph 35 other than the citation and
16 footnote 40?
17 **A Well, I stated in paragraph 13 that I rely**
18 **on my knowledge in fields such as surveys,**
19 **consumer behavior, and marketing. But in terms of**
20 **the specific numbers I provided that one source in**
21 **the footnote -- footnote 40.**
22 Q Did you find -- the source that you cited
23 footnote 40, did you find that source yourself or
24 did someone provide that to you?
25 **A I found that myself.**

**63**

1 Q Did you find that using an Internet
2 search?
3 **A Well, I found it on the Internet.**
4 Q Is that -- is that the --
5 **A It's somewhat vague.**
6 Q I'm sorry. I cut you off. Can you
7 repeat?
8 **A I said that the term Internet search is**
9 **somewhat vague, so I'm not sure exactly what you**
10 **mean.**
11 Q Well, how did you find -- how did you find
12 this source on the Internet?
13 **A I don't recall exactly how I found it.**
14 Q Well, isn't it fair to conclude that you
15 found it using an Internet search? I mean how
16 else would you have found this except searching on
17 the Internet using a search engine?
18 MS. ALLEN: Compound.
19 **A Well, there are ways to search the**
20 **Internet without using a search engine. And I**
21 **address that in one of my criticisms to**
22 **Mr. Poret's report. And that's why I'm confused**
23 **by your question. But now you're qualifying the**
24 **question to ask did I use an Internet search**
25 **engine to find this. I don't recall.**

**64**

1 Q (By Mr. Getzoff) Was this a document that
2 you already were aware of or did you find it for
3 purposes of your work on this case?
4 **A It was for this case.**
5 Q How did you determine the reliability of
6 the source that you cited in footnote 40?
7 **A I don't recall what information I looked**
8 **at at that point.**
9 Q Did you do anything to confirm or vet the
10 numbers or data that you saw in the source that
11 you cited in footnote 40?
12 MS. ALLEN: Vague.
13 **A I don't know because it would be my**
14 **standard practice to do that. But I don't recall**
15 **what steps I took when I retrieved this on May 9th**
16 **of this year.**
17 Q (By Mr. Getzoff) And you didn't -- and
18 your report doesn't cite or describe any sort of
19 checking or vetting or other sources that you
20 relied upon for what you said in paragraph 35,
21 right?
22 **A I don't believe it does.**
23 Q Have you ever done a survey of how
24 consumers use search engines?
25 MS. ALLEN: Vague.

65

1    A Yes.
2    Q (By Mr. Getzoff)  What was that survey?
3  What did that survey study?
4    A I would say it's more than one survey, not
5  just one. And I think those -- I think the
6  findings of that would be confidential. I don't
7  think I could share that.
8    Q Well, what was the topic?
9    A And I'm not relying on that -- and I'm not
10 relying on that for my opinions in this matter.
11   Q Okay. Okay. For your work on this case
12 did you conduct any research to see or understand
13 how consumers use search engines in the context of
14 looking for credit union or banking services?
15   A I'm sorry in the context of what?
16   Q In the context of shopping for a credit
17 union or banking services.
18     MS. ALLEN:  Vague.
19   A Can you clarify what you mean?
20   Q (By Mr. Getzoff)  What part of that don't
21 you understand?
22   A Well, maybe if you please repeat the
23 question and maybe I can figure it out.
24   Q Yeah. For purposes of this case, did you
25 conduct any research or any investigation to see

66

1  how consumers use search engines, an Internet
2  search engine, when shopping for credit union or
3  banking services?
4     MS. ALLEN:  Same objection.
5    A I would say to the extent that that is
6  related to -- well, I would say that that is
7  related to the research I conducted on
8  involvement. And that has an impact on what
9  information consumers may search for in a
10 particular context.
11   Q (By Mr. Getzoff)  What are you referring
12 to?
13   A It's in my -- let me see if I can find it
14 here. On page 23 of my report, page 23,
15 paragraph 69, I discuss a concept called
16 involvement. And this continues into the next
17 page. And involvement as it's described here is a
18 degree of thought that consumers put into a
19 decision.
20     And I describe high-involvement and
21 low-involvement decisions. And when a consumer is
22 engaged in a high-involvement decision, they may
23 search for a lot of information or they search for
24 more information when they're in a
25 high-involvement situation than when they're in a

67

1  low-involvement situation. And that may affect
2  how they would use an Internet -- well, use an
3  Internet search engine. I think was what the
4  focus of the question.
5    Q Other than your discussion in this section
6  of your report regarding high-involvement and
7  low-involvement purchasing decisions, did you
8  conduct any other research or investigation on the
9  topic of how people use search engines to shop for
10 credit union or banking services?
11   A I think the only other example would be in
12 paragraph 35 that you have referred to about the
13 use of Internet search engines.
14   Q Okay. Let me ask you about the
15 high-involvement and low-involvement issue since
16 you jumped to that.
17     Have you conducted any surveys that you
18 relied upon for this case to conclude whether
19 shopping for credit union or banking services on
20 the Internet is a high-involvement or
21 low-involvement exercise?
22   A No. I believe I testified earlier today
23 that I have not conducted any surveys specifically
24 for this matter.
25   Q Did you conduct any research into whether

68

1  shopping on the Internet for banking or credit
2  union services is a high-involvement or
3  low-involvement decision?
4    A Yes.
5    Q I see you cited two cases. Is that what
6  you're referring to, exhibits -- or footnote 63
7  and 64?
8    A I'm referring to that as well as research
9  on involvement, and I cited a consumer behavior
10 reference in footnote 62.
11   Q Did that -- does that source in
12 footnote 62 address credit union or banking
13 services?
14   A I don't recall if it -- I don't recall if
15 it specifically addresses credit unions. But it
16 discusses context in which consumers are more
17 likely to be -- have a higher degree of
18 involvement versus a lower degree of involvement.
19 And financial institutions, financial decisions
20 are often an example of a situation in which
21 consumers would have a higher -- tend would have a
22 higher degree of involvement than a lower degree
23 of involvement.
24   Q Did you look at any studies or surveys
25 conducted by others regarding consumers' habits or

69

1   practices when selecting a financial institution?
2       MS. ALLEN:  Asked and answered.
3   **A   I would say that I relied on the sources**
4   **that I've cited in my report.**
5   Q  (By Mr. Getzoff)  In your report you say
6   that a consumer in selecting a credit union is
7   likely to gather detailed information about it,
8   including speaking in person by telephone -- or by
9   telephone with staff at the credit union.  Did you
10  rely on any --
11  **A   I'm sorry, before you go to your question,**
12  **can you point me to the paragraph?**
13  Q  Yeah.  Yeah.  It's paragraph 72, sorry.
14  **A   Okay.  I see it.  What was the section you**
15  **were quoting?**
16  Q  So in paragraph -- let me start over.
17      In paragraph 72 you say that deciding
18  which credit union to use is likely to be a
19  high-involvement decision for many customers --
20  consumers.  And then you go on to assert that
21  those consumers are likely to gather detailed
22  information including speaking in person or by
23  telephone with staff at the credit union.  Do you
24  see that?
25  **A   I see that.**

70

1   Q  Did you rely on any source for that
2   assertion?
3   **A   That's based on my expertise regarding**
4   **consumer psychology and how involvement affects**
5   **decision-making or evaluations.**
6   Q  Other than your general expertise?  I mean
7   you don't cite anything for that search engines in
8   your report, right?
9   **A   Well, I do cite the -- what involvements**
10  **and what impacts it can have on decision-making.**
11  Q  Sir, paragraph 72 --
12      (Simultaneous crosstalk.)
13  Q  (By Mr. Getzoff)  -- paragraph 72 doesn't
14  have any citations to it, right?
15  **A   Well, it follows from a discussion of**
16  **involvement that begins in paragraph 69 where**
17  **there is a citation.**
18  Q  Are you saying that the source -- you're
19  referring to footnote 62?
20  **A   Yes.**
21  Q  Are you saying that the source cited in
22  footnote 62 discusses the assertions and supports
23  the assertions you made in paragraph 72?
24  **A   I think it does provide support for that,**
25  **yes.**

71

1   Q  So if I read the source in footnote 62 it
2   would say that when people select a credit union
3   they're likely to speak in person or by telephone
4   with staff at the credit union?
5       MS. ALLEN:  Objection, mischaracterizes --
6   **A   I don't think --**
7       MS. ALLEN:  Yeah.  Mischaracterizes his
8   prior testimony.
9   **A   I don't think it would go into that**
10  **detail.  That source would describe that when**
11  **consumers are in a high-involvement scenario they**
12  **are likely to attend to and seek out and process**
13  **more information than when they are in a**
14  **low-involvement scenario.**
15  Q  (By Mr. Getzoff)  Do you know how many
16  customers of either of the parties in this case
17  joined or signed up for that party's credit union
18  services without talking to a representative?
19  **A   No.**
20  Q  Do you agree that it's not necessary to
21  sign up for a bank or credit union by talking to a
22  representative either in person or on the phone,
23  right?
24      MS. ALLEN:  Vague.
25  **A   I don't know.  The answer may be different**

72

1   **for a bank or a credit union.**
2   Q  (By Mr. Getzoff)  That same paragraph --
3   we're still on paragraph 72 -- you also mention
4   that consumers are likely to discuss the decision
5   with others, including family -- family and
6   friends, before deciding whether to use that
7   credit union.
8       Do you have any data or support for that
9   assertion?
10  **A   There is support in the Poret survey where**
11  **it seems more than half, 53.7 percent of**
12  **respondents indicated that they shared the**
13  **decision with others.**
14  Q  Is that what you relied upon for your
15  assertion in paragraph 72?
16  **A   Which assertion?  I see the assertion**
17  **about consumers discussing information the others,**
18  **including family and friends?**
19  Q  Correct.
20  **A   No.  That's based on my expertise**
21  **regarding the affect an involvement can have on**
22  **consumer decision-making.**
23  Q  Do you have any data or survey information
24  or other information that you relied upon
25  discussing what types of information consumers

73

1  consider before signing up for a financial
2  institution or credit union?
3     A  I'm sorry, can you repeat that?
4     Q  Yeah.  Do you have any -- on the question
5  of the information that a person would consider
6  before joining a credit union or signing up for a
7  financial institution, do you have any data like
8  from a survey or something else that you relied
9  upon to know what information consumers rely upon
10 when making that decision?
11    MS. ALLEN:  Vague.
12    A  There is a wealth of data about the effect
13 of involvement of consumer decision-making.  So
14 I -- I would point you to the reference that I
15 cited.  And from there are citations within that
16 document to other research that's been conducted
17 on that topic.
18    Q  (By Mr. Getzoff)  Sir, my question
19 isn't -- isn't high-involvement versus
20 low-involvement.  My question is with regards to
21 the people specifically signing up for credit
22 unions or banking financial institutions.
23       Do you have any source or data or survey
24 or other information you relied upon to know what
25 information people consider before making that

74

1  decision?
2     MS. ALLEN:  Asked and answered.
3     A  Yeah, I think this is the same question.
4  I rely on my expertise based on consumer
5  psychology and the effect of involvement of
6  consumer decision-making based on my
7  doctoral-level training in that subject.
8     Q  (By Mr. Getzoff)  Did your -- have any of
9  your other cases where you performed a survey or
10 were involved in performing a survey involve
11 credit union or financial -- consumer financial
12 institutions?
13    MS. ALLEN:  Vague.
14    A  I've done other surveys.  I conducted
15 other surveys in a context of financial
16 institutions.
17    Q  (By Mr. Getzoff)  What surveys were those?
18    A  I think I -- those clients are
19 confidential.
20    Q  Were they in a litigation context?
21    A  Those that I'm thinking of were not.
22    Q  Have you been involved in any survey in a
23 litigation context where you measured consumer
24 behavior in signing up for credit union or banking
25 services?

75

1     MS. ALLEN:  Vague.
2     A  I don't recall.
3     Q  (By Mr. Getzoff)  Have you been involved
4  in any surveys in a nonlitigation context where
5  you studied consumer behavior in signing up for
6  credit union or banking services?
7     MS. ALLEN:  Vague.
8     A  Yes.
9     Q  (By Mr. Getzoff)  Did you rely on that
10 expertise for purposes of this case?
11    MS. ALLEN:  Vague.
12    A  Not specifically.  Only to the extent that
13 it informs my knowledge of the industry.
14    Q  (By Mr. Getzoff)  So what were those
15 surveys that you had prior involvement in that
16 formed your opinions in this case?
17    MS. ALLEN:  Asked and answered.
18    A  As I said, those are for confidential
19 clients.
20    Q  (By Mr. Getzoff)  Well, I mean you can't
21 have it both ways.  You can't say you've got
22 expertise based on past experience but then say
23 you -- that you relied upon and supports your
24 opinion, but then not tell me what that experience
25 is.

76

1     A  I didn't say that it developed or informed
2  my expertise.  My expertise is based on my
3  understanding of involvement and how it affects
4  consumer decision-making.
5     Q  Without revealing any party can you -- can
6  you tell me what you studied, what consumer
7  behavior regarding credit union or banking
8  services you studied?
9     A  Some of the topics addressed in that
10 research would have been ask consumers about what
11 information sources they used when making a
12 decision.
13    Q  Specifically with respect to signing up
14 for a credit union or a bank?
15    MS. ALLEN:  Vague.
16    A  I think I can broadly say financial
17 services.
18    Q  (By Mr. Getzoff)  Does that include --
19 does that concern a consumer-facing bank services
20 or credit union services?  Let me rephrase.
21       (Simultaneous crosstalk.)
22    Q  (By Mr. Getzoff)  Let me rephrase the
23 question.
24       Did that concern ordinary people that the
25 general public signing up for credit union or bank

77

1  services?
2      MS. ALLEN:  Vague.
3      **A  I'm not sure what you mean by ordinary**
4  **people.  I would say representative consumers.**
5  **And are you asking about bank or credit card -- or**
6  **credit union services?  Are you lumping those two?**
7  **You asked a lot about credit unions.  And I don't**
8  **know, are you lumping them together or asking**
9  **about them individually?**
10     Q  (By Mr. Getzoff)  I'm treating them as
11 synonymous for purposes of these questions, which
12 you do the same.  You talk about banking services
13 generally to include credit union services, right?
14 That's how -- that's how you use that in your
15 report.  I'm using it the same way.
16     **A  Okay.  So you're asking about financial**
17 **institutions in general?**
18     Q  I'm asking about financial institutions in
19 general, but I'm asking about financial
20 institutions that the general public would shop
21 for and obtain.  So I'm not talking about
22 professional investors or other types of financial
23 services that are out there.
24     **A  I see.**
25     Q  Did your prior work involve -- and that's

78

1  what I meant by ordinary people, the general
2  public.  Did your prior work involve behavior of
3  the general public in how they go about signing up
4  for credit unions or banking services?
5      MS. ALLEN:  Vague.
6      **A  I would say I have conducted surveys of**
7  **consumers who are customers or potential customers**
8  **of consumer banking and credit union -- well,**
9  **consumer banking services.**
10     Q  (By Mr. Getzoff)  And did you rely upon
11 that prior work for purposes of your work on this
12 case?
13     **A  No.  I don't think there was a need to.**
14     THE REPORTER:  Tim, when you get to
15 another good spot, can we take another break?
16     MR. GETZOFF:  Yeah, we can.  This is good
17 spot.
18     (Break taken from 12:30 p.m. to
19 12:42 p.m.)
20     Q  (By Mr. Getzoff)  Dr. Anderson, I want to
21 go back to paragraph 35 of your report.  It's on
22 page 14.
23     **A  I'm there.**
24     Q  In the last sentence you talk about an
25 Internet search you did of the phrase Elevate

79

1  Credit Union using the Google search engine,
2  right?
3      **A  Not the last sentence, but yes, I do see**
4  **that.**
5      Q  I stand corrected.  And then on the next
6  page figure 4 you pasted in the results of that
7  Internet search.  Is that right?
8      **A  Yes.**
9      Q  And you said you conducted that Internet
10 search on May 10th, 2021?
11     **A  Yes.**
12     Q  And then I go forward a few pages in your
13 report, paragraph 41 and paragraph 42 you mention
14 two other Internet searches that you did.  Do you
15 see that?
16     **A  I do.**
17     Q  I think, unless I missed something, that
18 in your report those are the only three Internet
19 searches that according to the report that you did
20 in this case.  Is that right?
21     **A  No.**
22     Q  Where else did you -- where else does your
23 report describe Internet searches that you were
24 on?  And I'm sorry, I should have -- are you
25 referring to the app store searches?

80

1      **A  On page 3, paragraph 12 of my report I**
2  **cite the materials that I relied on.  And in**
3  **bullets vii, viii, and ix all describe Internet**
4  **searches.**
5      Q  I see.  So vii is the websites themselves.
6  So that's not a search, right?
7      **A  Well, I believe it is.  I was searching --**
8  **the websites are listed on the Internet.**
9      Q  My question is Internet searches that you
10 did.  Does bullet -- does Roman numeral little vii
11 describe an Internet search that you ran?
12     MS. ALLEN:  Vague.
13     **A  Yes.**
14     Q  (By Mr. Getzoff)  Okay.  What --
15     (Simultaneous crosstalk.)
16     Q  (By Mr. Getzoff)  -- what Internet search
17 did you run that's reflected in item vii on page 3
18 of your report?
19     MS. ALLEN:  Vague.
20     **A  This gets to the issue that I**
21 **criticized -- one of the criticisms I alleged**
22 **against the Poret survey is that searching the**
23 **Internet is vague.  And in bullet vii I specify**
24 **the websites, the companies' websites that I**
25 **searched.  And those websites are on the Internet.**

81

1  So I think it's fair to call that an Internet
2  search.
3      Q  (By Mr. Getzoff)  What Internet search did
4  you run that's reflected in item vii?
5      MS. ALLEN:  Vague.
6      A  Can you clarify your question?
7      Q  (By Mr. Getzoff)  Yeah.  You said that
8  item vii reflects an Internet search, right?
9      A  Yes.
10     Q  So what Internet search did you run that's
11 reflected in item vii?  What did you search for?
12     A  The website for Elevate Federal Credit
13 Union and the website for Elevation Credit Union.
14     Q  So you saying you typed in Elevate Federal
15 Credit Union as a search?
16     A  I'm saying I reviewed those websites.
17     Q  Sir, I'm asking you about Internet
18 searches, searching, search terms, not websites
19 that --
20     A  So you're talking about using an Internet
21 search engine?
22     Q  Correct.
23     A  Okay.  See that's the distinction that
24 Mr. Poret failed to make in his survey and that I
25 criticized in my report.  Vii, I believe vii is

82

1  part -- is the type of Internet search.  What's
2  listed in viii and ix are -- well, it's not --
3  what's listed in viii would be an Internet search
4  using the search engines that are listed there,
5  Google and Bing.
6      Q  So viii actually describes Internet
7  searches, right?
8      MS. ALLEN:  Vague.
9      A  That's one of those bullets that describe
10 Internet searches.  I would say vii, viii, and ix
11 all describe Internet searches.
12     Q  (By Mr. Getzoff)  Sir, my question was,
13 does viii describe Internet searches?
14     A  Yes.
15     Q  And it describes two searches.  I should
16 say two sets of search terms that you used, right?
17     A  Yes.
18     Q  And it says you searched those on both the
19 Google search engine and the Bing search engine.
20     A  That's right.
21     Q  Did you ever search for Elevations Credit
22 Union as a search term?
23     A  I don't recall.
24     Q  To arrive at the websites reflected in
25 item vii did you use an Internet search engine?

83

1      A  I don't recall if I did or if I just typed
2  in the URL.
3      Q  So based on your report it looks like if I
4  look at item vii -- I'm sorry, if I look at
5  item viii and ix and I look at paragraph 35, 41
6  and 42, I see that you searched -- that you used
7  an Internet search engine to search four different
8  phrases.  Did I get that right?
9      A  To search four different places, what do
10 you mean by that?
11     Q  Four different phrases.  Four different
12 phrases.
13     A  Phrases.  You said paragraphs 3 and then
14 41 and 42.  Is that correct?
15     Q  Correct.  Also paragraph 35, although
16 that's the same phrase that you've described on
17 page 3.
18     A  If that's all that I listed in my report,
19 then I think you're correct.  That's what's
20 listed.
21     Q  Okay.  And just so we're clear, the
22 phrases that I see that you searched for are
23 Elevate Federal Credit Union, Elevate Credit
24 Union, credit unions in Utah, and credit unions in
25 Colorado.  Did I get that right?

84

1      A  Those are the ones that I think I listed
2  in my report, yes.
3      Q  And you don't remember if you ever
4  searched for Elevations Credit Union, right?
5      MS. ALLEN:  Asked and answered.
6      A  Yeah, I think I said, as I sit here today,
7  I don't recall.
8      Q  (By Mr. Getzoff)  Were there any other
9  phrases -- so was part of your work on --
10     A  Sorry, that's -- that's not correct.  That
11 answer is not correct.  As I said before, I did
12 search on the Internet for Elevations Credit
13 Union.  But I think you're using Internet search
14 to mean using a search engine.  And as I answered
15 before, I don't recall.
16     Q  So my questions on Internet searches are,
17 did you use an Internet search engine using a
18 phrase or keyword to search?  And you don't recall
19 one way or the other whether you ever searched
20 Elevations Credit Union, right?
21     A  Using the Internet search engine I don't
22 recall.
23     Q  Can you recall other than the four phrases
24 that we just identified that's reflected in your
25 report in the locations we just talked about, can

---

85

1 you recall any other search terms that you used
2 using an Internet search engine as part of your
3 work for this case?
4     MS. ALLEN: Asked and answered.
5     **A Not as I sit here today, no.**
6     Q (By Mr. Getzoff) In page 3 it says you
7 searched Elevate Federal Credit Union in addition
8 for Elevate Credit Union. But in your report you
9 only talk about the results for Elevate Credit
10 Union, right?
11     **A Well, on page 3 it does say I searched for**
12 **both of those terms on Google and Bing and on the**
13 **Google Play app store. So that part is correct.**
14 **And the other part of your question was about the**
15 **results that I provided in my report. Is that**
16 **right?**
17     Q Correct. I don't see anywhere in your
18 report where you talk about what results you got
19 when you searched Elevate Federal Credit Union.
20     **A I don't know that I did provide that in my**
21 **report. In my report I provided the results from**
22 **my search of Elevate Credit Union because that's**
23 **the term that Mr. Poret used in his survey.**
24     Q Do you know what the results were for the
25 search you did of Elevate Federal Credit Union?

