Nicole M. Deforge (7581) (ndeforge@fabianvancott.com)
Matthew S. Brahana (13154) (mbrahana@fabianvancott.com)
Kirsten R. Allen (15082) (kallen@fabianvancott.com)
FABIAN VANCOTT
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ELEVATE FEDERAL CREDIT UNION<br><br>Plaintiff / Counterclaim Defendant,<br><br>v.<br><br>ELEVATIONS CREDIT UNION<br><br>Defendant / Counterclaim Plaintiff. | Case No. 1:20-cv-00028-DAK-JCB<br><br>**EFCU'S OPPOSITION TO ELEVATIONS MOTION TO EXCLUDE OPINIONS OF JUSTIN R. ANDERSON**<br><br>Honorable Dale A. Kimball<br>Magistrate Judge Jared C. Bennett |

**INTRODUCTION**

Plaintiff Elevate Federal Credit Union ("EFCU") respectfully requests that the Court deny Defendant Elevations Credit Union's ("Elevations") Motion to Exclude Opinions of Justin R. Anderson (the "Motion") in its entirety. Elevations' objections and arguments against Anderson's testimony are entirely misplaced and contrary to the Federal Rules of Evidence. As an expert, Anderson is allowed to rely on the information that he did in forming his opinions, which is consistent with commonly known and judicially recognized facts. His reliance on such information is also expressly allowed under Rule 703. At most, Elevations' complaints go to the weight of Anderson's opinions, and not to the admissibility of his opinions.[1]

---

[1] To promote judicial economy, EFCU adopts the factual background section to its motion to exclude Elevations' expert witness, Hal Poret, as if fully set forth herein. *See* Doc. No. 55, 2-5.

**ARGUMENT**

Fed. R. of Evid. 702 requires a party offering an expert only to make a "threshold showing that the principles or methods that are underlying in the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." Rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc*. 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).

I.  **ANDERSON'S RELIANCE ON THE SEMS WEBSITE IS APPROPRIATE AND HIS RESULTING OPINIONS ADMISSIBLE.**

   a.  **Google's Dominance in Internet Search at Approximately 90% Is Common Knowledge and Not Expert Testimony.**

Elevations seeks to exclude Anderson's opinion that the consumer survey conducted by its designated expert, Hal Poret, failed to represent the marketplace or demonstrate proximity between the subject marks because it only used the Bing search engine, rather than Google, which is not reflective of real-world internet search conditions. Elevations contends that Anderson must be an expert in internet searches to be able to state and rely on the well-known fact that the Google search engine provides the overwhelming majority of all internet searches. Elevations is incorrect. The information Elevations complains about is an undisputed fact acknowledged by numerous courts and does not require any expertise to determine or rely on.

Google's overwhelming dominance among search engines is well-known among the general public and the courts. *See* New York Times, *Google Dominates Thanks to an Unrivaled View of the Web* (Dec. 14, 2020) https://www.nytimes.com/2020/12/14/technology/how-google-dominates.html ("Google has a market share of about 90 percent."); CNBC.com, *Google*

*'overwhelmingly' dominates search market, antitrust committee states*

https://www.cnbc.com/2020/10/06/google-overwhelmingly-dominates-search-market-house-committee-finds.html ("The overwhelmingly dominant provider of general online search is Google, which captures around 81% of all general search queries in the U.S. on desktop and 94% on mobile[.]"). The Supreme Court earlier this year acknowledged as much: "Google search—at 90% of the market share—is valuable relative to other search engines…" *Biden v. Knight First Amendment Inst. as Columbia Univ.*, 141 S. Ct. 1220, 1224, 209 L. Ed. 2d 519 (2021) (Thomas, J., concurring) (also noting that Google "ha[s[] no comparable competitors"). Even this Court has recognized Google as "one of the world's most utilized internet search engines." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1158 (D. Utah 2010), *aff'd in part, rev'd in part*, 722 F.3d 1229 (10th Cir. 2013).

Google's internet search engine dominance is not subject to debate, is widely accepted, and, frankly, is a fact of which the court can and should take judicial notice. *See* Fed. R. Evid. 201. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id*. Based on the news articles and judicial decisions, Google's dominance in internet search market share is generally known throughout the country, including Utah. Alternatively, whether it is the anti-trust subcommittee of the U.S. House of Representative's Judiciary Committee, the United States Supreme Court, or the SEMS website (or another comparable search engine tracker), the fact of Google's overwhelming dominance is properly judicially noticed.[2] Whether the percentage is 88%, as noted by Anderson, or 90% as cited by the Supreme Court, or whether Google is simply

---

[2] Nowhere in Elevations' Motion did they actually challenge the correctness of this fact.

acknowledged as "one of the world's most utilized internet search engines," those differences go only to the weight the jury should give Anderson's testimony, not its admissibility. No expertise is required to state what is common knowledge to all.