---

86

1     MS. ALLEN: (Indiscernible.)
2     THE REPORTER: I'm sorry, what did you
3 say?
4     MS. ALLEN: I said vague.
5     THE REPORTER: Thank you.
6     **A No. I don't remember all the search**
7 **results that appeared when I conducted that**
8 **search.**
9     Q (By Mr. Getzoff) Do you have -- do you
10 still have a copy saved somewhere of that search
11 you did for Elevate Federal Credit Union?
12     **A I don't know.**
13     Q Do you have copies of any of the searches?
14 Other than what you pasted in your report, do you
15 have copies of the results of any of the Internet
16 searches that you did in this case?
17     MS. ALLEN: Vague.
18     **A I don't know.**
19     Q (By Mr. Getzoff) Did you do these
20 searches across multiple days to see if the
21 results changed, or did you just do them once?
22     MS. ALLEN: Compound.
23     **A I don't recall the days other than what**
24 **I've specified them.**
25     Q (By Mr. Getzoff) And to be clear, you

---

87

1 don't recall whether you did searches more than
2 once or whether you just did them once and this is
3 the result?
4     MS. ALLEN: Objection, mischaracterizes
5 prior testimony.
6     **A Well, I know that I searched multiple**
7 **times, and there's -- that's indicated by my**
8 **report.**
9     Q (By Mr. Getzoff) Well, so let me drill
10 into that. So let's talk about the search you did
11 for Elevate Credit Union, which you refer to on
12 paragraph 35. And then it's pasted -- the results
13 are pasted in figure 4. Are you with me?
14     **A Yes.**
15     Q So you -- this particular search you said
16 you retrieved on May 10th, 2021. Do you see that?
17     **A Yes.**
18     Q Is this -- for your search of Elevate
19 Credit Union using the Google search engine, is
20 this the first and only time you did that search?
21     **A I don't know.**
22     Q Do you recall doing a search earlier in
23 your work as part of your just general
24 investigation or getting up to speed and then
25 zeroing in when it got closer to report to doing

---

88

1 this particular search?
2     MS. ALLEN: Vague.
3     **A No, I don't recall.**
4     Q (By Mr. Getzoff) In your experience do
5 you know whether Internet search results are
6 static or do they change over time?
7     **A I don't know if there's one answer to**
8 **that. I think they can change over time but don't**
9 **necessarily.**
10     Q Are you -- I think we established this.
11 Do you plan to have any sort of expertise as to
12 how Internet search engines change over time or
13 what -- under what circumstances results can
14 change over time?
15     MS. ALLEN: Compound and asked and
16 answered.
17     **A Sorry, would you restate that?**
18     Q (By Mr. Getzoff) Yeah. Do you claim have
19 any expertise into the circumstances by which an
20 Internet search result can change over time?
21     MS. ALLEN: Same objection.
22     **A Not from an expert perspective.**
23     Q (By Mr. Getzoff) How about person using
24 the Internet perspective?
25     **A Right.**

**89**

1     MS. ALLEN:  Vague.
2     **A  And as someone who conducts research that**
3  **can involve using Internet search engines but not**
4  **as -- not as someone who I would say is an expert**
5  **in the way that Internet search algorithms work.**
6     Q  (By Mr. Getzoff)  Did you review searches
7  that Hal Poret did more recently that we produced
8  in this case that show different results on Google
9  than you portray your report in figure 4?
10     MS. ALLEN:  And, Tim, I think -- I don't
11  know if we need to discussion this.  But I'm going
12  to object to any use of those documents.  They're
13  subject to, you know, our pending short form
14  discovery order, which is essentially asking that
15  they be excluded.  And I don't think it's
16  appropriate here and we're not willing to waive
17  our objections here to let them be used in this
18  deposition.
19     MR. GETZOFF:  Well, I'll give you a
20  standing objection that preserves your objection.
21     MS. ALLEN:  I don't think that's
22  sufficient.  I think that that effectually waives
23  lot of the arguments we have.  And it's not
24  something that I think we should bring into
25  evidence here.  It wasn't part of the report our

**90**

1  expert reviewed in forming his opinions.  It
2  shouldn't be entered into evidence here today.  I
3  don't want to allow this deposition to be
4  basically a back doorway to get -- these
5  documents in when they should otherwise be
6  excluded.
7     MR. GETZOFF:  It's not a back doorway.
8  It's -- you have the right to make objections
9  during this deposition as you've been doing this
10  entire day.  And that preserves your objections.
11  That's the point of making the objection.
12     MS. ALLEN:  I understand.
13     MR. GETZOFF:  I only get this witness --
14  this is my only opportunity to depose him.  If
15  your objections are upheld then all of this -- any
16  testimony subject to the objections would -- will
17  be stricken.  That's the whole point.
18     MS. ALLEN:  I understand.  And we would be
19  willing to reopen this deposition for the limited
20  purpose of questioning about those documents
21  should that discovery rule go in your favor.  But
22  at this point allowing them to be entered is
23  essentially a waiver of a lot of our objections.
24  It's very problematic in terms of the merits of
25  our motion.  And those documents just aren't

**91**

1  properly in the record at this point.  And I don't
2  think we can allow the witness to be testifying
3  against about them.
4     MR. GETZOFF:  I can show this witness
5  anything I want for purposes of rebuttal and for
6  purposes of --
7     MS. ALLEN:  Those documents haven't been
8  entered as rebuttal.  Rebuttal had to be done
9  30 days after his testimony -- or after his report
10  rather.  It certainly wasn't that.  It wasn't in
11  response to any discovery requests.
12     MR. GETZOFF:  So let's do this.  I'm going
13  to mark -- actually, these documents were already
14  admitted as deposition exhibits by your
15  co-counsel, previously marked as Exhibit 73 in Hal
16  Poret's deposition.
17     (Exhibit No. 73 was previously marked for
18  identification and is attached to the transcript.)
19     MR. GETZOFF:  I have put Exhibit 73 in the
20  chat room.
21     MS. ALLEN:  I'm going to instruct my
22  witness not to open that document.  I think it's
23  inappropriate to try to use these documents, which
24  are currently essentially the subject of a
25  protective order.  That's not an -- this is not an

**92**

1  appropriate way to enter these documents.  And we
2  are willing to reopen this deposition for the
3  purposes of this -- these questions.
4     MR. GETZOFF:  Your own counsel marked
5  these documents as a deposition exhibit, and
6  you're saying I can't use that same deposition
7  exhibit against your expert?  That's your --
8     MS. ALLEN:  I don't know -- I don't know
9  the purposes for which -- no.  Yeah, that's
10  exactly what I'm saying.  I don't think this
11  witness can be testifying against -- about these
12  documents.  They're not our documents.  We don't
13  even really know where they came from.  I don't
14  think that they're appropriate before -- they're
15  not going to be appropriately before the court.
16  And they're subject to a protective order right
17  now.
18     MR. GETZOFF:  They're not subject to a
19  protective order.  They're subject to a motion you
20  filed.
21     MS. ALLEN:  I'm sorry.  I'm sorry, a
22  pending -- essentially a pending protective order.
23  They're subject to that.
24     MR. GETZOFF:  They're the subject of a
25  motion that you filed on Friday.

**93**

1    MS. ALLEN: Correct.

2    MR. GETZOFF: After your co-counsel

3 already used these same documents with my expert

4 and marked them as a deposition exhibit. And

5 you're saying I can't use that same deposition

6 exhibit against -- or with your expert because you

7 chose to file a motion in between my expert's

8 deposition and your expert's deposition?

9    MS. ALLEN: And in addition during all

10 that time when there were discussions going about

11 the inappropriateness of these documents. So,

12 yes, that is what I'm saying.

13    Q (By Mr. Getzoff) Dr. Anderson, have you

14 seen the Google searches run by Hal Poret dated

15 June 15?

16    MS. ALLEN: And, Tim, I'm going to just

17 object. We don't know that those are Google

18 searches run by Hal. I don't think that's what

19 the documents say.

20    MR. GETZOFF: Kirsten, you are making

21 speaking objections now. You can make your

22 objection.

23    MS. ALLEN: Okay. Well, my objection is

24 an instruction as for him not to look at those

25 documents. I'm happy -- I'm happy to reopen this

**94**

1 deposition for the purposes of the questioning

2 about these documents. But I do not want to allow

3 my witness to do that right now.

4    Q (By Mr. Getzoff) Dr. Anderson, have you

5 looked at, at any time, the documents that we

6 produced in this case that show Google Internet

7 searches run by Hal Poret in June of this year

8 after your rebuttal report?

9    MS. ALLEN: And all these same objections.

10 Tim, I don't -- I mean is it -- how can we -- how

11 can we deal with this? I think that --

12    MR. GETZOFF: Kirsten, I'm asking him this

13 question is has he seen these documents before. I

14 don't know what your objection would be, but if

15 you want to make --

16    MS. ALLEN: My objection is that we're not

17 talking about these documents during this

18 deposition until this short form protective order

19 is decided.

20    MR. GETZOFF: I'm asking him if he's seen

21 them before.

22    MS. ALLEN: Yeah. And that's questioning

23 him about the documents.

24    MR. GETZOFF: Are you instructing him not

25 to answer whether he's even seen these questions

**95**

1 about --

2    MS. ALLEN: I would like to reach an

3 agreement with you that we can reopen this

4 deposition if the court rules against us in this

5 short form protective order. I don't think it

6 would be overly onerous. It's not that many

7 documents. This is all via Zoom. I'm just doing

8 what I need to do to protect my client and to not

9 waive our objections, which is essentially what

10 this would be.

11    MR. GETZOFF: If you want to instruct him

12 not to answer, you can instruct him not to answer.

13 I think that's completely inappropriate and, in

14 fact, sanctionable because that's what the whole

15 objection process is for. And you can make your

16 objection. You have made your objection. But the

17 witness is here. We are here for this deposition.

18 And I'm going to make my -- my record. And if you

19 want to instruct him not to answer, you can do

20 that at your peril. But we're going to proceed.

21    MS. ALLEN: I am going to instruct him not

22 answer about these particular documents. I'm very

23 happy --

24    MR. GETZOFF: Okay. Let's take this one

25 question at a time.

**96**

1    Q (By Mr. Getzoff) Dr. Anderson, have you

2 seen the Google search reports that Hal Poret ran

3 and we produced that occurred after your rebuttal

4 report in this case?

5    MS. ALLEN: I'm going to instruct him not

6 to answer subject to having this reopened. And

7 I'll just repeat that to every question about

8 these documents.

9    MR. GETZOFF: I have put into the chat

10 room Exhibit 73, which was previously marked by

11 plaintiff's counsel in Hal Poret's deposition.

12 Are you instructing him not to look at that

13 exhibit?

14    MS. ALLEN: That is correct.

15    MR. GETZOFF: And if I asked him this

16 exhibit is Bates number ELEVATIONS004596 to 4625,

17 about 30 pages. Counsel, are you saying that

18 every question I ask about the contents and

19 substance of these documents you're instructing

20 him not to answer?

21    MS. ALLEN: Correct.

22    Q (By Mr. Getzoff) Dr. Anderson, I'm

23 marking a new exhibit.

24    (Exhibit No. 77 was marked for

25 identification and is attached to the transcript.)

97

1    Q  It is Exhibit 77 that I've just put into
2  the chat room.
3      MS. ALLEN:  And I can -- can I assume this
4  is not the same document?
5      MR. GETZOFF:  It's not any searches that
6  Hal Poret performed, and it's not part of the
7  searches that Hal Poret performed.
8    Q  (By Mr. Getzoff)  Dr. Anderson, do you see
9  Exhibit 77?
10    A  I haven't opened it yet.  I don't know if
11  this was going to be objected to.
12      MS. ALLEN:  Yeah, let me -- let me have a
13  quick look I guess.  And I guess I'll just make
14  the general objection that to the extent this is
15  another way to try to introduce the same -- the
16  same search, it's subject to the same objections.
17  But I will not instruct my witness not to look at
18  these documents.  They're not the subject of that
19  short form protective order.
20    Q  (By Mr. Getzoff)  Dr. Anderson?
21      THE WITNESS:  So you'd like me to open the
22  document?
23      MS. ALLEN:  Yes.
24    Q  (By Mr. Getzoff)  Dr. Anderson, I'm going
25  to represent to you that this is a -- the

98

1  result --
2    A  (Indiscernible.)
3    Q  Let me know when you're done.
4    A  I have it open.
5    Q  Okay.  I'm going to represent to you that
6  this is a printout of the Internet search report
7  that I ran yesterday for the phrase Elevate Credit
8  Union on the Google search engine.  Do you see
9  that?
10      MS. ALLEN:  And I'm just going to
11  generally object to foundation.  And I won't do
12  speaking objections.
13    A  So what was your question?  Sorry, I lost
14  the question.
15    Q  (By Mr. Getzoff)  First, just do you see
16  the document?
17    A  Yeah.  It's two pages long, correct.
18    Q  Right.  And do you see at the top it shows
19  the -- it shows that it appears to be search
20  results from Google of the phrase Elevate Credit
21  Union.  Do you see that?
22      MS. ALLEN:  Same objection.
23    A  Are you representing that to me?
24    Q  (By Mr. Getzoff)  Yes.  I'm representing
25  that to you.

99

1    A  Okay.  I see indications that that may be
2  the case.  I'll accept your representation.
3    Q  Okay.  And do you see that for this search
4  the first result is an advertisement for
5  Elevations Credit Union.  Do you see that?
6    A  I see that search result.
7    Q  And then the second search result is
8  Elevate Credit Union, the plaintiff, your client
9  in this case, right?
10      MS. ALLEN:  Tim, can I just say I'm just
11  going to say there's a lack of foundation -- or
12  objection to each these.  I don't want to keep
13  interrupting your flow.
14      MR. GETZOFF:  I'll give you a standing
15  foundation objection for all my questions
16  regarding Exhibit 77.
17      MS. ALLEN:  Thank you.
18    Q  (By Mr. Getzoff)  This second search
19  result is Elevate Credit Union, which is the
20  plaintiff in this case, right?
21    A  I see that one.
22    Q  And then the third search result goes back
23  to Elevations Credit Union, the defendant in this
24  case, right?
25    A  I see that.

100

1    Q  And then the other three on this page go
2  back to the plaintiff Elevate Credit Union.  Do
3  you see that?
4    A  No.  I see the on fourth one it looks like
5  it's for LinkedIn.
6    Q  I stand corrected.  Yeah, the fourth one
7  is for LinkedIn for the plaintiff, right?
8    A  I see it says Elevate Credit Union.  And
9  there's a vertical line.  And it says LinkedIn.
10  And looks like the URL leads to LinkedIn.
11    Q  The next one seems -- appears to be a
12  newspaper article about this lawsuit.
13    A  I see that.
14    Q  And then the next one is a Facebook page
15  for Elevate Credit Union.
16    A  I see that as well.
17    Q  Dr. Anderson, in view of the -- what the
18  authors discussed in that Swann article,
19  Exhibit 76 that we looked at earlier, would these
20  search results satisfy the competitive proximity
21  requirement for conducting a Squirt survey --
22      MS. ALLEN:  Objection.
23    Q  (By Mr. Getzoff)  -- confusion?
24      MS. ALLEN:  Calls for speculation.
25    A  No.

**101**

1    Q  (By Mr. Getzoff)  Why not?

2        A  First of all, I should say I don't know

3    how this search was conducted.  So I can't really

4    discuss -- I can't rely on these search results

5    without knowing how they were conducted, whether

6    this search result that we're looking at in this

7    document may be affected by previous searches

8    by -- on this device or by the person logged in on

9    the computer.

10        So there are -- there's information I

11   don't have about how this search was conducted.

12   But even if I -- even if I were to find that this

13   was conducted in a fair and impartial manner

14   unbiased by browser history or a cache that would

15   retain previous search results, this would not

16   satisfy the criteria that Swann and Henn in their

17   article list for demonstrating proximity for

18   several reasons.

19        One is the criteria that Swann and Henn

20   list indicate that a search to demonstrate

21   proximity using an Internet search engine the

22   search should use -- should be a keyword search

23   for the category, not for a particular brand.  And

24   this is a search for Elevate Credit Union.  It's

25   one of the marks at issue in this case.

**102**

1        Swann and Henn acknowledge that a search

2    for one of the marks at issue in a matter may be

3    appropriate if certain conditions are met that

4    aren't met here.  And those conditions are that,

5    first of all, the search term that the mark used

6    as a keyword search must have a sufficient level

7    of consumer awareness, which Mr. Poret says he

8    Elevate does not.  And second of all, that search

9    term must be a term that consumers would typically

10   or commonly search for.

11        And I think by Mr. Poret I think in his

12   report he indicated that if a consumer isn't aware

13   of the aware of the term, like he said, not aware

14   of Elevate in this matter, that they can't search

15   for it.  It's not something they can logically do.

16   So it does not -- this search does not meet the

17   criteria that Swann and Henn laid out regarding

18   justifying proximity.  And there are others

19   reasons why it doesn't justify proximity as well.

20        Q  For the -- so your first reason that you

21   explained was, and you had a lot of explanation,

22   but the start of it was because the search was for

23   the brand name or for one of the marks as opposed

24   to a generic or descriptive category search.  Is

25   that accurate?

**103**

1        A  I don't remember if it was the first thing

2    I said, but that's one of the points that I made.

3        Q  And you said that -- well, let's go to the

4    Swann article.  Could you go back to Exhibit 76?

5        A  Okay.

6        Q  And let's look at footnote 42, which is on

7    page 680.

8        A  I see it.

9        Q  And in this footnote they say on the

10   second sentence, quote, We do not suggest that a

11   Squirt survey is appropriate only where search

12   terminology uses generic or highly descriptive

13   terms of the product category.

14        You see that, right?

15        A  That's one sentence in that footnote.

16        Q  Correct.

17        A  Yes, I see that.

18        Q  It goes to say, Indeed an Internet user in

19   a particular product or service category may use

20   brand specific search terminology rather than

21   generic product terminology.

22        And it goes on with -- just stop right

23   there.  You're with me so far, right?

24        A  I'm with you so far.  But if you stop

25   right there, we're not --

**104**

1        (Simultaneous crosstalk.)

2        Q  (By Mr. Getzoff)  The next phrase are the

3    conditions -- I think that was your word -- that

4    you said must be present in order for a brand

5    specific search terminology to be appropriate,

6    right?

7        A  According to what they said in this

8    article, yes.

9        Q  And there's two conditions, right?

10       A  That they listed here, yes.

11       Q  Yeah.  And in your description you only

12   mentioned one of the conditions.  You said a known

13   brand or familiarity with a known brand.  And then

14   you said -- Mr. Poret said there wasn't sufficient

15   familiarity on brands.  So you concluded that this

16   condition wasn't met.  Is that right?

17        MS. ALLEN:  Objection, mischaracterizes

18   the report.

19       A  There's two conditions in that sentence.

20   And there is more to this footnote that provides

21   other conditions that I said had not been met

22   here.

23       Q  (By Mr. Getzoff)  The other condition that

24   you didn't mention it says, quote, Or recent

25   exposure through EG advertising to a new brand.

105

1  Right?
2  **A I see that.**
3  Q  Do you agree with that?
4  **A I see that they have written that, yes.**
5  Q  Do you agree with their statement in this
6  footnote by these authors that brand specific
7  search terminology is appropriate if you have
8  either familiarity with a known brand or recent
9  exposure such as to advertising to a new brand?
10  **A I think if that advertising exposure, that**
11  **recent exposure, creates as sufficient level of**
12  **awareness for the consumer, then that makes sense.**
13  Q  Do you -- did you conduct any sort of
14  analysis of what sort of advertising Elevate
15  Federal Credit Union does?
16  **A No.**
17  Q  Do you have any idea what level of
18  advertising Elevate Federal Credit Union engages
19  in?
20  MS. ALLEN:  Vague.
21  **A I don't know what you mean by level, but I**
22  **haven't analyzed their advertising.**
23  Q  (By Mr. Getzoff) By level I mean the type
24  of advertising or the extent of advertising.  Do
25  you have any idea what they -- what Federal --

106

1  Elevate Federal Credit Union does by way of type
2  or extent of advertising?
3  MS. ALLEN:  Vague.
4  **A No.**
5  Q  (By Mr. Getzoff)  Do you know what their
6  advertising budget or expenditures have been?
7  **A No.**
8  Q  If these conditions are satisfied, the
9  ones described in paragraph 42 of the Swann
10  report, would you then agree that the proximity of
11  the two brands in Exhibit 77 a Google search is
12  sufficient to justify a Squirt survey?
13  **A No.  I don't think you can rely on**
14  **Exhibit 77 to justify this, a Squirt survey.**
15  Q  Well, yeah, your objection that you don't
16  know where 77 comes from and whether it's unbiased
17  has been noted.  And I'm not -- I'm not asking to
18  you set that aside.  If -- if Exhibit 77 is taken
19  at face value -- and I'm just asking you to assume
20  that because you don't know -- if the conditions
21  in the Swann article in the footnote we just
22  looked at are satisfied, do these search results
23  justify a Squirt survey?
24  **A Thank you for adding the caveat.  But**
25  **that's not why I answered no.  No.  Even if these**

107

1  **search results from that exhibit are conducted**
2  **reliably and in an unbiased manner, then those**
3  **would not be sufficient to demonstrate that**
4  **there's proximity that would support the use of**
5  **the Squirt survey in this matter.**
6  Q  Even -- even if the conditions in
7  footnote 42 were satisfied as well.  That was
8  your -- that was your initial objection.  So if we
9  resolve that objection, do we now have an
10  appropriate Squirt survey or do you have more
11  objections?
12  **A Well, I don't think that one search can**
13  **satisfy the objection, the conditions in**
14  **footnote 42, because one of those conditions**
15  **indicates that the search should be reasonably**
16  **common.  Or that -- and that the search results**
17  **would be reasonably common.  I don't think that**
18  **that's -- not the search results but the search**
19  **term would be reasonably common.**
20  **I don't think that can be satisfied in**
21  **this case.  It doesn't make logical sense that**
22  **consumers would commonly search for a name that**
23  **they aren't familiar with.  But even then there**
24  **are other reasons why the -- the search conducted**
25  **in Exhibit 77 would not be sufficient.**

108

1  Q  What are those other reasons?
2  **A I haven't had a lot of time to look**
3  **through this Exhibit.  But based on my, you know,**
4  **review, you walked me through some of these, the**
5  **information on this first page.  The second from**
6  **the bottom search results it says Elevate FCU and**
7  **Elevations Credit Union in trademark tug-of.**
8  **That search result seems -- I think you**
9  **described it as probably a news article or some**
10  **news story about this dispute.  It's my**
11  **understanding that search results on a -- on a**
12  **search engine like Google can be affected by news**
13  **articles like this.  And this article is putting**
14  **these two parties in juxtaposition with each**
15  **other.  And that is appearing in the search**
16  **results, which may be affecting the search results**
17  **that this algorithm is generating.**
18  **I don't think that would it be appropriate**
19  **to base a decision of proximity based on search**
20  **results that are affected by the dispute.  That's**
21  **one reason why I don't think these are sufficient.**
22  Q  I asked about that -- or do you want to
23  list them all first?
24  **A I'll give another.  This is one search**
25  **result -- sorry, this is one search or one**

109

1  document of, you know, one -- I know it's two
2  pages in the document. But I think that we said
3  it's the first -- it's one -- maybe I'm assuming
4  this is the first page of search results for this
5  search term.
6      I don't think that that is sufficient to
7  show one search and one page to show that there's
8  proximity when the standard is that this should be
9  a common or typical occurrence. This is the
10 equivalent of providing a survey and only giving
11 the answers that are favorable to -- to your
12 arguments in the case and not any of the search
13 results or the survey results that are
14 unfavorable.
15     The way to justify proximity is to conduct
16 multiple searches, a large number of searches, and
17 record whether or not there's proximity, you know,
18 what percent of the searches indicate that there's
19 proximity. And then the court can determine
20 whether that percentage is frequent enough or
21 common or typical enough to justify that there's
22 proximity.
23     It doesn't seem because of this dispute
24 making its way into the media that that kind of an
25 analysis can be done on an unbiased manner

110

1  anymore. That's something that Mr. Poret should
2  have done when he designed his survey. And
3  according to my understanding of his deposition
4  transcript, he said that he didn't keep those kind
5  of records. So we don't have any way to evaluate
6  that.
7      Q  You didn't keep your records either,
8  though, did you, Dr. Anderson?
9      MS. ALLEN:  Objection, misstates prior
10 testimony.
11     A  I may have reported everything that I
12 searched for.
13     Q  (By Mr. Getzoff)  But you didn't --
14     A  And --
15     Q  -- you didn't produce the results of any
16 of those searches other than the one that you
17 pasted, right?
18     A  Yes, I did. It's in my report. But it's
19 also not my burden to demonstrate that there's a
20 lack of proximity. It's Mr. Poret's burden to
21 demonstrate that there is sufficient proximity.
22 And one page of search results for a
23 brand-specific term for a brand that he himself
24 says has little consumer awareness doesn't seem to
25 meet the standards for proximity according to the

111

1  authorities in these articles, the Swann and Henn
2  article, that we've reviewed.
3      Q  You would agree with me that the Swann and
4  Henn article is a reliable authoritative source on
5  that topic, right?
6      A  On the topic of proximity for --
7      Q  An Internet --
8      A  -- likelihood of confusion or Squirt
9  surveys?
10     Q  Yes.
11     A  I would say so.
12     Q  Have you run -- since the time that you
13 ran the search, it's figure 4 of your report
14 page 15 that you ran on May 10th, have you run
15 that same search any time since then to see if it
16 changed, to see if the results changed?
17     A  I don't recall doing so.
18     Q  You know, I'm looking at your search
19 results, if you look at figure 4.
20     A  I see figure 4.
21     Q  That same news article is in your search
22 results. Do you see that?
23     A  I do.
24     Q  When you ran this search -- well, so let
25 me ask you about all of the searches that you ran.