Here, the fact that Google is by far the most dominant internet search comes into play in Anderson's critique of the consumer survey conducted by Elevation's designated expert Hal Poret. It was Poret's burden to establish that his survey is reflective of a "significant number of real-world situations." 6 McCarthy on Trademarks, § 32:174.50 (5th ed. June 2021 Update). Yet, Poret curiously chose to include only one search result from the Bing search engine.[3] Anderson criticizes that odd choice—relying on the sheer dominance of Google over Bing[4]—because Bing does not reflect the marketplace or establish the required proximity between the marks.[5] Thus, Anderson contends Poret has failed to meet his burden to show proximity between the marks and that his survey result is reflective of the marketplace. Anderson reliably applied the evidence to the facts of this case. F. R. Evid. 702.

Elevations' arguments that Anderson offered opinions about the "superiority" or "accuracy" of Google to Bing from a search engine analysis is a red herring. A review of Anderson's report shows that his opinion was limited to his area of expertise. Indeed, his opinion was that for establishing marketplace and proximity, Google search results, by virtue of Google's significant market share, was representative of the marketplace and Bing, by virtue of its nominal

---

[3] Contrary to his obligations both to disclosure everything he considered, Fed. R. Civ. P. 26(a)(2)(B)(ii), and his burden to show admissibility, the Bing search result was the only example of a real-world result in Poret's report.
[4] Google's 88% market share is about 16 times Bing's 5.5% market share
[5] As shown in EFCU's Motion to Strike Elevations' Expert, Hal Poret, this is because the Google search results did not return EFCU and Elevations marks in close proximity. *See* Doc. No. 55, 19-21 and *Id.*, Ex. E, ¶¶ 3-6.

market share were not. No understanding of *how* internet search engines operate was implicated by Anderson's opinion.

Andersons' reliance on the SEMS Website is not itself an expert opinion and he was not required to be an expert in internet search engines to rely on the SEMS Website. *See* Fed. R. Evid. 703. While Elevations' complaints may be an appropriate topic for cross-examination, they are not a proper basis on which to exclude those opinions outright.

      b.    **The SEMS Website Is Admissible Under Rule 803(17).**

Rule 803(17) of the Federal Rules of Evidence states: "The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: … (17) Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." The Advisory Committee Notes explain that "[t]he basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate." Examples of market reports admitted under this hearsay exception rule include internet tracking statistics, *L.A. Gem & Jewelry Design, Inc., An & Assoc. Co. Inc.*, CV17–2417–CAS(JEMx), 2017 WL 6209816, at * 8 n.6 (C.D. Cal. Dec. 6, 2017), statistical findings based on survey and poll data, *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984), and calculations based on independent market research firms, *Wilson by and through Wilson v. Merrell Dow Pharm., Inc.*, 893 F.2d 1149, 1154 n.6 (10th Cir. 1990).

"The two factors for admissibility under this exception are necessity and reliability. Necessity means that, as a practical matter, it would be impossible to present all the witnesses and information in court that went into the compilation. As indicated by the Advisory Committee Note, reliability means that the compilers (here, the managers of a website) have a motive to be

accurate." *United States v. Pac. Chem. Int'l, Inc.*, No. CV147203MWFPJWX, 2019 WL 4451214, at *2 (C.D. Cal. Apr. 25, 2019) (citing *United States v. Woods*, 321 U.S. F.3d 361, 364 (3d Cir. 2003) (internal citations omitted)).

Both factors are present here. First, it would be impossible to present all the information about each and every web search that went into the compilation and calculation run by the SEMS website. According to SEMS' frequently asked question entitled, "What methodology is used to calculate Statcounter Global Stats?", the information comes from more than two million websites globally, and "more than ten billion page views per month[.]" https://gs.statcounter.com/faq#methodology (last accessed Sept. 25, 2021). Accordingly, the first factor is satisfied. The second factor is equally present. Statcounter has a motive to be accurate because it is selling a service and if it is inaccurate, it loses customers.