112

1  I think -- I think we established that you ran --
2  you searched four different phrases using search
3  engines, right?
4      A  That I've noted in my report and that I
5  can recall today, that's correct.
6      Q  Right. And you may have done more, but
7  you don't remember one way or the other, right?
8      A  That's correct.
9      Q  Each time did you use the same device for
10 each of the searches?
11     A  I don't recall.
12     Q  Did you use the same browser each time?
13     A  I don't recall.
14     Q  Can you recall any of the browsers that
15 you used?
16     A  When I look at figure 6 and figure 7, this
17 is page 27 of my report, I don't recall what
18 browser this is for these two figures. But I
19 think that based on the format of the top line
20 where you see the backwards arrow in the top left
21 and the forward arrow, which is kind of grayed out
22 and the refresh button and the home button and the
23 URL, that row, we can probably determine whether
24 that -- what browser that -- that is.
25     Q  Each time you ran a search, the searches

113

1 that we're talking, about did you clear your cache
2 and your browsing history beforehand?
3 **A I don't recall every search. But I do**
4 **know that at some -- some searches or at least one**
5 **search I deliberately did not clear the cache to**
6 **make the search conservative. In other words, if**
7 **someone -- my search result would -- would account**
8 **for the previous search term. And despite that**
9 **conservative attempt at a search, I did not find**
10 **the same results or results for the plaintiff and**
11 **defendant in the same list or the same page of**
12 **search results.**
13 Q So let me just wrap and then we'll break
14 for lunch.
15 So not clearing the cache or the browsing
16 history, that could influence the search one way
17 or the other. I mean you don't know how -- which
18 direction that could influence the results,
19 correct?
20 **A I think it could have an impact. I don't**
21 **know the direction of the impact. And that's why**
22 **I searched in some cases by clearing the cache and**
23 **in other cases by -- at least one case by not.**
24 MR. GETZOFF: Off the record.
25 (Break taken from 1:37 p.m. to 2:45 p.m.)

114

1 Q (By Mr. Getzoff) Dr. Anderson, before we
2 broke for lunch I was asking you about the
3 conditions by which you ran the searches, the
4 Internet search engine searches, affected in your
5 report. And I think you said before we broke that
6 you cleared -- before running each search you
7 cleared your cache and search history before each
8 search except once that you intentionally left
9 it -- left it unclear. Is that right?
10 **A I believe I said at least one I left**
11 **intentionally uncleared. And I should clarify**
12 **that I also conducted some searches using what on**
13 **Google I think it's called incognito. So in that**
14 **sense it's not necessary to clear the cache. I**
15 **believe that mode prevents the cache or the search**
16 **history from affecting the next result.**
17 Q For the search reflected in figure 4 of
18 your report on page 15, the one where you pasted
19 the results into your report itself, did you clear
20 the cache and search history on that one?
21 **A I don't recall.**
22 Q Could that have been one where you
23 intentionally did not clear it?
24 **A I don't recall whether I did or not for**
25 **that one.**

115

1 Q Do you know whether that search was one
2 that you ran incognito mode or private mode?
3 **A Typically a search that I would paste into**
4 **a report would be run in incognito mode. But I**
5 **don't specifically recall whether that was the**
6 **case here. That's my normal course of action.**
7 Q Dr. Anderson, I want to switch gears a
8 little bit and ask you some questions about your
9 criticism of Mr. Poret's questioning. And in
10 particular you accuse him of using leading
11 questions in some of his questions.
12 I believe that section of the report
13 starts on page 33 -- or pardon me, 32,
14 paragraph 93. Are you with me?
15 **A Section IV in my report, the Poret survey**
16 **asks questions that are leading and vague?**
17 Q Correct.
18 **A I'm there.**
19 Q How do you define a leading question? For
20 purposes of the use of the word leading question
21 in your report, how do you define leading
22 question?
23 **A I think a leading question is one where**
24 **the question, or what the question is referring to**
25 **perhaps, suggests an answer to the question.**

116

1 Q Is one of your explanations or reasonings
2 for why you think Mr. Poret used leading
3 questions, you provide an explanation in
4 paragraph 105. Now I want to understand -- I want
5 to understand what you did here. How did you
6 calculate -- what did you do to calculate the
7 144 responses out of total 600?
8 **A I reviewed the database that was provided**
9 **with the Poret report, which I believe was**
10 **appendix D, as in Delta, to the Poret report. And**
11 **on a respondent-by-respondent basis, so for each**
12 **respondent I classified that respondent as to**
13 **whether they did or did not indicate that one or**
14 **more of the search results on the page that**
15 **Mr. Poret tested were -- that were not for Elevate**
16 **nor for the defendant, was whether the respondent**
17 **indicated that it was for or affiliated with --**
18 **with Elevate.**
19 Q So to conclude that 144 respondents
20 indicated one of the other search results, which
21 is to say not Elevations or Elevate, did you add
22 all the respondents together who searched
23 anything -- who put anything other than Elevate or
24 Elevations to arrive at the 144?
25 **A I think that's the right way to say it,**

117

1  yes. So as I mentioned I classified each
2  respondent regardless of how many of those, what
3  I've called, other search results. Regardless of
4  how many of those other search results they
5  selected, each respondent was given -- was
6  classified that they -- that they did or did not
7  select at least one of those search results. So
8  if a respondent selected multiple other search
9  results, they were only counted once.
10    Q  Correct. But you aggregated for everybody
11  that selected a result other than Elevate or
12  Elevations, you aggregated all of them together to
13  arrive at the 144, right?
14    A  That's correct.
15    Q  And you said that there was 600 total
16  respondents. But there were only 300 total
17  respondents in Mr. Poret's report. How did you
18  get to 600?
19    A  If there were only 300, then I apologize.
20  That 600 must be a mistake. And in that case that
21  would make -- 144 would be a higher percentage.
22  Probably it looks like 48 percent out of 300.
23    Q  So you think the 144 is accurate but the
24  600 is double?
25      MS. ALLEN:  I'm just going to object that

118

1  it misstates the testimony.
2    A  Well, actually no. The report is correct.
3  There were 300 respondents in the test and 300 in
4  the control according to my footnote here. So I'd
5  have to look back at Mr. Poret's report to find
6  out the number of respondents in his survey.
7    Q  (By Mr. Getzoff)  So if you look at his
8  report. Here, let me --
9      (Exhibit No. 62 was previously marked for
10  identification and is attached to the transcript.)
11    Q  So, Dr. Anderson, I have put what's been
12  previously marked as Exhibit 62, Deposition
13  Exhibit 62, in the chat room, which is the body of
14  his report. And if you turn -- if you look at
15  page 9 where he starts talking about the -- the
16  design. He says there was a total of 300
17  respondents.
18    A  At the bottom of page 9 you said?
19    Q  It's actually -- it's the top of page 9.
20    A  I see that.
21    Q  So you think the 600 you meant 300?
22    A  This is something we could, you know,
23  easily verify by looking at his data file. But,
24  yes, it looks like I made a mistake in the total
25  number of respondents in the Poret survey.

119

1    Q  And then so if -- if the 600 should have
2  been 300, I'm going back to your report now, is
3  144 correct or is 24 percent correct? And what --
4    A  I believe the 144 was correct because I
5  did a count of those respondents who met the
6  criteria that I mentioned for selecting one of the
7  other search results.
8      THE REPORTER:  Excuse me, Doctor, can I
9  just make sure -- can you just be sure and speak
10  up a little bit more, please?
11      THE WITNESS:  Yes. Did you hear the last
12  response?
13      THE REPORTER:  Yes. I'm straining but I
14  heard it, yes. Thank you.
15    Q  (By Mr. Getzoff)  I want to see -- Doctor,
16  I want to see if we can get to the bottom of this.
17  I'm going to send you Exhibit D as in dog -- I'm
18  sorry, appendix D of his report, which it looks
19  like that's what you used to do this calculation.
20  Is that right?
21    A  Exhibit D, correct.
22    Q  Okay.
23    A  I'm sorry, appendix D.
24    Q  Appendix D. So appendix D was separately
25  marked in Mr. Poret's deposition as Exhibit 67.

120

1      (Exhibit No. 67 was previously marked for
2  identification and is attached to the transcript.)
3    Q  I have put Exhibit 67 in the chat. And
4  just as a warning it initially is the entire
5  spreadsheet on a single page. At least that's the
6  way it a appears to me until you start to blow it
7  up.
8    A  I didn't understand what you just said.
9    Q  It's probably not material. It's an Excel
10  spreadsheet. And the way it was saved makes it
11  look really, really small when you first open it.
12  That's all I meant. Okay.
13    A  I've got Exhibit 67 open.
14    Q  Okay. So could you -- looking at the
15  process you followed as described by you in
16  paragraph 105, can you walk me through what you
17  actually did on Exhibit 67 to arrive at the 144?
18    A  Do you have the data map available that
19  was provided that explains what these codes mean?
20    Q  Yes. Give me a second. So what does --
21  so what does a data map look like? Is it another
22  Excel spreadsheet?
23    A  I forget the format that Mr. Poret
24  provided it in. It wasn't included with his
25  initial report, which is why I think it had to be

121

1  requested.
2    Q  I think -- I think I have it.  I just --
3    A  What it would provide is, for example,
4  does a one mean a yes or no, for instance.  Or
5  does a one mean a male or female.  It would
6  provide that kind of interpretation of what we see
7  in Exhibit D -- appendix D.
8    Q  Okay.  I'm going to put that in the chat
9  room, and we will mark this as the next exhibit.
10    MR. GETZOFF:  Which will make it 78 I
11  think, Carla?
12    THE REPORTER:  (Nodding head.)
13    (Exhibit No. 78 was marked for
14  identification and is attached to the transcript.)
15    Q  (By Mr. Getzoff)  So what I -- what I just
16  sent you, Dr. Anderson, is it's an Excel
17  spreadsheet.  It has two sheets at the bottom.
18  The first sheet I think is the same as Exhibit 67
19  that I sent you.  And then it has a different it
20  has a different -- it has a second sheet, which is
21  the data map that I think interprets the answers.
22    A  I see those.
23    Q  And I don't necessarily need you to
24  recompute everything.  I just want you to explain
25  sort of the methodology you went through to add

122

1  this up.
2    A  And I know there was also a document that
3  explained what the different areas, applicable
4  areas, were on the search results that Mr. Poret
5  tested.  I'm not going to ask you to provide that
6  also, but I'm going to refer to my footnote 85.
7    And based that it looks like the areas
8  numbered 1, 8, 9, 10, and 11 are search results in
9  what Mr. Poret tested that do not refer to Elevate
10  or Elevations.  So what I did in my analysis is
11  for each respondent and in the Excel file in row 2
12  there's respondent that's labeled in column case
13  ID.  In cell 2 -- what's cell A2 case ID 10011.
14  It's one of the respondents in the survey.  I
15  would have gone to their responses for the
16  questions that measure likelihood of confusion,
17  which I believe start at question 3 -- I don't
18  know if it's 320.  Let's see.  320.  No, 330.
19  Q330.  And in columns AH through AT are the
20  responses for one of the questions Mr. Poret asked
21  that measured -- that he used to measure
22  likelihood of confusion.
23    And then for question 350, 3-5-0, in
24  columns AV through BG, that's I believe for the
25  test cell.  And then also there are other columns

123

1  for questions 330 and questions 350, the control
2  cell.  If at -- in any of those columns the
3  respondent indicated that they -- data indicates
4  that the respondent selected area 1, 8, 9, 10,
5  and/or 11, then I would have counted them as
6  having selected one of those other search results.
7    Q  I see.  So for example, for the first
8  entry here case ID 10011, if you go over to the
9  Q330 questions they responded for AH, they put in
10  a number 1.
11    A  Well, that was -- that was a different
12  question.  That was question 320.
13    Q  Ah.
14    A  But I would start looking --
15    Q  Sorry, right so --
16    (Simultaneous crosstalk.)
17    Q  (By Mr. Getzoff)  So it's column -- you
18  talk.  I'll listen.
19    A  So for that respondent and the way this
20  data file is organized it makes it a little
21  inconvenient as opposed to having a column for
22  each response option.  But in A, column AI, that
23  respondent indicated area two on the searchable --
24  the applicable image that Mr. Poret showed.  And
25  then in the next column area 4 and area 5, 7, and

124

1  12 and if we continue to question 350 they -- that
2  respondent selected area 3.
3    And I think from the list I just
4  mentioned, none of those areas indicate an other
5  response.  So I would have classified that
6  response as not having selected any of the other
7  search results.  And I'll give an example of --
8  the fourth respondent down, this is case ID
9  100319, that respondent in column AK did select
10  the eighth search result or the eighth area that
11  was selectable on the map.  And it looks like that
12  was one of the other search results.  So they
13  would have been classified as having selected one
14  of the other search results other than Elevate or
15  the defendant.
16    Q  Got it.  So you didn't distinguish between
17  what other category they selected.  So long as it
18  was one of the other categories, they were
19  included in your total.
20    A  One of the other search results, right.
21    Q  So basically if it wasn't -- if it was a
22  1, 8, 9, 10, or 11 you aggregated all of those
23  responses to arrive at 144, the figure you put in
24  paragraph 105.
25    A  No, not all the responses.  All of the

125

1 respondents, so.
2     Q I stand corrected.
3     A And each with -- each respondent --
4     Q You didn't double count -- you didn't
5 count a respondent twice. If a respondent
6 selected 1, 8, 9, 10, or 11 or any of the
7 questions in cell 330 or 350, they went in the
8 other category for your calculation and were part
9 of the total that led to the 144 figure.
10     A There was no double counting of
11 respondents, that's correct.
12     Q Okay. I think we can figure out the rest.
13     Dr. Anderson, over the last 18 months,
14 basically during -- during the time of the COVID
15 pandemic, do you think consumer buying of banking
16 or credit union services over the Internet have
17 gone up or down?
18     MS. ALLEN: I'm going to object that it's
19 outside of the scope of his report.
20     A I don't know the answer to that.
21     Q (By Mr. Getzoff) Have you looked at
22 any -- any data or objective information indicate
23 whether consumers of banking or financial services
24 the during COVID over the Internet has gone up or
25 down?

126

1     MS. ALLEN: Vague.
2     A Not that I recall.
3     Q (By Mr. Getzoff) Do you know, again over
4 the last 18 months or so during the COVID
5 pandemic, whether physical branches for Elevate
6 Federal Credit Union have been open for people to
7 walk into?
8     A I didn't hear all of your question.
9     Q Do you know whether during the last
10 18 months or so of the COVID pandemic whether the
11 physical brick and mortar bank branches operated
12 by Elevate Federal Credit Union have been open?
13     MS. ALLEN: Objection that it's outside of
14 the scope of his report.
15     A No.
16     Q (By Mr. Getzoff) You don't know one way
17 or the other?
18     A That's correct. I don't know.
19     Q If -- if credit union branch locations
20 have been closed over the last 18 months, how do
21 you think people have signed up for banking
22 services or credit union services?
23     MS. ALLEN: Calls for speculation,
24 incomplete hypothetical.
25     A I don't think the premise of the question

127

1 is correct.
2     Q (By Mr. Getzoff) Well, the premise of the
3 question was an if. So that's asking you to
4 accept the premise. If -- if the physical
5 locations during the COVID pandemic, the physical
6 Elevate Federal Credit Union locations have been
7 closed, how do you think their customers have --
8 how do you think they have obtained new customers?
9     MS. ALLEN: Same objections.
10     A Sorry, I'm not sure the premise is
11 correct. And I think that question was different
12 than the previous one you asked me, so I have to
13 ask you to repeat it.
14     Q (By Mr. Getzoff) What part of the -- what
15 part of the premise are you disagreeing with?
16     A Well, I think the first time you asked me
17 the question you phrased it as if -- if credit
18 unions have been closed.
19     Q No. No.
20     (Simultaneous crosstalk.)
21     Q (By Mr. Getzoff) If the physical branch
22 locations that people would normally go into if
23 they wanted to conduct their banking in person, if
24 those locations have been closed during the COVID
25 pandemic how do you think Elevate Federal Credit

128

1 Union has been signing up new customers?
2     MS. ALLEN: Same objections.
3     A Again, this is still a different question.
4 In the premise, are you talking about Elevate?
5     Q (By Mr. Getzoff) Yes.
6     A Not credit unions in general, which is --
7     Q I'm talking about Elevate. I'm asking you
8 to assume that the Elevate branch locations have
9 been closed to foot traffic during COVID. And if
10 that's been the case how has Elevations been
11 signing up new customers?
12     MS. ALLEN: Same objections.
13     A Once again, I don't know that the premise
14 of the question is true. But regardless, the
15 answer would be I don't know.
16     Q (By Mr. Getzoff) I mean all of your
17 experience in consumer behavior including the
18 financial institutions and if they can't sign up
19 in person you have no idea how they might sign up
20 as an alternative to an in-person transaction?
21     MS. ALLEN: Misstates the testimony, asked
22 and answered.
23     A I think I would have to speculate, which I
24 don't think the court would want me to do.
25     Q (By Mr. Getzoff) That sounds -- fair to

129

1 say, that's outside the field of your expertise?
2     MS. ALLEN: Misstates the testimony.
3     **A I wouldn't say it's outside of the field**
4 **of my expertise. But I think you're asking a**
5 **question for which information probably exists,**
6 **but it's not at my disposal.**
7     Q (By Mr. Getzoff) Well, in your report you
8 said that consumers are not likely to select a
9 credit union based solely on a list of Internet
10 search results, right?
11     **A You're reading the last sentence of**
12 **paragraph 77, correct?**
13     Q Correct.
14     **A Yes, I did say that -- or write that.**
15     Q What did you rely on to reach that
16 conclusion -- strike that. Let me ask a different
17 question.
18     You weren't speculating when you made that
19 assertion, right?
20     **A No. I was -- this is part of my report**
21 **where I discuss involvement beginning in**
22 **paragraph 69 and the effect that involvement has**
23 **on decision-making. And I've also cited some of**
24 **the information from Mr. Poret's survey and then**
25 **reached that paragraph 77 where I made that**

130

1 **statement.**
2     Q Have you looked at or relied on any data
3 or objective information to know how many -- or
4 how often credit union customers in general
5 actually use a branch location, a physical branch
6 location?
7     **A No.**
8     Q Have you looked at any data or objective
9 information to determine how many credit union
10 customers conduct most or all of their -- their
11 banking online?
12     MS. ALLEN: Vague.
13     **A No, I don't believe so.**
14     Q (By Mr. Getzoff) Are you aware of banks
15 or credit unions that have no physical branches at
16 all that are 100 percent online?
17     **A I believe that to be the case at least for**
18 **banks. I don't know about credit unions.**
19     Q Are you aware of how many of Elevate's
20 current customers are eligible to join Elevations
21 Credit Union?
22     MS. ALLEN: Objection, outside the scope
23 of his report.
24     **A No.**
25     Q (By Mr. Getzoff) And that same question

131

1 in reverse. Are you aware of how many of
2 Elevations' current customers are eligible to join
3 Elevate Federal Credit Union?
4     MS. ALLEN: Same objection.
5     **A No.**
6     MR. GETZOFF: Let's go off the record.
7     (Break taken from 3:20 p.m. to 3:29 p.m.)
8     Q (By Mr. Getzoff) Dr. Anderson, during the
9 lunch break today or at any time did you happen to
10 run a search of (indiscernible.)
11     THE REPORTER: I'm sorry, of what?
12     Q (By Mr. Getzoff) Elevate Credit Union to
13 see what the results were?
14     **A No.**
15     Q Are you -- are you curious?
16     **A I may be curious by nature but in regard**
17 **to that question, no, I don't think that it would**
18 **matter today.**
19     Q You said you don't think it matters?
20     **A I don't it matters what that search**
21 **result -- what the search results would be today.**
22     Q And why is that?
23     **A Mr. Poret was responsible -- Mr. Poret was**
24 **responsible for conducting searches when he**
25 **designed his survey to demonstrate justification**

132

1 **for the type of survey that he conducted.**
2     Q So if there's physical proximity -- if
3 there's proximity in search results between
4 Elevations and Elevate, such as on the same first
5 page of a search for Elevate Credit Union, you
6 don't think it matters?
7     MS. ALLEN: Objection, misstates the
8 testimony, calls for speculation.
9     **A I think your question was referring to**
10 what the results would be (indiscernible.)
11     THE REPORTER: I'm sorry. Can you start
12 that over? You're really bleeping out.
13     THE WITNESS: Can you hear me okay?
14     THE REPORTER: Yes.
15     THE WITNESS: Is that better?
16     THE REPORTER: Yes.
17     **A I believe your question referred to search**
18 **results today. And search results today may not**
19 **reflect the situation when Mr. Poret conducted his**
20 **survey or the searches that he may have conducted**
21 **he didn't document. So I don't know that search**
22 **results today would be relevant to evaluating the**
23 **Poret survey.**
24     Q (By Mr. Getzoff) Dr. Anderson, is it your
25 understanding that the plaintiff Elevate is still

---

**133**

1 today using the mark Elevate for all of their
2 services?
3    MS. ALLEN: Objection, outside the scope
4 of his report.
5    **A I don't know.**
6    Q (By Mr. Getzoff) If the -- if the
7 circumstances and conditions of the use of the
8 marks by both parties is the same today as it was
9 three months ago, wouldn't you want to know
10 whether there was competitive proximity from the
11 consumer standpoint as to those marks?
12    MS. ALLEN: Objection, calls for
13 speculation and vague.
14    **A Not in terms of my opinions. It wouldn't**
15 **affect my opinion about the Poret survey, which**
16 **was provided in the first quarter -- conducted in**
17 **the first quarter of this year.**
18    Q (By Mr. Getzoff) But it would be relevant
19 to the real world situation as to whether there's
20 a likelihood of confusion between these two marks
21 based on ongoing use by the two parties, right?
22    **A I don't know whether it would be relevant**
23 **to that issue. But it would not be relevant to my**
24 **opinions about the Poret survey, and it wouldn't**
25 **be relevant to the Poret survey.**

---

**134**

1    MR. GETZOFF: I have no further questions.
2 Thank you, sir, for your time.
3    THE WITNESS: Thank you.
4    THE REPORTER: And if there's not any
5 other questions, can I get you-all to state on the
6 record what you'd like to order, please.
7    MR. GETZOFF: I would like an e-trans,
8 please.
9    MS. ALLEN: We'll have the same.
10    (The adjourned concluded at 3:33 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**135**

1    ACKNOWLEDGMENT OF DEPONENT
2    I, JUSTIN ANDERSON, PhD, do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony and the same is a true,
5 correct, and complete transcription of the
6 testimony given by me and any corrections appear
7 on the attached errata sheet signed by me.
8
9
10
11 _____   _____
12    (SIGNATURE)          (DATE)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**136**

1    CERTIFICATE OF SHORTHAND REPORTER
2
3    I, CARLA S. KIMBROUGH, court reporter, the officer
4 before whom the foregoing deposition was taken, do
5 hereby certify that the foregoing transcript is a
6 true and correct record of the testimony given;
7 that said testimony was taken by me
8 stenographically and thereafter reduced to
9 typewriting under my direction; and that I am
10 neither counsel for, related to, nor employed by
11 any of the parties to this case and have no
12 interest, financial or otherwise, in its outcome.
13
14 IN WITNESS WHEREOF, I have hereunto set my hand
15 and affixed my seal this 9th day of August, 2021.
16
17 _Carla S. Kimbrough_
18
19 Carla Sue Kimbrough, C.S.R.
20 Oklahoma Certified Shorthand Reporter
21 Certificate No. 1237
22
23
24
25

**A**

a-n-d-e-r-s-o-n
6:2
a2
122:13
able
9:16, 9:23,
59:19
about
7:4, 11:4,
24:4, 24:13,
25:17, 27:19,
28:2, 28:4,
32:22, 33:1,
35:23, 41:5,
42:3, 42:23,
43:17, 47:4,
50:14, 52:24,
53:25, 54:4,
54:9, 54:13,
54:16, 55:5,
58:18, 59:19,
61:16, 61:17,
61:19, 61:20,
62:2, 67:12,
67:14, 69:7,
72:17, 73:12,
76:10, 77:5,
77:7, 77:9,
77:12, 77:16,
77:18, 77:19,
77:21, 78:3,
78:24, 81:17,
81:20, 84:25,
85:9, 85:14,
85:18, 87:10,
88:23, 90:20,
91:3, 92:11,
93:10, 94:2,
94:17, 94:23,
95:1, 95:22,
96:7, 96:17,
96:18, 100:12,
101:11, 108:10,
108:22, 111:25,
113:1, 114:2,
115:8, 118:15,