Elevations spends much of their brief arguing about methodology of the SEMS website, but the website itself answers all of those questions. There is a detailed explanation of the methodology and an explanation of how information is collected and presented. *See generally* https://gs.statcounter.com/faq (last accessed Sept. 25, 2021). It is clear that the SEMS's website provides the ratio of the number of searches performed on one search engine to all searches performed on all search engines. Here, the only well-known scientific principle at play is basic addition and division.[6]

In light of the SEMS website's transparency about the source of its numbers, what those numbers represent, and how those numbers are calculated, there is simply no basis to strike Anderson's opinions simply because they were based, in part, on the SEMS website. The SMS

---

[6] In that vein, Elevations' reliance on *Taber v. Allied Waste Systems, Inc.,* is entirely misplaced. As Taber recognizes, "because the 'core science'" – here, mathematical operations of addition and division – "'was sufficiently well-established,'" the expert was not required to test the well-established theory or otherwise prove its acceptance, reliability, or accuracy. 642 Fed. Appx. 801, 810 (10th Cir. 2016).

Website is admissible under Rule 803(17). At most, Elevations' complaints merely go to the weight to be given Anderson's well-taken critique of Elevations' expert.

        **c.**        **Anderson, As an Expert, Is Allowed to Rely on the SEMS Website.**

Elevations also complains that Anderson is relying on hearsay or other information that he does not have personal knowledge of, but those arguments have no basis under the Federal Rules of Evidence and interpreting case law.

Rule 703 of the Federal Rules of Evidence allows an expert to "base an opinion on facts or data in the case that the expert has been made aware of[.]" Moreover, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id*. "Unlike an ordinary witness, … an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observations." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786 (1993). "[E]xperts are often entitled to rely on otherwise inadmissible evidence to explain and support their ultimate opinions and conclusions." *Navajo Nation Human Rights Comm'n v. San Juan County*, 281 F. Supp. 3d 1136, 1162 (D. Utah 2017). "[I]t is well-accepted that experts can and do rely on hearsay." *Flitton v. Primary Residential Mortg., Inc.*, No. 2:03CV481DAK, 2008 WL 4911225 (D. Utah Nov. 13, 2008).

In *Quinton v. Farmland Indus., Inc.*, the Tenth Circuit held that a doctor, who was not a toxicologist, was properly allowed to testify as to causation on injury to cattle by feed that contained a toxic substance, cockleburs. There the expert reviewed literature detailing the toxic effect on cattle of cockleburs and "extrapolate[ed]" that the animals he inspected were damaged by exposure to cockleburs. The Tenth Circuit held that under either a plain error or an abuse of discretion standard of review, the court properly admitted the testimony because the complaint

7

about the expert's opinion only went to weight and not admissibility, even where the expert was unfamiliar with the underlying facts and unreliability of third-party information. 928 F.2d 335, 336-338 (10th Cir. 1991).

Contrary to Elevations' arguments, Anderson is entitled to consider and rely on the SMS Website regardless of whether it is independently admissible. He need only reasonably rely on information that is routinely relied upon by experts in his field, which is what he did here.

## II.     ANDERSON'S OPINIONS ABOUT MR. PORET'S LEADING QUESTIONS ARE CORRECT AND SHOULD NOT BE EXCLUDED.

Elevations attempts to challenge Anderson's opinions regarding the leading nature of Poret's survey and questions as unsupported by his qualifications, experience, and report. Anderson is amply qualified to offer such opinions and those opinions are fully supported by case law, journal articles, and the generally accepted practices in consumer surveys.

 Anderson is unquestionably qualified. He has both an MBA and a PhD in business administration with a concentration in marketing. He has conducted hundreds of surveys, including litigation surveys in intellectual property cases. He has published peer-reviewed articles in academic journals relating to, among other things, survey research. *See* Doc. 47-2, at 42 (Anderson's CV). He knows how to conduct consumer surveys and what questions to ask. He also knows what types of surveys and questions or improperly leading and unreliable.