128:4, 128:7,
130:18, 133:15,
133:24
abstract
58:8
accept
32:3, 46:22,
99:2, 127:4
accepted
31:13
according
29:17, 61:11,
79:19, 104:7,
110:3, 110:25,
118:4
account
113:7
accurate
8:14, 8:24,
11:15, 21:5,
102:25, 117:23
accuse
115:10
accused
12:5, 12:9,
13:6, 14:11,
37:2
accusing
12:12
acknowledge
5:5, 5:14,
5:18, 102:1,
135:3
acknowledgment
135:1
across
30:21, 30:25,
86:20
action
1:6, 115:6
actionable
31:21
actual
52:22
actually
32:17, 50:15,
82:6, 91:13,
118:2, 118:19,

120:17, 130:5
add
116:21, 121:25
adding
106:24
addition
85:7, 93:9
additional
29:19, 30:4
address
6:9, 7:25,
61:19, 63:21,
68:12
addressed
19:8, 31:17,
76:9
addresses
53:3, 53:7,
68:15
adjourned
134:10
admissibility
5:7
admitted
91:14
advertisement
47:8, 48:1,
99:4
advertisements
47:23
advertises
48:1, 48:8
advertising
48:20, 49:1,
104:25, 105:9,
105:10, 105:14,
105:18, 105:22,
105:24, 106:2,
106:6
affect
67:1, 72:21,
133:15
affected
101:7, 108:12,
108:20, 114:4
affecting
108:16, 114:16
affects
70:4, 76:3

affiliated
116:17
affixed
136:15
after
25:24, 91:9,
93:2, 94:8, 96:3
again
14:25, 21:11,
21:23, 26:12,
33:16, 35:19,
36:17, 41:23,
48:24, 50:25,
59:15, 126:3,
128:3, 128:13
against
80:22, 91:3,
92:7, 92:11,
93:6, 95:4
aggregated
117:10, 117:12,
124:22
ago
22:20, 22:22,
28:5, 40:9,
40:10, 133:9
agree
5:11, 5:12,
8:7, 38:11,
47:19, 47:25,
52:22, 71:20,
105:3, 105:5,
106:10, 111:3
agreed
55:17
agreement
95:3
ah
122:19, 123:9,
123:13
ai
123:22
ak
124:9
al
19:16
algorithm
108:17

algorithms
89:5
aligned
37:1
all
5:17, 9:5, 9:6,
11:17, 12:23,
21:5, 21:12,
27:25, 42:17,
43:1, 43:11,
43:18, 49:21,
57:2, 80:3,
82:11, 83:18,
86:6, 90:15,
93:9, 94:9,
95:7, 99:15,
101:2, 102:5,
102:8, 108:23,
111:25, 116:22,
117:12, 120:12,
124:22, 124:25,
126:8, 128:16,
130:10, 130:16,
133:1
allegations
32:8, 39:23
alleged
13:13, 14:21,
15:21, 80:21
allergen
17:10
allow
44:12, 90:3,
91:2, 94:2
allowing
90:22
already
42:9, 64:2,
91:13, 93:3
also
3:18, 6:21,
13:4, 15:4,
20:16, 26:5,
43:1, 72:3,
83:15, 110:19,
114:12, 122:2,
122:6, 122:25,
129:23

alternative
128:20
although
83:15
always
12:2, 12:3,
12:4
ambiguous
43:4
among
54:1, 54:24
analysis
26:6, 57:17,
105:14, 109:25,
122:10
analyzed
105:22
anderson
1:18, 2:1, 4:3,
4:8, 5:10, 5:13,
6:2, 6:3, 6:4,
6:6, 6:8, 6:16,
7:8, 7:24, 8:11,
8:20, 9:12,
10:7, 10:10,
10:13, 21:4,
22:3, 23:6,
24:3, 27:4,
28:18, 34:20,
36:2, 36:12,
41:18, 42:15,
43:16, 43:21,
44:3, 51:17,
52:15, 58:5,
78:20, 93:13,
94:4, 96:1,
96:22, 97:8,
97:20, 97:24,
100:17, 110:8,
114:1, 115:7,
118:11, 121:16,
125:13, 131:8,
132:24, 135:2
another
40:14, 41:1,
59:13, 59:23,
78:15, 97:15,
108:24, 120:21

answer
8:18, 18:2,
20:1, 32:1,
32:7, 33:7,
33:14, 35:15,
42:21, 43:17,
47:16, 61:1,
71:25, 84:11,
88:7, 94:25,
95:12, 95:19,
95:22, 96:6,
96:20, 115:25,
125:20, 128:15
answered
24:20, 26:15,
27:1, 27:22,
28:9, 28:12,
35:18, 36:16,
40:17, 40:23,
41:3, 41:10,
41:22, 42:13,
43:15, 45:18,
48:23, 49:15,
51:8, 61:23,
69:2, 74:2,
75:17, 84:5,
84:14, 85:4,
88:16, 106:25,
128:22
answers
109:11, 121:21
any
8:7, 8:8, 21:8,
21:16, 21:20,
23:4, 24:23,
25:4, 25:10,
26:6, 26:18,
29:19, 30:23,
32:4, 42:23,
45:25, 46:9,
46:18, 49:10,
49:11, 50:9,
50:22, 51:5,
59:21, 62:4,
62:14, 64:18,
65:12, 65:25,
67:8, 67:17,
67:23, 67:25,

68:24, 69:10,
70:1, 70:14,
72:8, 72:23,
73:4, 73:7,
73:23, 74:8,
74:22, 75:4,
76:5, 84:8,
85:1, 86:13,
86:15, 88:11,
88:19, 89:12,
90:15, 91:11,
94:5, 97:5,
105:13, 105:17,
105:25, 109:12,
110:5, 110:15,
111:15, 112:14,
123:2, 124:6,
125:6, 125:22,
130:2, 130:8,
131:9, 134:4,
135:6, 136:11
anybody
24:7, 24:17,
25:14, 25:21
anymore
110:1
anyone
8:3, 24:11,
25:8, 25:17,
28:24
anything
27:19, 30:14,
30:21, 30:25,
39:25, 51:14,
64:9, 70:7,
91:5, 116:23
anywhere
85:17
apologize
6:7, 117:19
app
79:25, 85:13
appear
135:6
appearance
13:14
appeared
86:7

appearing
108:15
appears
98:19, 100:11,
120:6
appendix
116:10, 119:18,
119:23, 119:24,
121:7
appendixes
10:18
applicable
122:3, 123:24
applicant
15:24
applicant's
16:2
applied
50:6, 50:10
applying
49:11
appropriate
38:13, 44:19,
45:4, 45:16,
45:22, 52:21,
57:5, 57:17,
58:2, 89:16,
92:1, 92:14,
102:3, 103:11,
104:5, 105:7,
107:10, 108:18
appropriately
92:15
approximately
6:22
area
123:4, 123:23,
123:25, 124:2,
124:10
areas
122:3, 122:4,
122:7, 124:4
aren't
42:24, 51:15,
90:25, 102:4,
107:23
argued
39:11

arguments
43:6, 43:19,
89:23, 109:12
around
47:21
arrive
82:24, 116:24,
117:13, 120:17,
124:23
arrow
112:20, 112:21
article
51:18, 51:24,
52:13, 52:19,
53:1, 53:5,
53:14, 53:15,
53:21, 54:18,
56:15, 57:1,
62:3, 100:12,
100:18, 101:17,
103:4, 104:8,
106:21, 108:9,
108:13, 111:2,
111:4, 111:21
articles
108:13, 111:1
aside
11:14, 106:18
asked
18:2, 24:20,
26:10, 26:15,
27:1, 27:9,
27:22, 28:9,
28:12, 35:18,
36:16, 40:17,
40:23, 41:3,
41:22, 42:13,
42:22, 43:8,
43:10, 43:14,
45:18, 48:23,
49:15, 51:8,
52:23, 59:16,
61:23, 69:2,
74:2, 75:17,
77:7, 84:5,
85:4, 88:15,
96:15, 108:22,
122:20, 127:12,

127:16, 128:21
asking
23:22, 35:1,
35:2, 35:3,
41:5, 42:3,
42:10, 43:9,
43:10, 47:15,
61:16, 61:17,
61:18, 77:5,
77:8, 77:16,
77:18, 77:19,
81:17, 89:14,
94:12, 94:20,
106:17, 106:19,
114:2, 127:3,
128:7, 129:4
asks
115:16
assert
69:20
asserted
38:19
asserting
15:21, 15:23
assertion
60:6, 60:9,
62:14, 70:2,
72:9, 72:15,
72:16, 129:19
assertions
70:22, 70:23
assist
26:5
assume
15:10, 97:3,
106:19, 128:8
assumed
12:24
assuming
109:3
atlantic
19:16
attached
4:7, 10:6,
52:11, 91:18,
96:25, 118:10,
120:2, 121:14,
135:7

attempt
113:9
attempting
19:24
attend
71:12
attention
55:15
attorneys
25:12
audioeye
15:9, 15:12,
15:24
august
136:15
authoritative
53:2, 53:6,
111:4
authorities
111:1
authority
52:20, 52:24
authors
55:18, 55:23,
56:7, 56:25,
57:21, 100:18,
105:6
automatically
48:10, 48:21
av
122:24
available
60:13, 60:19,
120:18
aware
32:4, 48:15,
48:18, 64:2,
102:12, 102:13,
130:14, 130:19,
131:1
awareness
37:22, 38:7,
38:14, 39:1,
39:7, 39:20,
40:4, 45:2,
45:11, 45:21,
46:4, 46:8,
46:10, 46:12,

47:5, 47:9,
47:14, 48:3,
48:11, 48:22,
48:25, 49:1,
49:8, 49:13,
50:2, 50:13,
50:16, 50:22,
50:24, 51:5,
102:7, 105:12,
110:24

**B**

**back**
17:1, 36:3,
78:21, 90:4,
90:7, 99:22,
100:2, 103:4,
118:5, 119:2
**backwards**
112:20
**bag**
11:10
**bags**
11:21, 12:12
**bank**
71:21, 72:1,
76:14, 76:19,
76:25, 77:5,
126:11
**banking**
24:12, 24:14,
24:18, 24:25,
25:6, 65:14,
65:17, 66:3,
67:10, 67:19,
68:1, 68:12,
73:22, 74:24,
75:6, 76:7,
77:12, 78:4,
78:8, 78:9,
125:15, 125:23,
126:21, 127:23,
130:11
**banks**
130:14, 130:18
**base**
108:19
**based**
5:8, 35:3,

35:21, 45:20,
47:16, 47:21,
55:19, 56:7,
56:22, 57:17,
61:10, 70:3,
72:20, 74:4,
74:6, 75:22,
76:2, 83:3,
108:3, 108:19,
112:19, 122:7,
129:9, 133:21
**bases**
43:1, 43:6,
43:13
**basically**
90:4, 124:21,
125:14
**basis**
42:18, 62:14,
116:11
**bates**
96:16
**bay**
20:16, 20:23
**bearing**
46:8
**became**
48:17
**because**
31:18, 33:3,
33:5, 39:3,
48:7, 48:8,
64:13, 85:22,
93:6, 95:14,
102:22, 106:20,
107:14, 109:23,
119:4
**been**
8:12, 10:2,
11:24, 24:1,
26:11, 26:24,
26:25, 27:6,
29:19, 45:16,
46:19, 49:4,
49:5, 49:11,
50:25, 73:16,
74:22, 75:3,
76:10, 90:9,

91:7, 104:21,
106:6, 106:17,
114:22, 118:11,
119:2, 124:13,
126:6, 126:12,
126:20, 127:6,
127:18, 127:24,
128:1, 128:9,
128:10
**before**
2:9, 20:16,
26:11, 34:2,
43:8, 69:11,
72:6, 73:1,
73:6, 73:25,
84:11, 84:15,
92:14, 92:15,
94:13, 94:21,
114:1, 114:5,
114:6, 114:7,
136:4
**beforehand**
113:2
**beginning**
129:21
**begins**
57:20, 70:16
**behalf**
3:2, 3:10
**behavior**
59:9, 59:17,
62:19, 68:9,
74:24, 75:5,
76:7, 78:2,
128:17
**being**
12:9, 13:6,
13:11, 14:11,
19:7, 29:1,
37:1, 38:18,
47:21, 52:19,
56:9, 57:12,
59:15, 59:16
**belief**
32:17
**believe**
7:13, 10:12,
11:13, 11:20,

12:11, 12:14,
12:16, 12:19,
13:8, 14:2,
14:13, 16:24,
17:24, 18:21,
23:24, 28:14,
30:2, 31:22,
36:6, 37:13,
42:23, 43:18,
45:8, 45:9,
46:23, 46:24,
47:2, 51:22,
51:23, 57:4,
57:19, 64:22,
67:22, 80:7,
81:25, 114:10,
114:15, 115:12,
116:9, 119:4,
122:17, 122:24,
130:13, 130:17,
132:17
**believed**
30:22
**besides**
30:14
**bet**
34:17
**better**
132:15
**between**
22:11, 54:10,
58:13, 58:19,
93:7, 124:16,
132:3, 133:20
**bg**
122:24
**bill**
29:14
**billed**
29:17
**bills**
29:10, 29:11
**bing**
60:7, 62:6,
82:5, 82:19,
85:12
**bit**
24:3, 115:8,

119:10
**blackboard**
15:9, 15:18,
15:20, 15:21,
15:25
**blackstone**
12:17
**bleeping**
132:12
**blow**
120:6
**blueprint**
18:22, 18:23
**body**
10:14, 118:13
**bombardier**
18:5
**both**
44:2, 75:21,
82:18, 85:12,
133:8
**bottom**
108:6, 118:18,
119:16, 121:17
**boulder**
3:15
**boulevard**
6:10
**branch**
126:19, 127:21,
128:8, 130:5
**branches**
126:5, 126:11,
130:15
**brand**
101:23, 102:23,
103:20, 104:4,
104:13, 104:25,
105:6, 105:8,
105:9, 110:23
**brand-specific**
110:23
**brands**
104:15, 106:11
**break**
7:1, 34:12,
34:19, 35:25,
78:15, 78:18,

113:13, 113:25,
131:7, 131:9
**brewing**
20:15
**brick**
126:11
**bring**
89:24
**broadly**
76:16
**broadway**
3:14
**broke**
114:2, 114:5
**browser**
101:14, 112:12,
112:18, 112:24
**browsers**
112:14
**browsing**
113:2, 113:15
**budget**
106:6
**bullet**
80:10, 80:23
**bullets**
80:3, 82:9
**bunch**
53:10
**burden**
110:19, 110:20
**business**
24:16
**button**
112:22
**buying**
125:15

---
**C**
---

**cache**
101:14, 113:1,
113:5, 113:15,
113:22, 114:7,
114:14, 114:15,
114:20
**calculate**
116:6
**calculation**
119:19, 125:8

**california**
6:11
**call**
6:6, 23:16,
53:14, 81:1
**called**
51:19, 66:15,
114:13, 117:3
**calls**
31:24, 32:20,
34:6, 35:8,
37:24, 43:4,
44:6, 100:24,
126:23, 132:8,
133:12
**came**
92:13
**can't**
27:12, 27:17,
28:6, 32:22,
33:6, 51:22,
75:20, 75:21,
92:6, 93:5,
101:3, 101:4,
102:14, 128:18
**card**
77:5
**career**
9:7, 42:10
**carla**
1:25, 2:9,
121:11, 136:3,
136:19
**cases**
8:14, 10:18,
11:18, 20:14,
21:5, 21:12,
21:14, 35:14,
68:5, 74:9,
113:22, 113:23
**categories**
124:18
**category**
101:23, 102:24,
103:13, 103:19,
124:17, 125:8
**caveat**
106:24

**celestial**
14:1, 14:11,
17:1
**cell**
122:13, 122:25,
123:2, 125:7
**certain**
19:13, 37:18,
102:3
**certainly**
9:10, 91:10
**certificate**
136:1, 136:21
**certified**
2:10, 136:20
**certify**
136:5
**challenge**
23:21
**challenged**
23:19
**challenges**
24:1
**change**
31:1, 88:6,
88:8, 88:12,
88:14, 88:20
**changed**
86:21, 111:16
**channel**
51:10, 51:11
**characterize**
56:8, 57:11,
58:7
**charge**
28:24, 29:5
**charged**
29:15
**charges**
29:6, 29:9
**charging**
28:18, 28:22,
29:7
**chat**
10:8, 52:14,
91:20, 96:9,
97:2, 118:13,
120:3, 121:8

check
25:25, 34:13
checking
64:19
chips
32:14
chose
93:7
chronological
11:5
circumstance
50:10
circumstances
44:11, 46:17,
88:13, 88:19,
133:7
citation
62:15, 70:17
citations
70:14, 73:15
cite
51:24, 52:8,
60:10, 62:8,
62:13, 64:18,
70:7, 70:9, 80:2
cited
53:10, 61:12,
62:4, 62:10,
62:22, 64:6,
64:11, 68:5,
68:9, 69:4,
70:21, 73:15,
129:23
citing
62:3
city
3:7
civil
1:6
claim
88:18
clarified
31:4
clarify
12:6, 12:21,
26:17, 65:19,
81:6, 114:11
classified
116:12, 117:1,

117:6, 124:5,
124:13
clause
31:21
clear
17:25, 22:24,
26:24, 49:25,
83:21, 86:25,
113:1, 113:5,
114:14, 114:19,
114:23
cleared
114:6, 114:7
clearing
113:15, 113:22
clearly
7:19, 14:22,
15:2
client
95:8, 99:8
clients
74:18, 75:19
closed
126:20, 127:7,
127:18, 127:24,
128:9
closely
19:13
closer
87:25
club
36:7, 36:11,
40:22
co-counsel
91:15, 93:2
codes
120:19
coffee
18:23
colleague
25:24, 26:3,
26:5
colorado
3:15, 83:25
column
122:12, 123:17,
123:21, 123:22,
123:25, 124:9

columns
122:19, 122:24,
122:25, 123:2
come
30:21, 30:25,
32:16, 32:18
comes
41:16, 106:16
coming
51:16
commenting
45:11
common
107:16, 107:17,
107:19, 109:9,
109:21
commonly
102:10, 107:22
communications
8:8
companies
54:11, 80:24
company
19:16, 32:16,
32:18, 48:1,
48:8
compensation
29:21
competing
60:18, 61:9
competitive
57:3, 100:20,
133:10
complete
11:17, 30:1,
30:2, 42:17,
43:11, 135:5
completely
95:13
compound
19:25, 33:8,
42:20, 63:18,
86:22, 88:15
computer
101:9
concept
66:15
concern
76:19, 76:24

concerning
8:17, 18:8
conclude
61:8, 63:14,
67:18, 116:19
concluded
104:15, 134:10
conclusion
31:25, 32:21,
34:6, 35:2,
35:9, 37:6,
37:25, 55:1,
129:16
condition
104:16, 104:23
conditions
57:6, 57:16,
102:3, 102:4,
104:3, 104:9,
104:12, 104:19,
104:21, 106:8,
106:20, 107:6,
107:13, 107:14,
114:3, 133:7
conduct
16:14, 17:17,
18:13, 18:14,
18:25, 20:9,
21:7, 21:19,
21:24, 22:4,
22:25, 23:3,
23:4, 36:20,
46:9, 52:20,
52:25, 53:16,
65:12, 65:25,
67:8, 67:25,
105:13, 109:15,
127:23, 130:10
conducted
1:19, 2:1,
8:22, 9:6,
22:13, 22:17,
28:3, 31:19,
37:9, 40:15,
40:20, 41:1,
41:5, 41:8,
41:19, 46:6,
49:3, 50:19,

66:7, 67:17,
67:23, 68:25,
73:16, 74:14,
78:6, 79:9,
86:7, 101:3,
101:5, 101:11,
101:13, 107:1,
107:24, 114:12,
132:1, 132:19,
132:20, 133:16
**conducting**
8:13, 54:14,
100:21, 131:24
**conducts**
89:2
**confidential**
65:6, 74:19,
75:18
**confirm**
64:9
**confused**
32:16, 63:22
**confusion**
8:24, 9:2, 9:9,
13:22, 14:3,
14:15, 16:3,
16:6, 16:20,
19:5, 19:21,
20:9, 20:25,
21:8, 21:16,
21:20, 21:25,
22:5, 22:8,
22:13, 22:17,
22:25, 26:13,
27:14, 27:20,
28:3, 28:8,
31:10, 31:11,
31:16, 31:20,
31:22, 31:23,
32:2, 32:5,
32:8, 32:19,
33:4, 33:5,
33:6, 34:4,
34:5, 34:21,
34:22, 34:23,
35:6, 35:11,
35:22, 36:14,
36:21, 37:5,

38:25, 40:16,
40:21, 41:2,
41:8, 41:19,
42:12, 43:21,
44:5, 44:10,
44:12, 44:14,
46:18, 47:1,
48:16, 49:6,
50:17, 51:19,
52:1, 53:6,
53:23, 54:1,
54:6, 54:15,
54:24, 55:10,
55:16, 56:16,
100:23, 111:8,
122:16, 122:22,
133:20
**conservative**
113:6, 113:9
**consider**
58:5, 58:9,
58:12, 59:5,
59:11, 60:11,
60:17, 60:23,
62:2, 73:1,
73:5, 73:25
**consumer**
34:1, 37:22,
38:6, 38:14,
39:1, 39:7,
39:20, 40:4,
46:3, 46:8,
47:5, 47:7,
47:14, 48:3,
48:11, 49:1,
49:8, 49:13,
50:2, 50:13,
50:16, 50:22,
50:24, 51:4,
59:9, 59:10,
59:12, 59:17,
59:18, 62:19,
66:21, 68:9,
69:6, 70:4,
72:22, 73:13,
74:4, 74:6,
74:11, 74:23,
75:5, 76:4,

76:6, 78:8,
78:9, 102:7,
102:12, 105:12,
110:24, 125:15,
128:17, 133:11
**consumer-facing**
76:19
**consumers**
47:20, 48:15,
58:22, 64:24,
65:13, 66:1,
66:9, 66:18,
68:16, 68:21,
68:25, 69:20,
69:21, 71:11,
72:4, 72:17,
72:25, 73:9,
76:10, 77:4,
78:7, 102:9,
107:22, 125:23,
129:8
**contacted**
7:14, 7:18
**contain**
42:17
**contents**
96:18
**context**
22:5, 22:9,
22:18, 23:13,
26:12, 32:9,
47:2, 51:1,
54:15, 55:6,
59:21, 65:13,
65:15, 65:16,
66:10, 68:16,
74:15, 74:20,
74:23, 75:4
**continue**
124:1
**continues**
54:25, 66:16
**control**
118:4, 123:1
**cookies**
32:13
**copies**
86:13, 86:15

**copy**
9:13, 9:20,
9:24, 86:10
**correct**
7:10, 10:23,
11:2, 12:7,
13:17, 21:21,
22:14, 22:23,
23:2, 23:4,
23:5, 24:21,
26:22, 27:7,
29:9, 36:15,
36:22, 39:20,
40:24, 42:5,
42:6, 46:24,
47:2, 52:4,
52:6, 53:11,
60:4, 72:19,
81:22, 83:14,
83:15, 83:19,
84:10, 84:11,
85:13, 85:17,
93:1, 96:14,
96:21, 98:17,
103:16, 112:5,
112:8, 113:19,
115:17, 117:10,
117:14, 118:2,
119:3, 119:4,
119:21, 125:11,
126:18, 127:1,
127:11, 129:12,
129:13, 135:5,
136:6
**corrected**
79:5, 100:6,
125:2
**corrections**
135:6
**costco**
12:18, 13:2,
13:6
**could**
14:25, 20:5,
21:23, 27:5,
32:5, 34:12,
36:17, 44:4,
44:8, 44:9,

46:19, 48:6,
65:7, 103:4,
113:16, 113:18,
113:20, 114:22,
118:22, 120:14
**couldn't**
32:1, 32:22,
32:24, 32:25,
47:16
**counsel**
5:2, 5:6, 5:10,
7:15, 7:18,
25:16, 25:22,
92:4, 96:11,
96:17, 136:10
**count**
119:5, 125:4,
125:5
**counted**
117:9, 123:5
**counterclaim**
1:8, 3:2
**counterclaimant**
1:15, 3:11
**counting**
125:10
**country**
13:25
**couple**
11:4
**course**
24:6, 24:10,
25:14, 54:18,
115:6
**court**
1:1, 23:8,
32:10, 33:9,
33:16, 34:8,
34:24, 35:10,
35:19, 35:20,
38:23, 47:13,
48:24, 92:15,
95:4, 109:19,
128:24, 136:3
**courts**
32:3, 46:25
**covid**
125:14, 125:24,