Elevations' suggestion that Anderson "fundamentally misunderstands" what leading questions are is unsubstantiated and incorrect.  *See* Doc. 47-2, ¶¶ 93-94. First, it is not merely the questions asked but the <u>survey</u> itself that is improperly leading. As Anderson explained in his report, "[b]y placing the junior and senior users' uses of their respective marks together in an artificial survey context, Squirt surveys are inherently leading." Doc. 47-2, ¶ 96. Many courts recognize that *Squirt* surveys are inherently leading. 6 <u>McCarthy on Trademarks and Unfair</u>

8

Competition § 32:174.50 (5th ed. Sept. 2021 Update) ("A number of courts have felt that presenting survey respondents with the conflicting trademarks and asking if they identify the same or different sources is improperly leading.") (citing cases). Accordingly, Anderson's leading opinions are not just related to the questions, but to the survey methodology as a whole. *See, e.g.*, *Kargo Global, Inc. v. Advance Magazine Pub., Inc.*, 06 Civ. 550(JFK), 2007 WL 2258688, *8-9 (S.D.N.Y. Aug. 6, 2007). Indeed, as Anderson pointed out, the literature explains that "[a] Squirt survey using either a one-room or two-room test methodology would typically ask respondents who indicate confusion a follow-up question to measure why they indicated confusion. The Poret Survey deviated from typical Squirt surveys by failing to ask such a follow-up question." Doc. 47-2, ¶ 98 n.80. Therefore, regardless of whether specific questions are leading, as Elevations argues, the court should deny the Motion because Poret's survey itself is leading. Elevations fails to address that deficiency at all.

But Poret's questions were leading as well. By using the word "every" in "highlight every search result," Poret was overtly suggesting that there was more than one search result that was responsive. Poret put the survey participants on alert to look more than one credit union that was responsive to the search result and question. And here, where only two different credit unions marks were presented without any distractors (EFCU's mark eight times above, below, and around Elevations' single mark, *see* Doc. 47-1, Q320-Q350), the survey merely tested whether the recipient construed the business names as similar. *See Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 451 (S.D.N.Y. 1982) ("[W]hen faced with the prospect of borrowing money from either plaintiffs or defendant, a consumer or business would necessarily know more about the company than the minimal information provided to the survey respondents:

the names of the companies. The survey establishes no more than that the names are similar[.]") That results in an invalid and unreliable survey, as Anderson correctly noted.

The absence of a filter question also contributed to the leading nature of Poret's survey. Merely including "don't know" or "none" as a possible answer is insufficient to render Poret's survey admissible in light of its structure and question biases, which are pervasive. Poret should have included an open-ended question to assure the survey tested confusion as to source, and not just participants identifying similarly-named businesses. Indeed, such open-ended questions are the most probative as to actual confusion because the participants, in their own words, get to explain their thought process. Doc. 47-2, ¶ 101; *see also Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 599 (N.D. Ohio 2019) (criticizing survey and concluding it was entitled to "little to no weight" in part because the expert "collected no information as to the respondents' rationale, which could have been addressed in an open-ended question…").

Furthermore, the "don't know" and "unsure" options were hidden all the way at the bottom of the page, which required extensive scrolling to access. And, unlike the visually obvious radio buttons used at the bottom on prior pages, the "don't know" or "none" options were masked by Poret, who intentionally embedded them into the website image in a small font. *Compare* Doc. 47-1 at Q320 (Cell 1 and Cell 2) and Q340 (Cell 1 and Cell 2) *with* Q330 (Cell 1 and Cell 2) and Q350 (Cell 1 and Cell 2). Anderson therefore correctly concluded that the questions asked and the survey structure and methodology itself were improperly leading and the resulting results and opinions unreliable.

This opinion is reliable and helpful to the jury. It is admissible, and Elevations' complaints only go to weight, not admissibility.

## CONCLUSION

As Elevations' Motion is not consistent with the Federal Rules of Evidence and applicable Tenth Circuit and other case law, the Court should deny the Motion and allow Anderson to testify as to all the opinions set forth in his report and to which he was extensively deposed.

DATED this 27th day of September 2021.

**FABIAN VANCOTT**

/s/ Matthew S. Brahana
Nicole M. Deforge
Matthew M. Brahana
Kirsten R. Allen
*Attorneys for EFCU*

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September, 2021, I caused to be served, via the Court's electronic filing system, a true and correct copy of **EFCU'S OPPOSITION TO ELEVATIONS MOTION TO EXCLUDE OPINIONS OF JUSTIN R. ANDERSON** to:

Stephen M. Sansom
Holland & Hart LLP
222 Main Street, Suite 220
Salt Lake City, UT 84101
801-799-5800
smsansom@hollandhart.com

Timothy P. Getzoff (pro hac vice)
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, CO 80302
303-473-2700
tgetzoff@hollandhart.com

Ryan H. Seewald (pro hac vice)
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80202
303.295.8198
rhseewald@hollandhart.com

Attorneys for Defendant/Counterclaim Plaintiff Elevations Credit Union

    /s/ Annette E. Clark