126:4, 126:10,
127:5, 127:24,
128:9
**create**
48:2, 48:21
**creates**
105:11
**creating**
16:2
**credit**
1:5, 1:11,
7:10, 24:8,
24:11, 24:15,
24:18, 24:24,
25:5, 65:14,
65:16, 66:2,
67:10, 67:19,
68:1, 68:12,
68:15, 69:6,
69:9, 69:18,
69:23, 71:2,
71:4, 71:17,
71:21, 72:1,
72:7, 73:2,
73:6, 73:21,
74:11, 74:24,
75:6, 76:7,
76:14, 76:20,
76:25, 77:5,
77:6, 77:7,
77:13, 78:4,
78:8, 79:1,
81:12, 81:13,
81:15, 82:21,
83:23, 83:24,
84:4, 84:12,
84:20, 85:7,
85:8, 85:9,
85:19, 85:22,
85:25, 86:11,
87:11, 87:19,
98:7, 98:20,
99:5, 99:8,
99:19, 99:23,
100:2, 100:8,
100:15, 101:24,
105:15, 105:18,
106:1, 108:7,

125:16, 126:6,
126:12, 126:19,
126:22, 127:6,
127:17, 127:25,
128:6, 129:9,
130:4, 130:9,
130:15, 130:18,
130:21, 131:3,
131:12, 132:5
**criteria**
49:12, 50:1,
50:5, 50:9,
50:23, 51:6,
101:16, 101:19,
102:17, 119:6
**criticism**
115:9
**criticisms**
63:21, 80:21
**criticized**
80:21, 81:25
**critique**
14:7, 15:17,
16:17, 17:4,
17:7, 17:19,
20:22
**critiqued**
16:5, 17:2,
18:16, 19:2
**critiques**
26:7
**cross**
17:14
**crosstalk**
49:17, 70:12,
76:21, 80:15,
104:1, 123:16,
127:20
**ct**
1:21
**curious**
131:15, 131:16
**current**
130:20, 131:2
**currently**
6:17, 7:24,
91:24
**customers**
24:24, 25:5,

25:10, 69:19,
71:16, 78:7,
127:7, 127:8,
128:1, 128:11,
130:4, 130:10,
130:20, 131:2
**cut**
63:6
**cv**
27:10

| D |
| --- |

**data**
64:10, 72:8,
72:23, 73:7,
73:12, 73:23,
118:23, 120:18,
120:21, 121:21,
123:3, 123:20,
125:22, 130:2,
130:8
**database**
116:8
**date**
13:4, 27:16,
27:18, 30:2,
135:12
**dated**
93:14
**daubert**
23:16
**day**
47:21, 90:10,
136:15
**days**
86:20, 86:23,
91:9
**deal**
94:11
**dealt**
9:7
**decided**
94:19
**deciding**
69:17, 72:6
**decision**
66:19, 66:22,
68:3, 69:19,

72:4, 72:13,
73:10, 74:1,
76:12, 108:19
**decision-making**
59:18, 70:5,
70:10, 72:22,
73:13, 74:6,
76:4, 129:23
**decisions**
66:21, 67:7,
68:19
**deemed**
57:17
**defendant**
1:9, 1:14, 3:3,
3:11, 12:2,
18:13, 18:14,
99:23, 113:11,
116:16, 124:15
**defendant's**
18:19
**defender**
18:9
**define**
115:19, 115:21
**degree**
66:18, 68:17,
68:18, 68:22
**deliberately**
113:5
**delta**
116:10
**demonstrate**
101:20, 107:3,
110:19, 110:21,
131:25
**demonstrating**
101:17
**depend**
35:19
**dependent**
51:1
**depends**
59:15
**deponent**
135:1
**depose**
90:14

**deposed**
11:24
**deposition**
1:18, 2:1, 4:8,
6:7, 8:5, 8:6,
10:19, 10:25,
12:25, 30:10,
30:13, 30:15,
30:21, 31:4,
31:6, 31:14,
45:8, 52:14,
89:18, 90:3,
90:9, 90:19,
91:14, 91:16,
92:2, 92:5,
92:6, 93:4,
93:5, 93:8,
94:1, 94:18,
95:4, 95:17,
96:11, 110:3,
118:12, 119:25,
136:4
**depositions**
10:3
**describe**
31:10, 35:5,
51:5, 56:21,
57:7, 57:10,
57:11, 57:14,
57:15, 64:18,
66:20, 71:10,
79:23, 80:3,
80:11, 82:9,
82:11, 82:13
**described**
16:24, 19:6,
19:13, 34:4,
46:5, 56:6,
56:8, 56:20,
66:17, 83:16,
106:9, 108:9,
120:15
**describes**
57:25, 58:1,
82:6, 82:15
**describing**
57:22
**description**
104:11

**descriptive**
102:24, 103:12
**design**
118:16
**designed**
8:21, 8:22,
110:2, 131:25
**despite**
113:8
**detail**
71:10
**detailed**
69:7, 69:21
**determine**
33:10, 33:17,
34:8, 34:25,
35:20, 39:18,
46:1, 47:13,
48:25, 49:7,
50:1, 58:3,
64:5, 109:19,
112:23, 130:9
**determining**
49:12
**developed**
76:1
**device**
101:8, 112:9
**differences**
58:13, 58:16,
58:19
**different**
26:11, 47:19,
50:25, 56:21,
57:7, 61:8,
61:9, 61:21,
71:25, 83:7,
83:9, 83:11,
89:8, 112:2,
121:19, 121:20,
122:3, 123:11,
127:11, 128:3,
129:16
**differently**
44:9
**difficulties**
6:25, 7:7
**direct**
56:11

**directed**
55:15
**direction**
113:18, 113:21,
136:9
**directly**
46:10
**disagreeing**
127:15
**disclosed**
26:18, 41:25,
42:11
**discovery**
89:14, 90:21,
91:11
**discuss**
55:23, 55:24,
66:15, 72:4,
101:4, 129:21
**discussed**
56:6, 59:16,
100:18
**discusses**
54:16, 54:20,
68:16, 70:22
**discussing**
55:7, 55:19,
58:2, 72:17,
72:25
**discussion**
6:24, 7:6,
55:9, 57:21,
67:5, 70:15,
89:11
**discussions**
93:10
**disposal**
129:6
**dispute**
44:12, 51:2,
108:10, 108:20,
109:23
**distinction**
81:23
**distinguish**
124:16
**distributed**
52:12

**distribution**
51:10, 51:11
**district**
1:1, 1:2
**doctor**
34:13, 49:21,
119:8, 119:15
**doctoral-level**
74:7
**document**
44:20, 64:1,
73:16, 91:22,
97:4, 97:22,
98:16, 101:7,
109:1, 109:2,
122:2, 132:21
**documents**
30:4, 89:12,
90:5, 90:20,
90:25, 91:7,
91:13, 91:23,
92:1, 92:5,
92:12, 93:3,
93:11, 93:19,
93:25, 94:2,
94:5, 94:13,
94:17, 94:23,
95:7, 95:22,
96:8, 96:19,
97:18
**dog**
119:17
**doing**
29:4, 51:6,
87:22, 87:25,
90:9, 95:7,
111:17
**done**
25:24, 43:23,
44:4, 44:10,
46:19, 62:10,
64:23, 74:14,
91:8, 98:3,
109:25, 110:2,
112:6
**doorway**
90:4, 90:7
**double**
117:24, 125:4,

125:10
**down**
124:8, 125:17,
125:25
**download**
52:16
**dozens**
47:20
**dr**
5:9, 5:13, 6:4,
6:6, 6:8, 6:16,
7:8, 7:24, 8:11,
8:20, 9:12,
10:7, 10:10,
10:13, 21:4,
22:3, 23:6,
24:3, 27:4,
28:18, 34:20,
36:2, 36:12,
41:18, 42:15,
43:16, 43:21,
44:3, 51:17,
52:15, 58:5,
78:20, 93:13,
94:4, 96:1,
96:22, 97:8,
97:20, 97:24,
100:17, 110:8,
114:1, 115:7,
118:11, 121:16,
125:13, 131:8,
132:24
**dress**
13:14, 15:3,
37:18, 37:21,
38:5, 39:6,
39:11, 39:12,
39:14, 39:19,
40:3
**drill**
87:9
**drinks**
32:13
**drl**
19:15
**due**
6:24, 7:6
**during**
6:7, 8:6, 8:11,

8:21, 90:9,
93:9, 94:17,
125:14, 125:24,
126:4, 126:9,
127:5, 127:24,
128:9, 131:8

## E

**e-mails**
8:7
**e-n-c-i-n-o**
6:14
**e-trans**
134:7
**each**
11:4, 99:12,
108:14, 112:9,
112:10, 112:12,
112:25, 114:6,
114:7, 116:11,
117:1, 117:5,
122:11, 123:22,
125:3
**earlier**
40:12, 45:6,
67:22, 87:22,
100:19
**early**
7:13
**easier**
9:19
**easily**
118:23
**effect**
73:12, 74:5,
129:22
**effectually**
89:22
**eg**
104:25
**eighth**
124:10
**either**
9:7, 12:25,
23:8, 23:22,
31:13, 31:22,
34:2, 34:22,
45:2, 46:2,

46:10, 46:14,
71:16, 71:22,
105:8, 110:7
**elements**
37:19, 37:22,
38:5
**elevate**
1:4, 7:9, 24:7,
78:25, 81:12,
81:14, 83:23,
85:7, 85:8,
85:9, 85:19,
85:22, 85:25,
86:11, 87:11,
87:18, 98:7,
98:20, 99:8,
99:19, 100:2,
100:8, 100:15,
101:24, 102:8,
102:14, 105:14,
105:18, 106:1,
108:6, 116:15,
116:18, 116:21,
116:23, 117:11,
122:9, 124:14,
126:5, 126:12,
127:6, 127:25,
128:4, 128:7,
128:8, 131:3,
131:12, 132:4,
132:5, 132:25,
133:1
**elevate's**
130:19
**elevation**
81:13
**elevations**
1:11, 82:21,
84:4, 84:12,
84:20, 96:16,
99:5, 99:23,
108:7, 116:21,
116:24, 117:12,
122:10, 128:10,
130:20, 131:2,
132:4
**eligible**
130:20, 131:2

else
30:14, 33:12,
43:8, 51:14,
63:16, 73:8,
79:22
employed
136:10
employer
29:6, 29:7
enable
33:13
encino
6:14
encountered
34:2
end
10:18
ended
10:4
engaged
11:1, 66:22
engages
105:18
engine
59:13, 59:22,
60:8, 62:6,
63:17, 63:20,
63:25, 66:2,
67:3, 79:1,
81:21, 82:19,
82:25, 83:7,
84:14, 84:17,
84:21, 85:2,
87:19, 98:8,
101:21, 108:12,
114:4
engines
58:6, 58:10,
58:14, 58:19,
58:22, 59:2,
60:13, 60:19,
61:5, 61:9,
61:16, 61:21,
61:22, 62:12,
64:24, 65:13,
66:1, 67:9,
67:13, 70:7,
82:4, 88:12,

89:3, 112:3
enough
33:4, 109:20,
109:21
enter
92:1
entered
90:2, 90:22,
91:8
enterprises
19:15
entire
57:19, 90:10,
120:4
entry
123:8
equivalent
109:10
errata
135:7
errors
25:25
esquire
3:4, 3:12
essentially
89:14, 90:23,
91:24, 92:22,
95:9
established
88:10, 112:1
estimate
9:7
et
19:16
evaluate
110:5
evaluated
51:12, 51:13
evaluating
132:22
evaluations
70:5
even
60:15, 92:13,
94:25, 101:12,
106:25, 107:6,
107:23
ever
23:6, 23:19,

24:6, 24:11,
41:19, 41:24,
42:10, 49:3,
49:5, 49:11,
50:10, 51:6,
55:1, 58:20,
58:21, 58:25,
59:20, 64:23,
82:21, 84:3,
84:19
ever-constant
51:20, 52:2
ever-evolving
51:20, 52:3,
55:13
eveready
13:19, 14:17,
16:22, 17:23,
17:24, 18:20,
18:21, 19:11,
19:12, 37:8,
37:10, 37:23,
38:7, 38:12,
38:24, 39:2,
39:4, 39:24,
44:18, 45:3,
45:15, 45:22,
46:4, 47:6,
47:10, 48:4,
48:11, 48:15,
48:22, 49:5,
49:14, 50:3,
50:18, 50:24,
51:7, 51:20,
52:2, 55:6
every
47:20, 96:7,
96:18, 113:3
everybody
117:10
everything
110:11, 121:24
evidence
89:25, 90:2
exactly
19:14, 53:19,
63:9, 63:13,
92:10

examination
4:3, 5:23
examined
135:3
example
27:23, 31:9,
31:18, 33:11,
41:11, 50:12,
62:10, 67:11,
68:20, 121:3,
123:7, 124:7
examples
51:11
excel
120:9, 120:22,
121:16, 122:11
except
63:16, 114:8
exception
25:16
exclude
23:14
excluded
23:8, 23:10,
23:22, 89:15,
90:6
excludes
55:14
excuse
34:11, 119:8
exercise
67:21
exhibit
4:9, 4:11,
4:12, 4:14,
4:15, 4:17,
4:19, 10:1,
10:5, 10:8,
24:5, 52:10,
52:13, 52:18,
91:15, 91:17,
91:19, 92:5,
92:7, 93:4,
93:6, 96:10,
96:13, 96:16,
96:23, 96:24,
97:1, 97:9,
99:16, 100:19,

103:4, 106:11,
106:14, 106:18,
107:1, 107:25,
108:3, 118:9,
118:12, 118:13,
119:17, 119:21,
119:25, 120:1,
120:3, 120:13,
120:17, 121:7,
121:9, 121:13,
121:18
**exhibits**
4:8, 8:5, 10:2,
68:6, 91:14
**exists**
129:5
**expenditures**
106:6
**experience**
35:3, 35:21,
75:22, 75:24,
88:4, 128:17
**expert**
4:9, 4:14,
9:12, 9:14,
10:10, 10:19,
10:22, 11:1,
11:12, 11:18,
11:23, 12:24,
14:8, 14:14,
17:7, 17:22,
18:14, 18:16,
18:19, 19:3,
19:10, 21:13,
21:14, 23:7,
23:15, 26:8,
26:18, 26:21,
27:13, 27:20,
28:7, 33:18,
35:4, 38:1,
40:15, 41:25,
42:3, 42:4,
42:11, 58:6,
58:9, 58:13,
58:17, 58:18,
58:21, 59:1,
59:6, 59:12,
59:19, 59:21,

60:12, 60:18,
60:24, 61:13,
88:22, 89:4,
90:1, 92:7,
93:3, 93:6
**expert's**
93:7, 93:8
**expertise**
62:5, 70:3,
70:6, 72:20,
74:4, 75:10,
75:22, 76:2,
88:11, 88:19,
129:1, 129:4
**experts**
35:4
**explain**
31:12, 121:24
**explained**
102:21, 122:3
**explains**
120:19
**explanation**
43:18, 102:21,
116:3
**explanations**
43:6, 116:1
**exposed**
47:20
**exposure**
47:7, 104:25,
105:9, 105:10,
105:11
**express**
42:18, 43:2
**expressly**
44:17
**extent**
45:10, 59:8,
66:5, 75:12,
97:14, 105:24,
106:2

**F**

**fabian**
3:5, 7:21,
25:12
**face**
106:19

**facebook**
100:14
**fact**
5:9, 95:14
**failed**
81:24
**fair**
31:8, 54:8,
60:11, 61:8,
63:14, 81:1,
101:13, 128:25
**familiar**
16:4, 23:16,
33:4, 33:6,
51:17, 56:14,
56:18, 56:19,
107:23
**familiarity**
104:13, 104:15,
105:8
**family**
72:5, 72:18
**famous**
39:16
**far**
103:23, 103:24
**fareportal**
16:11, 17:6
**favor**
90:21
**favorable**
109:11
**fcu**
108:6
**federal**
1:4, 7:10,
24:7, 81:12,
81:14, 83:23,
85:7, 85:19,
85:25, 86:11,
105:15, 105:18,
105:25, 106:1,
126:6, 126:12,
127:6, 127:25,
131:3
**female**
121:5
**few**
34:14, 79:12

**field**
129:1, 129:3
**fields**
62:18
**figure**
65:23, 79:6,
87:13, 89:9,
111:13, 111:19,
111:20, 112:16,
114:17, 124:23,
125:9, 125:12
**figures**
112:18
**file**
23:14, 93:7,
118:23, 122:11,
123:20
**filed**
23:21, 92:20,
92:25
**financial**
68:19, 69:1,
73:1, 73:7,
73:22, 74:11,
74:15, 76:16,
77:16, 77:18,
77:19, 77:22,
125:23, 128:18,
136:12
**find**
22:7, 37:4,
37:20, 37:21,
62:22, 62:23,
63:1, 63:11,
63:25, 64:2,
66:13, 101:12,
113:9, 118:5
**findings**
65:6
**firm**
7:21, 25:13
**first**
10:1, 49:7,
56:13, 87:20,
98:15, 99:4,
101:2, 102:5,
102:20, 103:1,
108:5, 108:23,

109:3, 109:4,
120:11, 121:18,
123:7, 127:16,
132:4, 133:16,
133:17
**fit**
31:13
**five**
28:16
**flow**
99:13
**focus**
9:1, 67:4
**focused**
31:18
**folks**
24:16
**follow-up**
34:16
**followed**
120:15
**follows**
70:15
**foot**
128:9
**footnote**
44:24, 62:4,
62:16, 62:21,
62:23, 64:6,
64:11, 68:6,
68:10, 68:12,
70:19, 70:22,
71:1, 103:6,
103:9, 103:15,
104:20, 105:6,
106:21, 107:7,
107:14, 118:4,
122:6
**foregoing**
135:4, 136:4,
136:5
**forget**
120:23
**form**
34:10, 89:13,
94:18, 95:5,
97:19
**formally**
5:3

**format**
13:19, 13:20,
14:17, 14:18,
16:23, 17:3,
17:4, 17:8,
17:23, 18:20,
19:11, 19:14,
37:7, 37:8,
37:23, 38:8,
38:12, 39:4,
39:25, 41:21,
42:1, 42:12,
45:16, 46:19,
46:25, 47:6,
47:10, 48:12,
50:18, 51:20,
51:21, 52:2,
52:3, 55:13,
55:24, 56:8,
56:22, 57:4,
57:21, 57:22,
57:23, 57:25,
112:19, 120:23
**formats**
55:19
**formed**
75:16
**forming**
90:1
**forward**
31:10, 31:18,
31:22, 32:6,
32:19, 33:4,
34:4, 34:22,
35:7, 35:12,
38:24, 48:16,
79:12, 112:21
**found**
62:12, 62:25,
63:3, 63:13,
63:15, 63:16
**foundation**
98:11, 99:11,
99:15
**four**
10:20, 11:19,
20:15, 21:7,
21:15, 22:11,

22:20, 22:22,
26:25, 27:6,
28:5, 40:13,
42:7, 56:15,
56:25, 57:7,
83:7, 83:9,
83:11, 84:23,
112:2
**fourth**
100:4, 100:6,
124:8
**free**
29:4
**frequent**
109:20
**friday**
92:25
**friends**
72:6, 72:18
**ftc**
15:6
**full**
6:1
**further**
31:7, 134:1

**G**

**gaby's**
11:10, 11:21,
12:12
**gather**
69:7, 69:21
**gave**
8:1, 12:24,
53:13
**gears**
115:7
**general**
52:20, 52:25,
70:6, 76:25,
77:17, 77:19,
77:20, 78:1,
78:3, 87:23,
97:14, 128:6,
130:4
**generally**
61:17, 61:18,
77:13, 98:11

**generating**
108:17
**generic**
102:24, 103:12,
103:21
**genericness**
16:8
**getting**
34:13, 87:24
**give**
12:20, 13:2,
38:5, 89:19,
99:14, 108:24,
120:20, 124:7
**given**
33:10, 34:9,
41:11, 46:17,
59:20, 117:5,
135:6, 136:6
**giving**
44:17, 109:10
**global**
15:6
**go**
6:4, 7:5, 9:20,
11:3, 12:17,
15:5, 29:10,
32:12, 33:11,
36:3, 37:14,
69:11, 69:20,
71:9, 78:3,
78:21, 79:12,
90:21, 100:1,
103:3, 103:4,
123:8, 127:22,
131:6
**goes**
99:22, 103:18,
103:22
**going**
12:5, 17:1,
17:15, 52:17,
89:11, 91:12,
91:21, 92:15,
93:10, 93:16,
95:18, 95:20,
95:21, 96:5,
97:11, 97:24,

98:5, 98:10,
99:11, 117:25,
119:2, 119:17,
121:8, 122:5,
122:6, 125:18
**gone**
122:15, 125:17,
125:24
**good**
5:25, 14:25,
34:12, 78:15,
78:16
**goods**
54:6
**google**
4:12, 4:17,
60:8, 62:6,
79:1, 82:5,
82:19, 85:12,
85:13, 87:19,
89:8, 93:14,
93:17, 94:6,
96:2, 98:8,
98:20, 106:11,
108:12, 114:13
**grayed**
112:21
**green**
20:16, 20:23
**group**
6:17, 6:20,
8:12, 14:1
**guess**
17:15, 56:13,
97:13
**guidelines**
52:20
**guys**
49:20

**H**

**habits**
68:25
**hain**
13:25, 14:10,
14:11, 17:1,
18:22
**hal**
89:7, 91:15,

93:14, 93:18,
94:7, 96:2,
96:11, 97:6,
97:7
**half**
72:11
**hand**
136:14
**happen**
131:9
**happy**
93:25, 95:23
**hard**
9:13, 9:20
**hart**
3:13
**head**
121:12
**heading**
53:21
**hear**
5:17, 119:11,
126:8, 132:13
**heard**
119:14
**help**
25:25
**henn**
51:19, 101:16,
101:19, 102:1,
102:17, 111:1,
111:4
**here**
7:3, 7:4,
40:21, 41:12,
61:12, 66:14,
66:17, 84:6,
85:5, 89:16,
89:17, 89:25,
90:2, 95:17,
102:4, 104:10,
104:22, 115:6,
116:5, 118:4,
118:8, 123:8
**hereby**
5:13, 5:18,
135:2, 136:5
**hereunto**
136:14

**hey**
25:19
**high**
47:10
**high-involvement**
66:20, 66:22,
66:25, 67:6,
67:15, 67:20,
68:2, 69:19,
71:11, 73:19
**higher**
68:17, 68:21,
68:22, 117:21
**highly**
103:12
**himself**
110:23
**history**
101:14, 113:2,
113:16, 114:7,
114:16, 114:20
**holland**
3:13
**home**
112:22
**hundreds**
8:22
**hypothetical**
33:13, 34:1,
47:12, 126:24

**I**

**id**
122:13, 123:8,
124:8
**idea**
105:17, 105:25,
128:19
**identical**
60:21
**identification**
10:6, 52:11,
91:18, 96:25,
118:10, 120:2,
121:14
**identified**
84:24
**identify**
40:20, 40:25,

50:9, 51:3, 51:5
**iii**
55:12
**image**
123:24
**impact**
66:8, 113:20,
113:21
**impacts**
70:10
**impartial**
101:13
**imprimis**
17:11
**in-person**
128:20
**inaccurate**
30:22
**inappropriate**
91:23, 95:13
**inappropriateness**
93:11
**include**
43:1, 76:18,
77:13
**included**
41:7, 42:24,
43:19, 120:24,
124:19
**including**
8:23, 43:11,
69:8, 69:22,
72:5, 72:18,
128:17
**incognito**
114:13, 115:2,
115:4
**incomplete**
47:11, 126:24
**inconvenient**
123:21
**indeed**
103:18
**independent**
39:21, 40:1,
45:25, 62:5
**independently**
39:18

indicate
101:20, 109:18,
116:13, 124:4,
125:22
indicated
45:9, 72:12,
87:7, 102:12,
116:17, 116:20,
123:3, 123:23
indicates
107:15, 123:3
indications
99:1
individually
77:9
industry
24:12, 24:18,
75:13
influence
113:16, 113:18
information
33:11, 34:9,
40:7, 55:25,
64:7, 66:9,
66:23, 66:24,
69:7, 69:22,
71:13, 72:17,
72:23, 72:24,
72:25, 73:5,
73:9, 73:24,
73:25, 76:11,
101:10, 108:5,
125:22, 129:5,
129:24, 130:3,
130:9
informed
76:1
informs
75:13
infringed
13:13, 14:21
infringement
12:10, 12:13,
13:7, 14:12,
37:2
infringer
12:5
initial
107:8, 120:25

initially
120:4
instance
121:4
instead
5:4
institution
24:15, 69:1,
73:2, 73:7
institutions
68:19, 73:22,
74:12, 74:16,
77:17, 77:18,
77:20, 128:18
instruct
91:21, 95:11,
95:12, 95:19,
95:21, 96:5,
97:17
instructing
94:24, 96:12,
96:19
instruction
93:24
intended
31:15, 32:9
intentionally
114:8, 114:11,
114:23
intercepting
43:24
interest
136:12
internet
43:23, 47:22,
53:16, 53:23,
54:2, 54:7,
54:15, 54:24,
55:2, 55:10,
55:14, 55:17,
55:19, 56:1,
56:7, 56:17,
56:22, 57:3,
58:6, 58:22,
59:2, 59:22,
61:5, 61:9,
61:10, 61:15,
61:21, 63:1,

63:3, 63:8,
63:12, 63:15,
63:17, 63:20,
63:24, 66:1,
67:2, 67:3,
67:13, 67:20,
68:1, 78:25,
79:7, 79:9,
79:14, 79:18,
79:23, 80:3,
80:8, 80:9,
80:11, 80:16,
80:23, 80:25,
81:1, 81:3,
81:8, 81:10,
81:17, 81:20,
82:1, 82:3,
82:6, 82:10,
82:11, 82:13,
82:25, 83:7,
84:12, 84:13,
84:16, 84:17,
84:21, 85:2,
86:15, 88:5,
88:12, 88:20,
88:24, 89:3,
89:5, 94:6,
98:6, 101:21,
103:18, 111:7,
114:4, 125:16,
125:24, 129:9
internet-based
54:20
interpretation
121:6
interprets
121:21
interrupting
99:13
introduce
97:15
introduced
56:25
investigation
46:1, 65:25,
67:8, 87:24
investors
77:22

invoices
29:19
involve
74:10, 77:25,
78:2, 89:3
involved
8:13, 49:4,
49:5, 49:11,
74:10, 74:22,
75:3
involvement
66:8, 66:16,
66:17, 68:9,
68:18, 68:22,
68:23, 70:4,
70:16, 72:21,
73:13, 74:5,
75:15, 76:3,
129:21, 129:22
involvements
70:9
involving
28:4
issue
8:17, 15:3,
15:4, 22:16,
37:16, 38:6,
38:13, 38:17,
39:12, 39:14,
59:16, 67:15,
80:20, 101:25,
102:2, 133:23
issued
11:18, 22:10,
22:12
issues
9:5, 53:7
item
80:17, 81:4,
81:8, 81:11,
82:25, 83:4,
83:5
itself
44:21, 48:2,
50:16, 114:19
iv
55:16, 56:6,
56:16, 57:20,

115:15
**ix**
80:3, 82:2,
82:10, 83:5

**J**

**jacobs**
16:11, 17:6
**jaguar**
18:4
**job**
1:23
**join**
130:20, 131:2
**joined**
71:17
**joining**
73:6
**july**
1:20
**jumped**
67:16
**june**
93:15, 94:7
**junior**
33:20, 33:24,
34:3, 46:3
**justification**
43:19, 131:25
**justify**
37:23, 38:7,
39:2, 46:4,
47:6, 47:10,
48:3, 48:11,
49:13, 50:2,
50:24, 54:11,
58:4, 102:19,
106:12, 106:14,
106:23, 109:15,
109:21
**justifying**
48:14, 56:22,
102:18
**justin**
1:18, 2:1, 4:3,
4:8, 5:9, 6:2,
135:2
**juxtaposition**
108:14

**K**

**keep**
99:12, 110:4,
110:7
**keyword**
32:8, 84:18,
101:22, 102:6
**kimbrough**
1:25, 2:9,
136:3, 136:19
**kind**
13:23, 16:7,
19:23, 21:2,
23:4, 26:1,
47:1, 53:8,
109:24, 110:4,
112:21, 121:6
**kinds**
32:2, 33:6
**kirsten**
3:4, 93:20,
94:12
**know**
12:23, 15:2,
20:10, 20:12,
20:13, 23:10,
25:25, 28:13,
29:18, 32:7,
33:13, 33:18,
34:3, 39:10,
42:9, 42:21,
43:7, 44:8,
44:9, 48:16,
53:19, 55:13,
56:1, 57:23,
60:9, 61:2,
61:5, 64:13,
71:15, 71:25,
73:9, 73:24,
77:8, 85:20,
85:24, 86:12,
86:18, 87:6,
87:21, 88:5,
88:7, 89:11,
89:13, 92:8,
92:13, 93:17,
94:14, 97:10,

98:3, 101:2,
105:21, 106:5,
106:16, 106:20,
108:3, 109:1,
109:17, 111:18,
113:4, 113:17,
113:21, 115:1,
118:22, 122:2,
122:18, 125:20,
126:3, 126:9,
126:16, 126:18,
128:13, 128:15,
130:3, 130:18,
132:21, 133:5,
133:9, 133:22
**knowing**
101:5
**knowledge**
62:5, 62:18,
75:13
**known**
31:16, 45:10,
46:23, 104:12,
104:13, 105:8

**L**

**labeled**
122:12
**lack**
99:11, 110:20
**laid**
102:17
**lake**
3:7
**land**
18:4
**large**
109:16
**last**
6:1, 10:14,
10:17, 10:20,
11:19, 20:14,
20:15, 21:6,
21:13, 21:15,
22:4, 22:11,
22:15, 26:25,
27:6, 27:12,
27:19, 29:14,

78:24, 79:3,
119:11, 125:13,
126:4, 126:9,
126:20, 129:11
**law**
7:21, 25:13
**lawsuit**
100:12
**lead**
49:1
**leading**
115:10, 115:16,
115:19, 115:20,
115:21, 115:23,
116:2
**leads**
100:10
**least**
11:24, 12:24,
113:4, 113:23,
114:10, 117:7,
120:5, 130:17
**led**
125:9
**left**
112:20, 114:8,
114:9, 114:10
**legal**
31:24, 32:20,
34:6, 35:2,
35:8, 37:24
**let's**
7:5, 9:25,
12:17, 15:5,
49:24, 87:10,
91:12, 95:24,
103:3, 103:6,
122:18, 131:6
**level**
38:14, 39:7,
39:20, 40:3,
45:2, 47:14,
48:3, 48:10,
49:8, 102:6,
105:11, 105:17,
105:21, 105:23
**lieu**
5:3

life
13:25
likelihood
8:23, 9:2, 9:8,
13:21, 14:3,
14:15, 16:2,
16:6, 16:20,
19:5, 19:21,
20:9, 20:25,
21:7, 21:16,
21:20, 21:25,
22:4, 22:8,
22:13, 22:17,
22:25, 26:13,
27:13, 27:20,
28:2, 28:8,
31:10, 31:11,
31:15, 35:22,
36:13, 36:20,
37:4, 38:24,
40:16, 40:20,
41:2, 41:8,
41:19, 42:11,
43:21, 44:4,
44:10, 44:12,
44:14, 46:18,
47:1, 48:16,
49:6, 50:17,
51:19, 52:1,
53:6, 53:22,
53:25, 54:4,
54:5, 54:14,
54:24, 55:10,
55:16, 56:16,
111:8, 122:16,
122:22, 133:20
likely
57:4, 68:17,
69:7, 69:18,
69:21, 71:3,
71:12, 72:4,
129:8
limited
90:19
line
100:9, 112:19
linkedin
100:5, 100:7,

100:9, 100:10
list
10:18, 11:17,
20:14, 22:1,
27:10, 101:17,
101:20, 108:23,
113:11, 124:3,
129:9
listed
21:5, 21:13,
22:1, 80:8,
82:2, 82:3,
82:4, 83:18,
83:20, 84:1,
104:10
listen
123:18
listing
11:15, 29:24
litigation
7:20, 8:13,
8:17, 22:5,
22:9, 22:18,
23:13, 23:20,
26:12, 74:20,
74:23
little
24:3, 80:10,
110:24, 115:8,
119:10, 123:20
location
130:5, 130:6
locations
84:25, 126:19,
127:5, 127:6,
127:22, 127:24,
128:8
logged
101:8
logical
107:21
logically
102:15
long
6:19, 56:15,
98:17, 124:17
longer
54:18

look
32:12, 53:20,
68:24, 83:4,
83:5, 93:24,
96:12, 97:13,
97:17, 103:6,
108:2, 111:19,
112:16, 118:5,
118:7, 118:14,
120:11, 120:21
looked
64:7, 94:5,
100:19, 106:22,
125:21, 130:2,
130:8
looking
29:20, 44:23,
56:5, 56:11,
57:19, 60:2,
65:14, 101:6,
111:18, 118:23,
120:14, 123:14
looks
83:3, 100:4,
100:10, 117:22,
118:24, 119:18,
122:7, 124:11
lost
21:22, 98:13
lot
66:23, 77:7,
89:23, 90:23,
102:21, 108:2
low
45:21
low-involvement
66:21, 67:1,
67:7, 67:15,
67:21, 68:3,
71:14, 73:20
lower
68:18, 68:22
luggage
28:4, 36:3,
36:7, 37:19
lumping
77:6, 77:8
lunch
113:14, 114:2,

131:9

## M

made
43:7, 70:23,
95:16, 103:2,
118:24, 129:18,
129:25
make
49:24, 60:6,
60:9, 62:14,
81:24, 90:8,
93:21, 94:15,
95:15, 95:18,
97:13, 107:21,
113:6, 117:21,
119:9, 121:10
makes
53:9, 105:12,
120:10, 123:20
making
73:10, 73:25,
76:11, 90:11,
93:20, 109:24
male
121:5
mall
43:24
manner
101:13, 107:2,
109:25
many
9:7, 26:10,
26:13, 28:7,
40:9, 40:10,
69:19, 71:15,
95:6, 117:2,
117:4, 130:3,
130:9, 130:19,
131:1
map
120:18, 120:21,
121:21, 124:11
march
4:10
mark
10:1, 10:2,
16:2, 20:3,

20:7, 33:18,
33:19, 33:21,
33:23, 33:24,
34:2, 38:13,
38:17, 38:18,
39:1, 45:3,
46:3, 47:5,
47:8, 47:9,
48:2, 48:9,
48:17, 48:20,
49:2, 49:7,
49:13, 50:1,
50:13, 52:13,
91:13, 102:5,
121:9, 133:1
**marked**
10:5, 24:5,
52:10, 91:15,
91:17, 92:4,
93:4, 96:10,
96:24, 118:9,
118:12, 119:25,
120:1, 121:13
**market**
16:10, 60:12,
60:18, 60:24,
61:3, 61:10,
61:14, 61:15,
61:17, 61:20,
62:2, 62:5,
62:11
**marketing**
60:24, 61:17,
61:18, 62:19
**marketing-related**
60:25
**marketplace**
57:6
**marking**
10:2, 35:4,
96:23
**marks**
45:9, 45:21,
46:2, 46:6,
46:7, 46:14,
46:23, 47:20,
54:10, 101:25,
102:2, 102:23,

133:8, 133:11,
133:20
**material**
120:9
**materials**
29:21, 29:24,
30:5, 80:2
**matt**
34:12
**matter**
7:20, 11:13,
11:14, 11:25,
13:4, 23:20,
24:13, 28:3,
30:13, 40:8,
44:14, 45:4,
45:12, 45:23,
65:10, 67:24,
102:2, 102:14,
107:5, 131:18
**matters**
21:21, 21:25,
51:13, 131:19,
131:20, 132:6
**matthew**
3:19
**may-june**
4:16
**maybe**
65:22, 65:23,
109:3
**mean**
8:16, 12:2,
12:3, 12:4,
12:22, 12:25,
23:10, 23:12,
23:21, 25:20,
31:8, 31:9,
38:16, 39:5,
39:21, 47:19,
48:10, 53:9,
60:15, 63:10,
63:15, 65:19,
70:6, 75:20,
77:3, 83:10,
84:14, 94:10,
105:21, 105:23,
113:17, 120:19,

121:4, 121:5,
128:16
**meaning**
13:24, 21:3
**means**
61:3
**meant**
78:1, 118:21,
120:12
**measure**
16:8, 16:9,
19:24, 20:2,
20:6, 21:3,
31:15, 32:3,
32:10, 35:11,
44:13, 46:10,
46:12, 47:1,
50:12, 54:5,
122:16, 122:21
**measured**
13:24, 74:23,
122:21
**measures**
51:9, 54:14
**measuring**
38:24, 53:22,
53:25, 54:4,
55:10, 55:16,
56:16
**media**
109:24
**meet**
102:16, 110:25
**mention**
72:3, 79:13,
104:24
**mentioned**
45:6, 104:12,
117:1, 119:6,
124:4
**mercari**
11:10, 12:6,
12:9, 12:12
**mere**
48:20
**merits**
90:24
**met**
102:3, 102:4,

104:16, 104:21,
119:5
**methodologies**
31:13
**methodology**
54:12, 56:6,
56:19, 121:25
**metric**
49:12, 50:1,
50:6, 50:8,
50:9, 50:23,
51:1, 51:5
**metrics**
50:25
**might**
59:12, 59:22,
128:19
**mind**
41:16, 51:16
**mischaracterizes**
21:9, 27:2,
35:17, 39:8,
40:5, 45:19,
46:20, 55:21,
71:5, 71:7,
87:4, 104:17
**missed**
79:17
**misstates**
110:9, 118:1,
128:21, 129:2,
132:7
**mistake**
117:20, 118:24
**mistaken**
32:17
**misunderstood**
49:18, 49:23
**mmr**
6:17, 6:19,
6:21, 8:12,
8:21, 26:3,
29:8, 29:9,
29:15, 29:17
**mode**
114:15, 115:2,
115:4
**months**
125:13, 126:4,

126:10, 126:20,
133:9
**more**
9:10, 9:11,
11:8, 11:9,
11:16, 22:19,
22:21, 28:5,
28:11, 28:14,
28:15, 34:14,
40:13, 50:7,
50:8, 54:16,
65:4, 66:24,
68:16, 71:13,
72:11, 87:1,
89:7, 104:20,
107:10, 112:6,
116:14, 119:10
**morning**
5:25
**mortar**
126:11
**most**
11:11, 19:12,
57:4, 130:10
**motion**
23:14, 23:22,
90:25, 92:19,
92:25, 93:7
**much**
29:13, 29:14,
33:10, 54:18
**multiple**
51:24, 52:8,
86:20, 87:6,
109:16, 117:8
**must**
38:25, 102:6,
102:9, 104:4,
117:20
**myself**
60:23, 62:2,
62:25

**N**

**name**
6:1, 6:13,
15:4, 18:10,
40:14, 102:23,

107:22
**names**
32:15
**nature**
131:16
**necessarily**
10:25, 39:5,
88:9, 121:23
**necessary**
71:20, 114:14
**need**
34:9, 78:13,
89:11, 95:8,
121:23
**neither**
32:6, 136:10
**never**
24:17, 24:23,
25:4, 32:10,
34:2
**new**
96:23, 104:25,
105:9, 127:8,
128:1, 128:11
**news**
108:9, 108:10,
108:12, 111:21
**newspaper**
100:12
**next**
12:17, 13:25,
15:5, 15:9,
16:11, 17:10,
18:4, 18:22,
19:15, 66:16,
79:5, 100:11,
100:14, 104:2,
114:16, 121:9,
123:25
**nodding**
121:12
**none**
21:19, 23:25,
26:25, 27:6,
124:4
**nonlitigation**
75:4
**normal**
34:19, 57:6,

115:6
**normally**
127:22
**north**
19:15
**noted**
106:17, 112:4
**notes**
8:7, 21:4
**notice**
2:9
**number**
9:8, 26:23,
28:13, 29:25,
96:16, 109:16,
118:6, 118:25,
123:10
**numbered**
122:8
**numbers**
62:20, 64:10
**numeral**
80:10

**O**

**object**
5:7, 89:12,
93:17, 98:11,
117:25, 125:18
**objected**
97:11
**objection**
19:25, 21:9,
21:18, 25:1,
25:7, 26:15,
26:19, 27:1,
27:8, 28:9,
31:24, 32:20,
33:8, 35:8,
36:16, 36:23,
37:24, 38:15,
39:8, 40:5,
40:17, 41:9,
41:15, 42:2,
42:20, 43:3,
43:14, 43:25,
44:6, 44:20,
45:18, 47:11,

48:5, 56:10,
58:15, 58:23,
59:3, 59:7,
59:14, 66:4,
71:5, 87:4,
88:21, 89:20,
90:11, 93:22,
93:23, 94:14,
94:16, 95:15,
95:16, 97:14,
98:22, 99:12,
99:15, 100:22,
104:17, 106:15,
107:8, 107:9,
107:13, 110:9,
126:13, 130:22,
131:4, 132:7,
133:3, 133:12
**objections**
27:15, 33:15,
38:9, 89:17,
90:8, 90:10,
90:15, 90:16,
90:23, 93:21,
94:9, 95:9,
97:16, 98:12,
107:11, 127:9,
128:2, 128:12
**objective**
125:22, 130:3,
130:8
**obtain**
77:21
**obtained**
127:8
**occurred**
31:6, 96:3
**occurrence**
109:9
**off-the-record**
6:24, 7:6
**offered**
14:7, 15:18,
16:17, 17:19,
54:2, 54:6
**offering**
45:15
**offhand**
28:10, 40:18

officer
136:3
often
68:20, 130:4
okay
9:25, 10:10,
10:24, 11:7,
11:10, 13:1,
16:7, 29:7,
35:24, 65:11,
67:14, 69:14,
77:16, 80:14,
81:23, 83:21,
93:23, 95:24,
98:5, 99:1,
99:3, 103:5,
119:22, 120:12,
120:14, 121:8,
125:12, 132:13
oklahoma
2:11, 136:20
omit
6:7
once
48:24, 86:21,
87:2, 114:8,
117:9, 128:13
one
7:22, 9:16,
11:3, 23:13,
26:11, 34:16,
34:22, 35:6,
35:15, 36:4,
41:16, 50:7,
50:8, 54:19,
59:12, 59:22,
62:20, 63:21,
65:4, 65:5,
80:21, 82:9,
84:19, 88:7,
95:24, 99:21,
100:4, 100:6,
100:11, 100:14,
101:19, 101:25,
102:2, 102:23,
103:2, 103:15,
104:12, 107:12,
107:14, 108:21,

108:24, 108:25,
109:1, 109:3,
109:7, 110:16,
110:22, 112:7,
113:4, 113:16,
113:23, 114:10,
114:18, 114:20,
114:22, 114:25,
115:1, 115:23,
116:1, 116:13,
116:20, 117:7,
119:6, 121:4,
121:5, 122:14,
122:20, 123:6,
124:12, 124:13,
124:18, 124:20,
126:16, 127:12
one-room
55:3, 55:18,
56:2, 56:9,
57:12, 57:22
onerous
95:6
ones
11:8, 84:1,
106:9
ongoing
11:25, 13:5,
133:21
online
57:5, 130:11,
130:16
only
31:3, 32:2,
35:22, 40:19,
56:15, 67:11,
75:12, 79:18,
85:9, 87:20,
90:13, 90:14,
103:11, 104:11,
109:10, 117:9,
117:16, 117:19
open
91:22, 97:21,
98:4, 120:11,
120:13, 126:6,
126:12
opened
97:10

operated
126:11
operating
19:16
opine
39:18
opined
39:5, 39:10
opinion
18:16, 23:6,
23:15, 23:19,
23:22, 26:2,
33:1, 34:10,
35:15, 35:20,
37:6, 37:20,
38:5, 44:15,
44:17, 45:2,
45:12, 45:14,
45:15, 45:20,
46:22, 58:18,
58:21, 59:1,
59:19, 59:21,
75:24, 133:15
opinions
25:21, 25:23,
26:7, 42:18,
42:23, 43:2,
43:12, 43:13,
65:10, 75:16,
90:1, 133:14,
133:24
opportunity
90:14
opposed
9:2, 9:4,
102:23, 123:21
option
123:22
order
11:5, 31:20,
54:11, 89:14,
91:25, 92:16,
92:19, 92:22,
94:18, 95:5,
97:19, 104:4,
134:6
ordinary
76:24, 77:3,

78:1
organized
123:20
other
8:5, 8:8, 9:3,
9:4, 14:8, 20:8,
23:15, 23:20,
23:21, 25:12,
25:19, 25:22,
32:1, 33:6,
35:4, 35:13,
35:15, 40:7,
42:23, 45:24,
50:21, 50:22,
51:4, 51:13,
62:1, 62:3,
62:11, 62:15,
64:19, 67:5,
67:8, 67:11,
70:6, 72:24,
73:16, 73:24,
74:9, 74:14,
74:15, 77:22,
79:14, 84:8,
84:19, 84:23,
85:1, 85:14,
86:14, 86:23,
100:1, 104:21,
104:23, 107:24,
108:1, 108:15,
110:16, 112:7,
113:6, 113:17,
113:23, 116:20,
116:23, 117:3,
117:4, 117:8,
117:11, 119:7,
122:25, 123:6,
124:4, 124:6,
124:12, 124:14,
124:17, 124:18,
124:20, 125:8,
126:17, 134:5
others
68:25, 72:5,
72:13, 72:17,
102:18
otherwise
45:13, 90:5,

136:12
**out**
25:21, 29:10,
29:14, 48:9,
65:23, 71:12,
77:23, 102:17,
112:21, 116:7,
117:22, 118:6,
125:12, 132:12
**outcome**
136:12
**outline**
57:2
**outside**
37:25, 43:25,
125:19, 126:13,
129:1, 129:3,
130:22, 133:3
**over**
20:5, 20:14,
21:15, 43:23,
49:20, 54:6,
59:13, 59:22,
69:16, 88:6,
88:8, 88:12,
88:14, 88:20,
123:8, 125:13,
125:16, 125:24,
126:3, 126:20,
132:12
**overly**
95:6
**own**
9:19, 9:20,
37:12, 39:23,
44:4, 53:10,
92:4
**owner**
12:4

---

                **P**

---

**packers**
20:16, 20:23
**page**
4:3, 4:8,
10:14, 10:15,
10:17, 10:21,
21:13, 29:20,

44:24, 53:21,
54:25, 56:20,
57:20, 60:2,
66:14, 66:17,
78:22, 79:6,
80:1, 80:17,
83:17, 85:6,
85:11, 100:1,
100:14, 103:7,
108:5, 109:4,
109:7, 110:22,
111:14, 112:17,
113:11, 114:18,
115:13, 116:14,
118:15, 118:18,
118:19, 120:5,
132:5
**pages**
1:24, 56:15,
79:12, 96:17,
98:17, 109:2
**paid**
29:1
**pandemic**
125:15, 126:5,
126:10, 127:5,
127:25
**paper**
53:1
**paragraph**
29:25, 60:2,
60:3, 61:20,
62:15, 62:17,
64:20, 66:15,
67:12, 69:12,
69:13, 69:16,
69:17, 70:11,
70:13, 70:16,
70:23, 72:2,
72:3, 72:15,
78:21, 79:13,
80:1, 83:5,
83:15, 87:12,
106:9, 115:14,
116:4, 120:16,
124:24, 129:12,
129:22, 129:25
**paragraphs**
83:13

**pardon**
115:13
**part**
17:3, 17:6,
21:22, 23:8,
23:23, 37:20,
61:18, 65:20,
82:1, 84:9,
85:2, 85:13,
85:14, 87:23,
89:25, 97:6,
125:8, 127:14,
127:15, 129:20
**particular**
58:14, 66:10,
87:15, 88:1,
95:22, 101:23,
103:19, 115:10
**parties**
36:5, 71:16,
108:14, 133:8,
133:21, 136:11
**party**
15:23, 36:8,
37:1, 76:5
**party's**
71:17
**past**
42:7, 62:12,
75:22
**paste**
115:3
**pasted**
79:6, 86:14,
87:12, 87:13,
110:17, 114:18
**pause**
53:13
**pdf**
9:17, 9:22
**penalties**
5:6, 5:15, 5:20
**pending**
7:2, 89:13,
92:22
**people**
43:24, 58:22,
59:2, 60:7,

67:9, 71:2,
73:21, 73:25,
76:24, 77:4,
78:1, 126:6,
126:21, 127:22
**percent**
72:11, 109:18,
117:22, 119:3,
130:16
**percentage**
9:8, 60:7,
109:20, 117:21
**perform**
15:15, 18:1,
18:11, 19:19,
20:20, 21:16,
36:13
**performed**
19:2, 20:22,
25:14, 26:14,
26:17, 27:13,
28:8, 41:24,
50:15, 74:9,
97:6, 97:7
**performing**
26:6, 29:2,
50:16, 74:10
**perhaps**
115:25
**peril**
95:20
**perjury**
5:6, 5:15, 5:20
**person**
59:22, 69:8,
69:22, 71:3,
71:22, 73:5,
88:23, 101:8,
127:23, 128:19
**personal**
24:16
**personally**
25:4
**perspective**
88:22, 88:24
**petitioner**
20:17
**pharmaceuticals**
17:11

phd
1:18, 2:1, 4:3,
4:8, 6:4, 135:2
phone
71:22
phrase
56:2, 56:3,
78:25, 83:16,
84:18, 98:7,
98:20, 104:2
phrased
127:17
phrases
83:8, 83:11,
83:12, 83:13,
83:22, 84:9,
84:23, 112:2
phrasing
53:12
physical
126:5, 126:11,
127:4, 127:5,
127:21, 130:5,
130:15, 132:2
pivot
24:3
place
34:12
placement
46:6
places
83:9
plaintiff
1:7, 3:2, 7:9,
7:15, 13:12,
14:14, 14:20,
16:18, 17:2,
17:4, 17:20,
17:22, 24:7,
28:19, 29:8,
29:15, 37:11,
40:2, 99:8,
99:20, 100:2,
100:7, 113:10,
132:25
plaintiff's
7:21, 14:14,
17:7, 19:3,

19:10, 25:13,
39:23, 96:11
plan
43:12, 88:11
play
85:13
please
5:2, 5:25, 6:1,
6:9, 14:25,
20:5, 36:18,
65:22, 119:10,
134:6, 134:8
point
15:6, 64:8,
69:12, 73:14,
90:11, 90:17,
90:22, 91:1
points
103:2
poret
4:9, 31:4,
31:14, 31:19,
42:23, 45:8,
45:10, 45:25,
72:10, 80:22,
81:24, 85:23,
89:7, 93:14,
94:7, 96:2,
97:6, 97:7,
102:7, 102:11,
104:14, 110:1,
115:15, 116:2,
116:9, 116:10,
116:15, 118:25,
120:23, 122:4,
122:9, 122:20,
123:24, 131:23,
132:19, 132:23,
133:15, 133:24,
133:25
poret's
10:4, 30:12,
30:15, 31:5,
31:12, 45:7,
45:20, 46:22,
63:22, 91:16,
96:11, 110:20,
115:9, 117:17,

118:5, 119:25,
129:24
port
30:11
portray
89:9
possible
47:4, 47:6,
57:2
potential
24:24, 25:5,
25:10, 25:25,
78:7
practice
64:14
practices
69:1
predict
43:10
preexisting
16:3
premise
126:25, 127:2,
127:4, 127:10,
127:15, 128:4,
128:13
preparation
30:17, 30:20
prerequisite
39:24
present
3:18, 43:12,
104:4
presented
36:14, 36:21,
41:20
presently
22:6
preserves
89:20, 90:10
prevents
114:15
previous
6:22, 49:18,
49:23, 101:7,
101:15, 113:8,
127:12
previously
7:4, 8:1,

91:15, 91:17,
96:10, 118:9,
118:12, 120:1
primary
16:9, 20:2,
20:6
print
9:23
printout
98:6
prior
7:3, 7:21,
11:13, 35:18,
40:6, 46:20,
50:16, 55:5,
55:9, 55:21,
71:8, 75:15,
77:25, 78:2,
78:11, 87:5,
110:9
private
115:2
probably
24:14, 31:17,
108:9, 112:23,
117:22, 120:9,
129:5
problematic
90:24
problems
34:14
proceed
95:20
proceeding
5:8, 15:22
process
23:17, 71:12,
95:15, 120:15
produce
110:15
produced
89:7, 94:6,
96:3
product
13:15, 103:13,
103:19, 103:21
products
18:5, 32:13,

32:15, 32:18,
54:1
**professional**
77:22
**proofread**
25:24
**properly**
91:1
**protect**
95:8
**protective**
91:25, 92:16,
92:19, 92:22,
94:18, 95:5,
97:19
**provide**
16:14, 32:25,
36:20, 44:13,
58:18, 59:19,
62:24, 70:24,
85:20, 116:3,
121:3, 121:6,
122:5
**provided**
10:22, 11:23,
21:14, 26:7,
36:4, 41:6,
41:7, 47:17,
58:21, 59:1,
62:20, 85:15,
85:21, 116:8,
120:19, 120:24,
133:16
**provides**
43:5, 60:10,
104:20
**providing**
45:1, 109:10
**proximity**
54:10, 54:16,
54:19, 57:3,
57:18, 58:3,
100:20, 101:17,
101:21, 102:18,
102:19, 106:10,
107:4, 108:19,
109:8, 109:15,
109:17, 109:19,

109:22, 110:20,
110:21, 110:25,
111:6, 132:2,
132:3, 133:10
**psychology**
59:10, 59:18,
70:4, 74:5
**public**
76:25, 77:20,
78:2, 78:3
**published**
52:6
**punctuation**
26:1
**purchasing**
67:7
**purport**
57:2
**purpose**
90:20
**purposes**
24:17, 24:22,
25:3, 25:20,
25:23, 30:6,
64:3, 65:24,
75:10, 77:11,
78:11, 91:5,
91:6, 92:3,
92:9, 94:1,
115:20
**pursuant**
2:9
**put**
10:7, 66:18,
91:19, 96:9,
97:1, 116:23,
118:11, 120:3,
121:8, 123:9,
124:23
**putting**
11:14, 108:13

**Q**

**qualifying**
63:23
**quarter**
133:16, 133:17
**question**
7:2, 21:11,

22:15, 25:2,
25:8, 26:10,
27:5, 33:7,
34:16, 35:16,
36:18, 38:2,
39:25, 47:15,
48:19, 49:19,
49:23, 51:3,
52:23, 53:13,
54:3, 58:24,
59:15, 60:16,
60:22, 61:1,
61:25, 63:23,
63:24, 65:23,
67:4, 69:11,
73:4, 73:18,
73:20, 74:3,
76:23, 80:9,
81:6, 82:12,
85:14, 94:13,
95:25, 96:7,
96:18, 98:13,
98:14, 115:19,
115:20, 115:22,
115:23, 115:24,
115:25, 122:17,
122:23, 123:12,
124:1, 126:8,
126:25, 127:3,
127:11, 127:17,
128:3, 128:14,
129:5, 129:17,
130:25, 131:17,
132:9, 132:17
**questioning**
90:20, 94:1,
94:22, 115:9
**questions**
11:4, 42:22,
47:4, 77:11,
84:16, 92:3,
94:25, 99:15,
115:8, 115:11,
115:16, 116:3,
122:16, 122:20,
123:1, 123:9,
125:7, 134:1,
134:5

**quick**
34:12, 97:13
**quite**
5:16, 34:13
**quote**
45:1, 53:22,
103:10, 104:24
**quoting**
69:15

**R**

**ran**
80:11, 96:2,
98:7, 111:13,
111:14, 111:24,
111:25, 112:1,
112:25, 114:3,
115:2
**rather**
47:15, 52:23,
91:10, 103:20
**reach**
25:21, 95:2,
129:15
**reached**
129:25
**read**
7:2, 35:14,
35:23, 71:1,
135:3
**reading**
31:5, 129:11
**reads**
53:22
**real**
133:19
**realized**
30:22
**really**
34:8, 58:2,
60:22, 61:24,
92:13, 101:3,
120:11, 132:12
**reason**
9:16, 102:20,
108:21
**reasonably**
107:15, 107:17,

107:19
**reasonings**
43:13, 116:1
**reasons**
42:19, 43:1,
101:18, 102:19,
107:24, 108:1
**rebuttal**
4:14, 29:18,
91:5, 91:8,
94:8, 96:3
**recall**
7:17, 7:18,
15:3, 17:5,
17:9, 18:10,
22:19, 26:23,
28:17, 38:10,
40:7, 40:13,
42:7, 42:14,
49:9, 49:10,
49:25, 50:19,
50:22, 59:4,
59:25, 63:13,
63:25, 64:7,
64:14, 68:14,
75:2, 82:23,
83:1, 84:7,
84:15, 84:18,
84:22, 84:23,
85:1, 86:23,
87:1, 87:22,
88:3, 111:17,
112:5, 112:11,
112:13, 112:14,
112:17, 113:3,
114:21, 114:24,
115:5, 126:2
**recent**
11:9, 11:11,
47:7, 104:24,
105:8, 105:11
**recently**
89:7
**recognize**
52:19, 53:1,
53:5
**recognizes**
53:15

**recompute**
121:24
**record**
7:5, 8:9,
35:24, 49:25,
91:1, 95:18,
109:17, 113:24,
131:6, 134:6,
136:6
**records**
110:5, 110:7
**recreational**
18:5
**reduced**
136:8
**refer**
55:1, 87:11,
122:6, 122:9
**reference**
68:10, 73:14
**referred**
67:12, 132:17
**referring**
8:6, 38:20,
38:21, 38:22,
52:17, 56:4,
66:11, 68:6,
68:8, 70:19,
79:25, 115:24,
132:9
**reflect**
132:19
**reflected**
80:17, 81:4,
81:11, 82:24,
84:24, 114:17
**reflects**
10:21, 81:8
**refresh**
112:22
**regard**
35:22, 131:16
**regarding**
42:15, 45:2,
53:6, 53:7,
55:25, 60:6,
62:11, 67:6,
68:25, 70:3,

72:21, 76:7,
99:16, 102:17
**regardless**
48:17, 117:2,
117:3, 128:14
**regards**
73:20
**registrant**
16:1
**registration**
16:3
**related**
56:2, 59:9,
66:6, 66:7,
136:10
**relevant**
48:14, 132:22,
133:18, 133:22,
133:23, 133:25
**reliability**
64:5
**reliable**
44:10, 44:13,
111:4
**reliably**
46:19, 107:2
**relied**
39:23, 40:8,
46:25, 50:23,
51:6, 64:20,
67:18, 69:3,
72:14, 72:24,
73:8, 73:24,
75:23, 80:2,
130:2
**rely**
32:3, 32:11,
35:11, 45:12,
62:8, 62:13,
62:17, 69:10,
70:1, 73:9,
74:4, 75:9,
78:10, 101:4,
106:13, 129:15
**relying**
40:1, 50:21,
51:4, 65:9,
65:10

**remember**
14:22, 15:2,
15:23, 20:11,
27:12, 27:16,
27:18, 28:6,
41:12, 84:3,
86:6, 103:1,
112:7
**reopen**
90:19, 92:2,
93:25, 95:3
**reopened**
96:6
**repeat**
25:2, 27:5,
36:17, 54:3,
63:7, 65:22,
73:3, 96:7,
127:13
**rephrase**
76:20, 76:22
**reported**
1:25, 110:11
**reportedly**
19:7
**reporter**
2:10, 4:15,
5:2, 5:4, 5:13,
5:18, 5:22,
6:12, 6:15,
14:24, 20:4,
21:22, 22:2,
22:21, 27:25,
30:11, 32:24,
33:2, 33:21,
34:11, 34:17,
36:10, 39:14,
46:12, 46:15,
49:20, 52:7,
78:14, 86:2,
86:5, 119:8,
119:13, 121:12,
131:11, 132:11,
132:14, 132:16,
134:4, 136:1,
136:3, 136:20
**reports**
28:7, 41:6,

41:7, 96:2
**represent**
36:8, 97:25,
98:5
**representation**
99:2
**representative**
71:18, 71:22,
77:4
**representing**
98:23, 98:24
**requested**
121:1
**requests**
91:11
**required**
47:14
**requirement**
54:9, 100:21
**requirements**
47:5
**requisite**
40:3
**research**
46:1, 46:9,
62:11, 65:12,
65:25, 66:7,
67:8, 67:25,
68:8, 73:16,
76:10, 89:2
**reserve**
45:11
**resolve**
107:9
**respect**
76:13
**responded**
123:9
**respondent**
116:12, 116:16,
117:2, 117:5,
117:8, 122:11,
122:12, 123:3,
123:4, 123:19,
123:23, 124:2,
124:8, 124:9,
125:3, 125:5
**respondent-by-re-
spondent**
116:11

**respondents**
72:12, 116:19,
116:22, 117:16,
117:17, 118:3,
118:6, 118:17,
118:25, 119:5,
122:14, 125:1,
125:11
**response**
31:3, 60:11,
91:11, 119:12,
123:22, 124:5,
124:6
**responses**
116:7, 122:15,
122:20, 124:23,
124:25
**responsible**
131:23, 131:24
**rest**
125:12
**restate**
58:24, 88:17
**result**
56:7, 87:3,
88:20, 98:1,
99:4, 99:6,
99:7, 99:19,
99:22, 101:6,
108:8, 108:25,
113:7, 114:16,
117:11, 124:10,
131:21
**results**
46:7, 53:16,
54:11, 62:12,
79:6, 85:9,
85:15, 85:18,
85:21, 85:24,
86:7, 86:15,
86:21, 87:12,
88:5, 88:13,
89:8, 98:20,
100:20, 101:4,
101:15, 106:22,
107:1, 107:16,
107:18, 108:6,
108:11, 108:16,

108:20, 109:4,
109:13, 110:15,
110:22, 111:16,
111:19, 111:22,
113:10, 113:12,
113:18, 114:19,
116:14, 116:20,
117:3, 117:4,
117:7, 117:9,
119:7, 122:4,
122:8, 123:6,
124:7, 124:12,
124:14, 124:20,
129:10, 131:13,
131:21, 132:3,
132:10, 132:18,
132:22
**retail**
51:10
**retain**
101:15
**retained**
7:9, 7:12,
12:1, 12:6,
14:10, 15:12,
20:17
**retrieve**
10:8
**retrieved**
64:15, 87:16
**revealing**
76:5
**revenue**
51:10
**reverse**
11:8, 31:11,
31:15, 31:19,
31:23, 32:6,
32:19, 33:5,
34:5, 34:23,
35:7, 35:12,
131:1
**review**
8:7, 9:18,
30:17, 89:6,
108:4
**reviewed**
29:21, 29:24,

30:4, 30:9,
45:7, 81:16,
90:1, 111:2,
116:8
**reviewing**
30:20
**revise**
31:2
**right**
15:25, 18:1,
19:9, 20:18,
21:8, 21:17,
22:13, 23:1,
23:11, 24:14,
24:19, 24:25,
26:25, 27:3,
27:14, 28:20,
29:8, 40:22,
41:16, 42:9,
44:5, 44:19,
45:11, 45:17,
47:23, 48:4,
50:3, 50:18,
51:16, 53:12,
53:17, 54:2,
54:12, 54:21,
55:6, 55:11,
55:20, 57:8,
61:3, 61:6,
61:10, 64:21,
70:8, 70:14,
71:23, 77:13,
79:2, 79:7,
79:20, 80:6,
81:8, 82:7,
82:16, 82:20,
83:8, 83:25,
84:4, 84:20,
85:10, 85:16,
88:25, 90:8,
92:16, 94:3,
98:18, 99:9,
99:20, 99:24,
100:7, 103:14,
103:22, 103:23,
103:25, 104:6,
104:9, 104:16,
105:1, 110:17,

111:5, 112:3,
112:6, 112:7,
114:9, 116:25,
117:13, 119:20,
123:15, 124:20,
129:10, 129:19,
133:21
**rimowa**
28:4, 36:4,
36:6, 38:4,
39:3, 39:11,
40:22, 41:13,
43:22
**role**
6:23
**roman**
80:10
**room**
8:3, 91:20,
96:10, 97:2,
118:13, 121:9
**rover**
18:4
**row**
112:23, 122:11
**rule**
90:21
**rules**
95:4
**run**
80:17, 81:4,
81:10, 93:14,
93:18, 94:7,
111:12, 111:14,
115:4, 131:10
**running**
114:6

**S**

**said**
13:16, 31:14,
31:19, 34:7,
40:2, 43:7,
44:17, 45:25,
49:22, 52:1,
52:5, 54:17,
60:22, 63:8,
64:20, 75:18,

79:9, 81:7,
83:13, 84:6,
84:11, 86:4,
87:15, 102:13,
103:2, 103:3,
104:4, 104:7,
104:12, 104:14,
104:21, 109:2,
110:4, 114:5,
114:10, 117:15,
118:18, 120:8,
129:8, 131:19,
136:7
**sales**
51:9
**salt**
3:7
**same**
21:18, 25:7,
26:19, 27:8,
27:15, 32:16,
32:18, 33:15,
36:23, 38:9,
41:15, 42:2,
59:3, 66:4,
72:2, 74:3,
77:12, 77:15,
83:16, 88:21,
92:6, 93:3,
93:5, 94:9,
97:4, 97:15,
97:16, 98:22,
111:15, 111:21,
112:9, 112:12,
113:10, 113:11,
121:18, 127:9,
128:2, 128:12,
130:25, 131:4,
132:4, 133:8,
134:9, 135:4
**sanctionable**
95:14
**satisfied**
106:8, 106:22,
107:7, 107:20
**satisfy**
39:24, 49:7,
100:20, 101:16,

107:13
**satisfying**
40:2
**saved**
86:10, 120:10
**saw**
64:10
**say**
8:20, 12:1,
12:4, 16:9,
21:23, 31:7,
32:1, 32:13,
35:10, 36:17,
38:16, 38:17,
44:9, 45:1,
46:9, 47:8,
48:9, 52:24,
58:17, 65:4,
66:5, 66:6,
69:3, 69:5,
69:17, 71:2,
75:21, 75:22,
76:1, 76:16,
77:4, 78:6,
82:10, 82:16,
85:11, 86:3,
89:4, 93:19,
99:10, 99:11,
101:2, 103:9,
103:18, 111:11,
116:21, 116:25,
129:1, 129:3,
129:14
**saying**
16:1, 57:1,
70:18, 70:21,
81:14, 81:16,
92:6, 92:10,
93:5, 93:12,
96:17
**says**
12:1, 29:20,
53:19, 82:18,
85:6, 100:8,
100:9, 102:7,
104:24, 108:6,
110:24, 118:16
**scenario**
71:11, 71:14

**scenarios**
32:5, 56:21,
57:1, 57:2,
57:7, 57:12,
57:14, 57:15
**scope**
37:25, 44:1,
125:19, 126:14,
130:22, 133:3
**screen**
9:18
**seal**
136:15
**searchable**
123:23
**searched**
80:25, 82:18,
83:6, 83:22,
84:4, 84:19,
85:7, 85:11,
85:19, 87:6,
110:12, 112:2,
113:22, 116:22
**searches**
4:12, 46:5,
55:20, 56:23,
79:14, 79:19,
79:23, 79:25,
80:4, 80:9,
81:18, 82:7,
82:10, 82:11,
82:13, 82:15,
84:16, 86:13,
86:16, 86:20,
87:1, 89:6,
93:14, 93:18,
94:7, 97:5,
97:7, 101:7,
109:16, 109:18,
110:16, 111:25,
112:10, 112:25,
113:4, 114:3,
114:4, 114:12,
131:24, 132:20
**searching**
63:16, 80:7,
80:22, 81:18
**second**
9:18, 99:7,

99:18, 102:8,
103:10, 108:5,
120:20, 121:20
**secondary**
13:24, 21:3
**section**
54:23, 55:4,
55:6, 55:7,
55:12, 55:16,
56:3, 56:6,
56:14, 56:16,
57:20, 57:24,
67:5, 69:14,
115:12, 115:15
**see**
29:10, 29:21,
32:14, 44:25,
53:23, 53:24,
55:4, 55:7,
56:2, 57:9,
60:5, 65:12,
65:25, 66:13,
68:5, 69:14,
69:24, 69:25,
72:16, 77:24,
79:3, 79:15,
80:5, 81:23,
83:6, 83:22,
85:17, 86:20,
87:16, 97:8,
98:8, 98:15,
98:18, 98:21,
99:1, 99:3,
99:5, 99:6,
99:21, 99:25,
100:3, 100:4,
100:8, 100:13,
100:16, 103:8,
103:14, 103:17,
105:2, 105:4,
111:15, 111:16,
111:20, 111:22,
112:20, 118:20,
119:15, 119:16,
121:6, 121:22,
122:18, 123:7,
131:13
**seeing**
32:8, 45:24,

47:22, 47:25
**seek**
71:12
**seem**
109:23, 110:24
**seems**
22:7, 45:21,
72:11, 100:11,
108:8
**seen**
29:11, 32:2,
32:9, 35:10,
35:14, 47:8,
93:14, 94:13,
94:20, 94:25,
96:2
**select**
71:2, 117:7,
124:9, 129:8
**selectable**
124:11
**selected**
117:5, 117:8,
117:11, 123:4,
123:6, 124:2,
124:6, 124:13,
124:17, 125:6
**selecting**
69:1, 69:6,
119:6
**self**
59:6
**send**
9:17, 119:17
**senior**
33:19, 33:23,
34:3, 38:20,
38:22, 39:1,
39:5, 39:19,
40:3, 46:2,
48:17, 48:20
**sense**
53:9, 105:12,
107:21, 114:14
**sent**
29:14, 29:19,
52:12, 121:16,
121:19

**sentence**
54:19, 78:24,
79:3, 103:10,
103:15, 104:19,
129:11
**separately**
119:24
**sequentially**
10:3
**service**
103:19
**services**
24:25, 25:6,
54:1, 54:6,
65:14, 65:17,
66:3, 67:10,
67:19, 68:2,
68:13, 71:18,
74:25, 75:6,
76:8, 76:17,
76:19, 76:20,
77:1, 77:6,
77:12, 77:13,
77:23, 78:4,
78:9, 125:16,
125:23, 126:22,
133:2
**set**
106:18, 136:14
**sets**
82:16
**several**
41:10, 46:5,
56:21, 101:18
**share**
60:12, 60:18,
60:24, 61:3,
61:10, 61:14,
61:15, 61:18,
61:20, 62:2,
62:5, 62:11,
65:7
**shared**
72:12
**sharing**
9:22
**sheet**
121:18, 121:20,

135:7
**sheets**
121:17
**shelf**
32:13
**shop**
67:9, 77:20
**shoppers**
54:20, 54:24
**shopping**
65:16, 66:2,
67:19, 68:1
**short**
89:13, 94:18,
95:5, 97:19
**shorthand**
2:10, 136:1,
136:20
**should**
12:4, 16:9,
56:14, 79:24,
82:15, 89:24,
90:5, 90:21,
101:2, 101:22,
107:15, 109:8,
110:1, 114:11,
119:1
**shouldn't**
90:2
**show**
89:8, 91:4,
94:6, 109:7
**showed**
123:24
**shows**
98:18, 98:19
**side**
14:8, 20:8,
23:14, 23:20,
23:21
**side's**
23:15
**sign**
71:21, 128:18,
128:19
**signature**
10:13, 135:12
**signature-d2yvl**
136:16

signed
28:7, 30:3,
36:15, 36:22,
42:4, 42:10,
49:4, 71:17,
126:21, 135:7

significance
16:10, 20:7

significant
25:19

signing
26:20, 73:1,
73:6, 73:21,
74:24, 75:5,
76:13, 76:25,
78:3, 128:1,
128:11

similar
32:15, 60:22,
62:12

simply
40:1, 47:25,
48:7, 48:8

simultaneous
49:17, 70:12,
76:21, 80:15,
104:1, 123:16,
127:20

since
6:21, 7:3,
30:5, 45:6,
67:15, 111:12,
111:15

single
120:5

sir
5:25, 70:11,
73:18, 81:17,
82:12, 134:2

sit
41:12, 84:6,
85:5

sitting
7:25, 40:21

situation
50:5, 50:8,
50:15, 66:25,
67:1, 68:20,

132:19, 133:19

situations
57:5

small
120:11

sold
54:1

solely
129:9

some
10:24, 22:6,
31:3, 46:8,
47:4, 51:11,
58:16, 76:9,
108:4, 108:9,
113:4, 113:22,
114:12, 115:8,
115:11, 129:23

someone
62:24, 89:2,
89:4, 113:7

something
32:14, 73:8,
79:17, 89:24,
102:15, 110:1,
118:22

somewhat
23:18, 63:5,
63:9

somewhere
86:10

sorry
5:16, 6:12,
11:16, 14:24,
20:4, 21:22,
22:21, 25:2,
27:25, 30:11,
32:24, 33:21,
36:10, 49:20,
54:3, 63:6,
65:15, 69:11,
69:13, 73:3,
79:24, 83:4,
84:10, 86:2,
88:17, 92:21,
98:13, 108:25,
119:18, 119:23,
123:15, 127:10,

131:11, 132:11

sort
49:11, 64:18,
88:11, 105:13,
105:14, 121:25

sound
16:4

sounds
128:25

source
60:10, 61:11,
62:20, 62:22,
62:23, 63:12,
64:6, 64:10,
68:11, 70:1,
70:18, 70:21,
71:1, 71:10,
73:23, 111:4

sources
64:19, 69:3,
76:11

south
3:6

speak
58:16, 71:3,
119:9

speaking
69:8, 69:22,
93:21, 98:12

speaks
44:21

specific
11:16, 55:25,
61:19, 62:20,
103:20, 104:5,
105:6

specifically
9:1, 67:23,
68:15, 73:21,
75:12, 76:13,
115:5

specified
86:24

specify
80:23

speculate
128:23

speculating
129:18

speculation
43:4, 44:7,
100:24, 126:23,
132:8, 133:13

speed
87:24

spell
6:1

spelling
26:1, 36:4

spending
28:23

spent
28:19

spoke
49:21

spot
78:15, 78:17

spreadsheet
4:11, 4:19,
120:5, 120:10,
120:22, 121:17

squirt
13:19, 14:18,
14:19, 16:23,
16:24, 17:3,
17:4, 17:8,
17:23, 18:20,
19:11, 19:13,
19:14, 37:8,
41:21, 42:1,
42:12, 51:21,
52:3, 53:16,
54:12, 55:2,
55:7, 55:13,
55:19, 55:24,
56:8, 56:9,
56:22, 57:4,
57:15, 57:16,
57:21, 57:22,
57:23, 57:25,
58:1, 58:4,
100:21, 103:11,
106:12, 106:14,
106:23, 107:5,
107:10, 111:8

staff
69:9, 69:23,

71:4
**stand**
45:5, 45:13,
79:5, 100:6,
125:2
**standard**
64:14, 109:8
**standards**
38:23, 54:13,
110:25
**standing**
89:20, 99:14
**standpoint**
133:11
**start**
14:25, 20:5,
69:16, 102:22,
120:6, 122:17,
123:14, 132:11
**starting**
53:21
**starts**
54:25, 115:13,
118:15
**state**
2:10, 3:6,
5:25, 134:5
**stated**
62:17
**statement**
42:17, 45:5,
45:13, 105:5,
130:1
**states**
1:1
**static**
88:6
**stenographically**
136:8
**steps**
64:15
**still**
8:18, 11:25,
45:13, 47:9,
72:3, 86:10,
128:3, 132:25
**stipulate**
5:3

**stop**
103:22, 103:24
**store**
32:12, 79:25,
85:13
**story**
108:10
**straining**
119:13
**strategy**
6:17, 6:19,
8:12
**street**
3:6
**stricken**
90:17
**strike**
14:4, 129:16
**struggle**
22:7
**studied**
75:5, 76:6,
76:8
**studies**
68:24
**study**
65:3
**subject**
74:7, 89:13,
90:16, 91:24,
92:16, 92:18,
92:19, 92:23,
92:24, 96:6,
97:16, 97:18
**submit**
27:12, 40:10
**submitted**
10:11, 11:1,
11:11, 21:6,
23:7, 24:4,
27:19, 27:23,
28:1, 28:2,
38:4, 40:15,
42:16
**subparagraphs**
29:25
**substance**
96:19

**successful**
24:1
**sue**
136:19
**sufficient**
37:22, 38:6,
38:14, 38:25,
39:7, 39:19,
46:3, 48:10,
48:21, 48:25,
49:8, 49:13,
50:2, 57:3,
58:3, 89:22,
102:6, 104:14,
105:11, 106:12,
107:3, 107:25,
108:21, 109:6,
110:21
**sufficiently**
47:9
**suggest**
103:10
**suggests**
115:25
**suitcases**
28:5
**suite**
3:6, 3:14, 6:10
**summarized**
56:20
**support**
70:24, 72:8,
72:10, 107:4
**supports**
70:22, 75:23
**sure**
42:21, 44:11,
49:24, 51:15,
51:22, 56:13,
60:15, 61:1,
63:9, 77:3,
119:9, 127:10
**surveys**
8:13, 8:22,
9:2, 9:3, 9:4,
9:6, 26:13,
32:9, 35:23,
41:5, 51:19,

52:21, 52:25,
53:7, 53:8,
55:2, 55:8,
55:14, 55:24,
56:1, 57:11,
62:18, 67:17,
67:23, 68:24,
74:14, 74:15,
74:17, 75:4,
75:15, 78:6,
111:9
**swann**
51:18, 53:14,
100:18, 101:16,
101:19, 102:1,
102:17, 103:4,
106:9, 106:21,
111:1, 111:3
**swearing**
5:3
**switch**
115:7
**synonymous**
77:11

**T**

**take**
34:12, 34:18,
78:15, 95:24
**taken**
7:1, 35:25,
78:18, 106:18,
113:25, 131:7,
136:4, 136:7
**talk**
24:4, 24:6,
24:11, 24:15,
25:8, 25:9,
25:13, 25:16,
25:21, 55:5,
77:12, 78:24,
85:9, 85:18,
87:10, 123:18
**talked**
24:17, 24:23,
25:4, 84:25
**talking**
25:18, 50:14,

71:18, 71:21,
77:21, 81:20,
94:17, 113:1,
118:15, 128:4,
128:7

**talks**
53:25, 54:4,
54:9, 54:13,
54:15

**technical**
6:25, 7:7

**technician**
3:19

**telephone**
69:8, 69:9,
69:23, 71:3

**tell**
6:8, 9:5,
23:12, 75:24,
76:6

**ten**
28:11, 28:14

**tend**
68:21

**term**
63:8, 82:22,
85:23, 102:5,
102:9, 102:13,
107:19, 109:5,
110:23, 113:8

**terminology**
103:12, 103:20,
103:21, 104:5,
105:7

**terms**
43:11, 62:19,
81:18, 82:16,
85:1, 85:12,
90:24, 103:13,
133:14

**test**
46:4, 48:4,
50:3, 118:3,
122:25

**tested**
116:15, 122:5,
122:9

**testified**
10:19, 11:12,

11:19, 21:6,
21:15, 39:22,
40:12, 67:22

**testify**
10:25, 11:21

**testifying**
26:21, 42:4,
91:2, 92:11

**testimony**
5:5, 5:14,
5:19, 12:20,
12:22, 12:25,
13:3, 21:10,
23:25, 27:2,
35:18, 39:9,
40:6, 45:19,
46:16, 46:21,
55:22, 71:8,
87:5, 90:16,
91:9, 110:10,
118:1, 128:21,
129:2, 132:8,
135:4, 135:6,
136:6, 136:7

**tests**
55:6

**texts**
8:7

**th**
79:10, 87:16,
111:14

**thank**
5:22, 6:15,
22:2, 33:2,
46:15, 86:5,
99:17, 106:24,
119:14, 134:2,
134:3

**themselves**
58:17, 80:5

**thereafter**
136:8

**thing**
26:1, 103:1

**things**
31:3, 31:6,
51:12, 54:20

**thinking**
43:17, 74:21

**third**
99:22

**thought**
66:18

**three**
79:16, 100:1,
133:9

**through**
9:20, 11:3,
27:10, 51:10,
57:8, 104:25,
108:3, 108:4,
120:16, 121:25,
122:19, 122:24

**throughout**
10:3, 51:25

**tim**
78:14, 89:10,
93:16, 94:10,
99:10

**time**
8:12, 8:21,
11:3, 22:4,
22:7, 22:16,
22:19, 27:12,
27:19, 28:19,
28:22, 28:24,
29:9, 29:14,
30:5, 87:20,
88:6, 88:8,
88:12, 88:14,
88:20, 93:10,
94:5, 95:25,
108:2, 111:12,
111:15, 112:9,
112:12, 112:25,
125:14, 127:16,
131:9, 134:2

**times**
41:10, 51:24,
52:8, 53:10,
87:7

**timothy**
3:12

**title**
51:23

**titled**
55:12

**titletown**
20:15, 20:17

**today**
29:13, 30:18,
40:12, 40:21,
41:12, 42:14,
67:22, 84:6,
85:5, 90:2,
112:5, 131:9,
131:18, 131:21,
132:18, 132:22,
133:1, 133:8

**together**
77:8, 116:22,
117:12

**took**
64:15

**top**
11:9, 98:18,
112:19, 112:20,
118:19

**topic**
19:7, 53:2,
59:1, 59:6,
59:21, 60:25,
61:13, 61:14,
61:15, 61:19,
65:8, 67:9,
73:17, 111:5,
111:6

**topics**
8:23, 53:3,
76:9

**total**
29:16, 116:7,
117:15, 117:16,
118:16, 118:24,
124:19, 125:9

**totality**
35:21

**town**
6:13

**trade**
13:14, 15:3,
15:4, 37:18,
37:21, 38:5,
39:6, 39:11,
39:12, 39:14,

39:19, 40:3
**trademark**
4:15, 8:14,
8:17, 9:3, 9:5,
12:3, 12:9,
12:13, 12:15,
12:18, 13:11,
13:12, 14:1,
14:12, 14:20,
15:7, 15:10,
15:20, 15:24,
16:12, 17:12,
17:15, 18:6,
18:8, 18:23,
19:17, 31:20,
31:21, 32:5,
34:21, 35:6,
37:16, 39:6,
52:6, 108:7
**traffic**
128:9
**trailer**
17:14
**trailers**
17:14
**training**
74:7
**transaction**
128:20
**transcript**
4:7, 5:7, 10:6,
30:9, 30:12,
30:15, 45:7,
52:11, 91:18,
96:25, 110:4,
118:10, 120:2,
121:14, 136:5
**transcription**
135:5
**travelers**
36:7, 36:11,
36:25, 38:4,
40:22
**treating**
77:10
**trial**
10:19, 10:25,
12:25, 37:14

**true**
5:5, 5:14,
5:19, 128:14,
135:4, 136:6
**try**
9:22, 23:14,
91:23, 97:15
**ttab**
15:10, 20:16
**tuesday**
1:20
**tug-of**
108:7
**turn**
118:14
**twice**
125:5
**two**
32:14, 32:17,
34:22, 35:6,
68:5, 77:6,
79:14, 82:15,
82:16, 98:17,
104:9, 104:19,
106:11, 108:14,
109:1, 112:18,
121:17, 123:23,
133:20, 133:21
**two-room**
55:3, 55:18,
55:23, 56:3,
56:9, 57:13,
57:23
**type**
9:3, 9:4, 50:8,
57:12, 57:13,
82:1, 105:23,
106:1, 132:1
**typed**
81:14, 83:1
**types**
34:22, 35:6,
47:22, 55:2,
72:25, 77:22
**typewriting**
136:9
**typical**
57:6, 109:9,

109:21
**typically**
16:1, 102:9,
115:3

**U**

**unbiased**
101:14, 106:16,
107:2, 109:25
**unclear**
114:9
**uncleared**
114:11
**under**
5:6, 5:14,
5:19, 23:15,
31:21, 51:2,
57:6, 57:16,
88:13, 136:9
**understand**
6:3, 8:11,
57:24, 60:23,
61:24, 65:12,
65:21, 90:12,
90:18, 116:4,
116:5, 120:8
**understanding**
24:2, 34:21,
35:1, 38:23,
76:3, 108:11,
110:3, 132:25
**unfavorable**
109:14
**union**
1:5, 1:12,
7:10, 24:8,
24:11, 24:15,
24:18, 24:24,
25:5, 65:14,
65:17, 66:2,
67:10, 67:19,
68:2, 68:12,
69:6, 69:9,
69:18, 69:23,
71:2, 71:4,
71:17, 71:21,
72:1, 72:7,
73:2, 73:6,

74:11, 74:24,
75:6, 76:7,
76:14, 76:20,
76:25, 77:6,
77:13, 78:8,
79:1, 81:13,
81:15, 82:22,
83:23, 83:24,
84:4, 84:13,
84:20, 85:7,
85:8, 85:10,
85:19, 85:22,
85:25, 86:11,
87:11, 87:19,
98:8, 98:21,
99:5, 99:8,
99:19, 99:23,
100:2, 100:8,
100:15, 101:24,
105:15, 105:18,
106:1, 108:7,
125:16, 126:6,
126:12, 126:19,
126:22, 127:6,
128:1, 129:9,
130:4, 130:9,
130:21, 131:3,
131:12, 132:5
**unions**
68:15, 73:22,
77:7, 78:4,
83:24, 127:18,
128:6, 130:15,
130:18
**united**
1:1
**unless**
79:17
**until**
54:25, 94:18,
120:6
**upheld**
90:15
**url**
83:2, 100:10,
112:23
**use**
8:16, 13:19,

14:17, 16:22,
17:22, 19:11,
38:7, 39:2,
55:18, 58:22,
59:2, 59:12,
59:22, 60:7,
63:24, 64:24,
65:13, 66:1,
67:2, 67:9,
67:13, 69:18,
72:6, 77:14,
82:25, 84:17,
89:12, 91:23,
92:6, 93:5,
101:22, 103:19,
107:4, 112:9,
112:12, 115:20,
130:5, 133:7,
133:21
**usefulness**
53:15
**user**
33:24, 38:20,
38:22, 48:20,
103:18
**user's**
39:1, 39:19,
40:3, 46:3
**users**
39:5, 61:10
**uses**
103:12
**using**
39:24, 49:25,
53:16, 54:5,
63:1, 63:15,
63:17, 63:20,
77:15, 79:1,
81:20, 82:4,
84:13, 84:14,
84:17, 84:21,
85:2, 87:19,
88:23, 89:3,
101:21, 112:2,
114:12, 115:10,
133:1
**utah**
1:2, 3:7, 83:24

## V

**vague**
25:1, 38:15,
41:9, 42:13,
42:20, 43:3,
43:14, 47:16,
48:5, 48:13,
50:11, 52:24,
53:4, 53:18,
56:10, 58:15,
58:23, 59:7,
59:14, 59:24,
60:14, 60:20,
63:5, 63:9,
64:12, 64:25,
65:18, 71:24,
73:11, 74:13,
75:1, 75:7,
75:11, 76:15,
77:2, 78:5,
80:12, 80:19,
80:23, 81:5,
82:8, 86:4,
86:17, 88:2,
89:1, 105:20,
106:3, 115:16,
126:1, 130:12,
133:13
**value**
106:19
**vancott**
3:5, 7:21,
25:13
**variety**
8:23
**various**
47:22
**ventura**
6:10
**verified**
5:9
**verify**
118:23
**versus**
11:10, 12:18,
13:25, 15:6,
15:9, 16:11,

17:10, 17:14,
18:4, 18:22,
19:15, 20:15,
38:4, 40:22,
60:8, 62:6,
68:18, 73:19
**vertical**
100:9
**vet**
64:9
**vetting**
64:19
**via**
95:7
**view**
100:17
**vii**
80:3, 80:5,
80:10, 80:17,
80:23, 81:4,
81:8, 81:11,
81:25, 82:10,
82:25, 83:4
**viii**
80:3, 82:2,
82:3, 82:6,
82:10, 82:13,
83:5
**virtually**
1:19, 2:2
**visual**
37:18
**volume**
51:9

## W

**waive**
89:16, 95:9
**waiver**
90:23
**waives**
89:22
**walk**
120:16, 126:7
**walked**
108:4
**walking**
47:21

**want**
9:1, 11:3,
24:3, 31:7,
33:12, 33:18,
36:2, 47:4,
78:20, 90:3,
91:5, 94:2,
94:15, 95:11,
95:19, 99:12,
108:22, 115:7,
116:4, 119:15,
119:16, 121:24,
128:24, 133:9
**wanted**
31:1, 127:23
**warning**
120:4
**way**
5:8, 21:5,
30:23, 35:15,
47:19, 57:24,
58:7, 77:15,
84:19, 89:5,
92:1, 97:15,
106:1, 109:15,
109:24, 110:5,
112:7, 113:16,
116:25, 120:6,
120:10, 123:19,
126:16
**ways**
63:19, 75:21
**we'll**
8:5, 10:2,
34:18, 52:13,
113:13, 134:9
**we're**
26:24, 72:3,
83:21, 89:16,
94:16, 95:20,
101:6, 103:25,
113:1
**we've**
10:2, 24:5,
111:2
**wealth**
73:12
**website**
81:12, 81:13

**websites**
80:5, 80:8,
80:24, 80:25,
81:16, 81:18,
82:24
**weedon**
3:19
**went**
27:10, 121:25,
125:7
**weren't**
129:18
**whereof**
136:14
**whether**
15:4, 39:10,
44:18, 46:2,
48:15, 49:4,
49:12, 50:1,
50:19, 58:2,
58:3, 67:18,
67:25, 72:6,
84:19, 87:1,
87:2, 88:5,
94:25, 101:5,
106:16, 109:17,
109:20, 112:23,
114:24, 115:1,
115:5, 116:13,
116:16, 125:23,
126:5, 126:9,
126:10, 133:10,
133:19, 133:22
**whole**
23:8, 23:23,
90:17, 95:14
**willing**
89:16, 90:19,
92:2
**within**
46:7, 73:15
**without**
63:20, 71:18,
76:5, 101:5
**witness**
5:4, 5:9, 5:16,
5:21, 6:14,
15:1, 21:10,

21:24, 22:23,
27:2, 30:12,
32:25, 33:23,
35:17, 36:11,
39:9, 39:16,
40:6, 46:14,
49:22, 90:13,
91:2, 91:4,
91:22, 92:11,
94:3, 95:17,
97:17, 97:21,
119:11, 132:13,
132:15, 134:3,
136:14
**word**
104:3, 115:20
**words**
113:6
**work**
6:8, 6:17,
9:23, 24:6,
24:10, 24:23,
25:14, 25:17,
29:1, 29:5,
29:8, 29:15,
33:17, 58:10,
58:19, 64:3,
65:11, 77:25,
78:2, 78:11,
84:9, 85:3,
87:23, 89:5
**worked**
6:19, 6:21,
7:3, 7:20
**working**
22:6, 22:8,
25:19
**world**
133:19
**wouldn't**
31:17, 52:24,
58:7, 58:17,
129:3, 133:9,
133:14, 133:24
**wrap**
113:13
**write**
129:14

**written**
22:10, 22:12,
22:16, 26:18,
36:14, 36:21,
41:4, 41:20,
41:25, 51:18,
105:4
**wrote**
31:16

**Y**

**yeah**
11:17, 12:23,
25:3, 25:9,
34:15, 44:23,
58:25, 60:11,
61:24, 65:24,
69:13, 71:7,
73:4, 74:3,
78:16, 81:7,
84:6, 88:18,
92:9, 94:22,
97:12, 98:17,
100:6, 104:11,
106:15
**year**
7:4, 7:13,
64:16, 94:7,
133:17
**years**
10:20, 11:19,
20:15, 21:7,
21:15, 22:11,
22:20, 22:22,
26:25, 27:6,
28:5, 40:9,
40:10, 40:13,
42:8
**yesterday**
98:7
**you-all**
134:5
**yourself**
13:17, 18:1,
40:2, 46:1,
49:7, 57:10,
58:5, 58:9,
58:13, 59:11,

60:12, 60:17,
62:23

**Z**
**zeroing**
87:25
**zoom**
95:7

**$**
**$20,000**
29:17

**.**
**.2734**
3:16
**.8900**
3:8

**0**
**00028**
1:7
**004596**
96:16
**01**
7:1
**07**
36:1

**1**
**1**
113:25
**10**
4:14, 7:1,
35:25, 79:10,
87:16, 111:14,
122:8, 123:4,
124:22, 125:6
**100**
9:10, 130:16
**10011**
122:13, 123:8
**100319**
124:9
**105**
116:4, 120:16,
124:24
**11**
36:1, 122:8,

**123:5, 124:22,**
**125:6**
**118**
4:9
**119**
4:11
**12**
29:25, 78:18,
78:19, 80:1,
124:1
**1200**
3:6
**121**
4:19
**1237**
136:21
**13**
62:17
**136**
1:24
**14**
60:2, 78:22
**144**
116:7, 116:19,
116:24, 117:13,
117:21, 117:23,
119:3, 119:4,
120:17, 124:23,
125:9
**15**
4:13, 93:15,
111:14, 114:18
**16501**
6:10
**18**
44:24, 125:13,
126:4, 126:10,
126:20
**1800**
3:14
**19**
1:7
**1:-cv--dak-jcb**
1:7

───────── 2 ─────────

**2**
113:25

**20**
131:7
**2014**
6:21, 7:3
**2019**
4:16, 51:18
**2021**
1:20, 4:10,
4:13, 4:18,
79:10, 87:16,
136:15
**215**
3:6
**23**
66:14
**24**
119:3
**26**
4:18
**27**
1:20, 112:17
**29**
131:7

───────── 3 ─────────

**3**
131:7, 134:10
**3-5-0**
122:23
**30**
78:18, 91:9,
96:17
**300**
3:14, 117:16,
117:19, 117:22,
118:3, 118:16,
118:21, 119:2
**303.473**
3:16
**32**
115:13
**320**
122:18, 123:12
**33**
115:13, 134:10
**330**
122:18, 122:19,
123:1, 123:9,

**125:7**
**35**
60:2, 60:3,
61:20, 62:15,
64:20, 67:12,
78:21, 83:5,
83:15, 87:12
**350**
122:23, 123:1,
124:1, 125:7
**37**
10:15, 113:25
**384704**
1:23

───────── 4 ─────────

**40**
62:4, 62:16,
62:21, 62:23,
64:6, 64:11
**41**
79:13, 83:5,
83:14
**42**
78:19, 79:13,
83:6, 83:14,
103:6, 106:9,
107:7, 107:14
**45**
113:25
**4625**
96:16
**48**
117:22
**49**
44:24

───────── 5 ─────────

**50**
9:11
**51**
35:25
**52**
4:15
**5289**
3:15
**53.7**
72:11

**56**
1:21
**58**
7:1

───────── 6 ─────────

**6-**
4:13
**600**
116:7, 117:15,
117:18, 117:20,
117:24, 118:21,
119:1
**601**
6:10
**62**
4:9, 68:10,
68:12, 70:19,
70:22, 71:1,
118:9, 118:12,
118:13
**63**
68:6
**64**
68:7
**67**
4:11, 119:25,
120:1, 120:3,
120:13, 120:17,
121:18
**679**
53:21, 54:25,
57:20
**680**
103:7
**682**
56:20
**683**
55:1
**69**
66:15, 70:16,
129:22

───────── 7 ─────────

**7-**
4:18
**72**
69:13, 69:17,

```
70:11, 70:13,
70:23, 72:3,
72:15
73
4:12, 91:15,
91:17, 91:19,
96:10
74
10:4
75
4:14, 10:2,
10:5, 10:8, 24:5
76
4:15, 52:10,
52:13, 100:19,
103:4
77
4:17, 96:24,
97:1, 97:9,
99:16, 106:11,
106:14, 106:16,
106:18, 107:25,
129:12, 129:25
78
4:19, 121:10,
121:13
```

```
                8
801.531
3:8
80302
3:15
84111
3:7
85
122:6
```

```
                9
9
1:21, 7:1
91
4:12
91436
6:11
93
115:14
96
4:17
```

```
9th
64:15, 136:15
```