**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **ELEVATE FEDERAL CREDIT UNION,**<br><br>    **Plaintiff/Counterclaim Defendant,**<br><br>**vs.**<br><br>**ELEVATIONS CREDIT UNION,**<br><br>    **Defendant/Counterclaim Plaintiff.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 1:20-CV-00028-DAK-JCB**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on five motions: Defendant/Counterclaim Plaintiff Elevations Credit Union's ("Elevations") motions to exclude the opinions of Justin R. Anderson and Scott Hampton; Plaintiff/Counterclaim Defendant Elevate Federal Credit Union's ("EFCU") motion to exclude the opinions of Hal Poret; Elevations' motion for partial summary judgment; and EFCU's motion for summary judgment. The court held a hearing on these motions on February 16, 2022. At the hearing, EFCU was represented by Nicole Miller DeForge, Matthew S. Brahana, and Kirsten R. Allen, while Elevations was represented by Timothy P. Getzoff and Ryan H. Seewald. The court has carefully considered the parties' arguments and submissions, as well as the law and facts relevant to the motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

*History of EFCU and EFCU Membership*

EFCU is a federally chartered credit union that operates in the northern Utah counties Box Elder, Rich, and Cache – although there are EFCU members that live in other counties in

Utah as well as other states. EFCU currently has three branches – two in Box Elder County and one in Cache County. EFCU began its operations in Box Elder County, Utah under the name Intermountain Indian School Credit Union. In 1978, the name was changed to Box Elder County Federal Credit Union.

Per its charter, EFCU's membership is tied to the Utah counties. EFCU membership is limited to persons who "live in Box Elder, Cache, or Rich Counties, Utah; persons who work (or regularly conduct business in), worship, attend school, or participate in associations headquartered in Box Elder, Cache, or Rich Counties, Utah; persons participating in programs to alleviate poverty or distress which are located in Box Elder, Cache, or Rich Counties, Utah; incorporated and unincorporated organizations located in Box Elder, Cache, or Rich Counties, Utah, or maintaining a facility in Box Elder, Cache, or Rich Counties, Utah." Today, EFCU has approximately 13,000 members of which: (a) ninety-two percent (approx. 12,000) live in Utah counties; and (b) 26 EFCU members (.2%) have a Colorado address.

*EFCU's Rebrand*

In 2017, EFCU, then Box Elder Credit Union, began exploring a possible merger with Members First Credit Union ("Members First"), a credit union operating in Box Elder and Cache Counties, Utah. It was determined that the merged credit union should operate under a new name. In January 2018, EFCU instructed its Marketing Director, Tonya Gail Lucas-Smith ("Ms. Lucas-Smith"), to work with Members First's Marketing Supervisor, Cindy Parsons ("Ms. Parsons"), to come up with a new name and brand for the merged credit union.

Over the next several months, Ms. Lucas-Smith and Ms. Parsons engaged in a process of brainstorming, researching, and creating the new name and brand for the merged credit union. They both considered many different names as part of the new vision and purpose of the

rebranded credit union. They researched possible conflicts with those names, including through internet browser searches, searches with the USPTO, and inquiries with the National Credit Union Association ("NCUA").

Nothing that either EFCU or Members First found during their due diligence led them to believe that there would be any issue with rebranding as "Elevate Federal Credit Union." EFCU was aware that there were many companies that use the term "elevate" for their business. At one point, Ms. Parsons expressed concern that EFCU might not want to use the word "elevate" because of the existence of Elevate Pest Control in Logan, Utah. Ms. Parsons also sent EFCU a link to an article regarding credit union names that included Elevations, but Ms. Parsons testified that she did not know Elevations' name was on the list and Ms. Lucas-Smith testified that she never clicked on the link. Ms. Lucas-Smith was generally aware of Elevations and one of its registered work marks – which did not include a logo. However, Ms. Lucas-Smith did not believe that Elevations was too similar to "Elevate," and therefore concluded that there was no credit union too similar to "Elevate".

On February 1, 2018, the NCUA informed EFCU that two of the twelve proposed names were clearly not available, but cautioned EFCU that, whichever of the other ten names it chose, it was EFCU's responsibility to do its own research to make sure that the name would not infringe on the name of any corporation or credit union in EFCU's trade area. One of the remaining ten names was "Elevate Federal Credit Union."

Around February 6, 2018, EFCU had a conversation with attorney Richard Terry ("Mr. Terry") regarding the extent of its due diligence for selecting its new name in the context of trademark issues. EFCU and Mr. Terry reviewed the steps that EFCU had taken, and Mr. Terry reiterated that EFCU needed to make sure there was not another company trademarked as

Elevate Credit Union or Elevate Federal Credit Union. After speaking with Mr. Terry, Ms. Lucas-Smith re-checked the TESS USPTO database to make "double-sure" that there were no trademarks on Elevate Federal Credit Union or Elevate Credit Union. She did not find any existing trademarks for those names.

On February 16, 2018, Ms. Lucas-Smith reserved the name "Elevate Federal Credit Union" with the NCUA while she continued her due diligence. In that same month, EFCU registered eight domains for its new credit union name, including: elevatefcu.net, elevatecu.org, elevatefcu.com, elevatecreditunion.org, elevatecreditunion.net, elevatecu.com, elevatecu.org, and elevatecu.net. Since then, EFCU has retained and used its domain names. These websites went live in January 2020. There is no evidence that EFCU has offered to sell its domain names.

Eventually, Ms. Lucas-Smith and Ms. Parsons selected the top four potential names to be presented to their respective boards. When the EFCU board met, it selected Elevate Federal Credit Union as its top choice. Around this time, Ms. Lucas-Smith, who has degrees and experience in graphic designs, also began working on designing a logo/brand to go along with the new credit union name. She felt strongly that the credit union should come up with an original logo. Eventually, a list of eight stylized logos using "Elevate Credit Union" were created and gathered for selection by the EFCU board. Ultimately, the board selected a logo and color scheme of turquoise, gray, and green, which EFCU felt best related to its new brand. Blue and green had been the primary colors for EFCU prior to its rebranding.

In August 2018, it was determined that the merger between EFCU and Members First would not take place. However, in February 2019, EFCU decided to go forward with the rebranding to reflect the fact that it now served all three of the Utah counties, rather than just Box Elder County. In April 2019, EFCU notified its members at its annual meeting that the name

would be changed. As early as April 2019, various local and national publications picked up the news that EFCU was changing its name. Elevations claims it first learned of EFCU's planned name change on May 10, 2019, when its general counsel, Brian Holst, was told about it by a former client who emailed a link to him of a press release stating that another credit union intended to rebrand itself as "Elevate."

On November 1, 2019, EFCU made checks with its new name and logo available to EFCU members, and these checks were in fact, ordered by at least one EFCU member in November 2019. On December 16, 2019, NCUA informed EFCU that its name was officially changed four days earlier. EFCU's Certificate of Name Change and an amended charter approving the name change were dated December 17, 2019. In early 2020, EFCU registered and became the owners of Utah state trademark registrations for "ELEVATE FEDERAL CREDIT UNION" and "ELEVATE CREDIT UNION."

*EFCU's Awareness of Elevations*

Prior to the rebranding process, Ms. Lucas-Smith was generally aware of the existence of Elevations. In addition to the facts stated previously, she also did not visit Elevations' website or otherwise look at Elevations' online presence. Ms. Lucas-Smith had no discussions with anyone, including other EFCU employees, EFCU board members, or Ms. Parsons, about Elevations during or in connection with the rebranding process. Ms. Lucas-Smith knew that there was no other credit union using the name "Elevate," "Elevate Credit Union," or "Elevate Federal Credit Union," and she did not consider the existence of Elevations to be problematic. Ms. Parsons did not become aware of Elevations or Elevations' marks until after she was informed of the dispute between EFCU and Elevations in late 2019.

*EFCU Dispute with Elevations*

The first notice EFCU had that Elevations took issue with its rebranding was via a cease-and-desist letter received by EFCU's Chief Executive Officer on December 12, 2019. EFCU's CEO provided copies of the letter to Ms. Lucas-Smith (its Chief Marketing Officer) and EFCU's board president that same day. The letter, written by Elevations' attorneys, alleged that EFCU's use of EFCU's marks would cause consumer confusion and violate certain trademarks of Elevations, and demanded that it immediately cease and desist. The letter enclosed copies of Elevations' then-issued federal registrations. By the date it received the cease-and-desist letter, EFCU had already finished nearly all aspects of its rebranding that were within its control. EFCU had, among other things, already publicly announced the name change, sent reminders to membership, redesigned its website, printed internal and advertising materials, and redesigned and printed new plastic credit and debit cards. At that point, EFCU was mainly waiting for several outside vendors to finish their tasks.

After receiving this communication from Elevations, EFCU reached out to the NCUA and informed them about the December 12 letter. The NCUA responded:

> Who was the credit union? I will forward this to someone to contact you, but there is no other credit union with the name Elevate. There are 2 with the name Elevations, one state and the other federal. My advice is to let them know your name change was approved by the NCUA and you have not infringed on their trademarked name….

EFCU then sent a letter on January 3, 2020 stating that EFCU believed there was no infringement and indicated it would not change its course.

On January 8, 2020, EFCU's board held a meeting at which they discussed the letter from Elevations and the rebranding to Elevate. They voted to move forward with the rebranding and name change to "Elevate." EFCU had already made rebranded documents and checks available to its members in November 2019, and prior to December 2019 had stocked its inventory with its newly branded name and legally changed its name to Elevate Federal Credit Union. In January,

EFCU was finally able to unveil its new website and a few other major items, such as its custom-built signs. Thus, in January 2020 EFCU had fully rebranded itself and started operating as "Elevate Federal Credit Union" or variations thereof.

After the NCUA approves a credit union's name change, an entity is permitted to operate under its prior name for at least 180 days, which can be extended upon request. EFCU was specifically informed of and aware of this. A credit union is also permitted by the NCUA to identify itself using a trade name other than its legal name in advertising and for all other purposes, although legal documents and communications with the NCUA are required to identify the entity's legal name. EFCU was aware of this.

Elevations replied to EFCU's January 3rd letter by reiterating its cease-and-desist demand and asking counsel to contact them to discuss the resolution of the matter. Approximately four months after Elevations sent the initial cease-and-desist letter, EFCU brought this present action on March 4, 2020 for declaratory judgment of noninfringement in this court, and Elevations filed its counterclaims of trademark infringement.

*EFCU's Trade Channels, Marketing, Customer Base, and Sales*

EFCU considers its field of membership to be three rural northern Utah counties that it exclusively targets, and within which 92% of its membership lives. In 2021, EFCU opened a branch in Cache County, Utah. Prior to that, it had only two branches, both in Box Elder County. EFCU has no branches in Colorado. EFCU members may access EFCU services in-person at these three EFCU branches, via EFCU's website and mobile application, or by calling EFCU.

EFCU's marketing targets individuals in the three Utah counties and existing EFCU members. For example: (a) EFCU utilizes billboards in Box Elder County, Utah; (b) EFCU sponsors community events within these Utah counties; (c) EFCU has a vehicle wrapped with

EFCU's marks that primarily travels within these Utah counties; (d) EFCU does paid advertising on Facebook and Instagram, and all that advertising is geographically limited to the three Utah counties; (e) EFCU also sends email messages to its members or anyone who has requested to be on EFCU's email lists. EFCU has spent thousands of dollars targeting its members and potential members with its new branding. EFCU has never directed its marketing to Colorado or its residents or even to anyone outside of the three Utah counties. It would only send information to an existing member or person who happens to be outside of the three Utah counties upon request. Of the new members EFCU acquired in 2020 after its rebranding, not a single new member lists an address in Colorado.

*EFCU's and Elevations' Reputations*

Though small, EFCU has received prestigious awards based on its performance and has an excellent reputation with its members and community.

Elevations has been providing services under the ELEVATIONS and ELEVATIONS CREDIT UNION marks in Colorado since 2006. Elevations has been using its logo since at least 2007. Elevations has been awarded the Malcom Baldridge National Quality Award twice – a nationally recognized presidential award. Elevations has also received trade association awards, including the Credit Union National Association ("CUNA") Diamond Awards, the Golden Mirror Awards, and MAC Awards for credit union marketing. Elevations received a Community Credit Union of the Year by CUNA and other national organizations and Colorado state.

*Elevations' Marks, Customer Base, and Business Plan*

Elevations is a Colorado state-chartered credit union that began operating as the University of Colorado Federal Credit Union in 1953, but in 2006 rebranded itself as Elevations

Credit Union. As a state-chartered credit union it is not allowed to call itself a "federal credit union" or "FCU."

Elevations is the owner of the service marks "ELEVATIONS," "ELEVATIONS CREDIT UNION" and "ELEVATIONS" (Reg. Nos. 3,263,189; 3,266,416; and 5,135,377 respectively) (collectively, "Elevations' marks"). The '189 and '416 registrations, which were originally issued in July 2007, were both renewed in 2017. At the time of these registrations' first renewals in 2013, Elevations submitted declarations of incontestability. The '377 registration was issued in 2017. Elevations also owns the design mark  (Reg. No. 6,265,108). The '108 registration was issued in February 2021. All four registrations remain active.

Elevations first submitted its ELEVATIONS mark for registration with the United States Patent and Trademark Office (the "USPTO") in 2006, and it was registered for "checking and savings account services offered by a credit union to its members." During that registration, there were no rejections based on a likelihood of confusion with any other marks. In 2015, Elevations filed an application to register ELEVATIONS for additional services, including "payroll processing services" and "banking and financial services." During that registration process, the USPTO initially refused to register this mark after it concluded that there would be a likelihood of confusion with an existing registration for the mark ELEVATIONS PARTNERS. Elevations argued, successfully, that there would be no confusion between the marks despite both marks being used in connection with financing services. Elevations uses its marks in conjunction with its credit union, which has branches in several counties in Colorado.

Elevations has no branches or offices outside of Colorado, and Elevations has not disclosed any plans to merge with any other credit union that has an office or branch location in EFCU's three Utah counties. Indeed, as Elevations noted in its 2020 Agency Brief, its

acquisition numbers had been flat for the last few years, and its brand awareness outside of Boulder and Broomfield Counties, Colorado, needed to be improved, and it needed to grow in the Fort Collins area, consider entering the Greely market, and start expansion into the North Denver area. Elevations has no documented plans to move into Utah at all, much less into the three Utah counties where EFCU is located.

Elevations' membership is limited to persons living or working in Adams, Arapahoe, Broomfield, Boulder, Denver, Douglas, El Paso, Jefferson, Larimer, or Weld Counties, Colorado ("the Colorado counties"); persons who are employed by or associated with approximately 500 companies, schools, and organizations (all of which are tied to Colorado – though their presence may extend further); persons whose immediate family members of Elevations' members or part of their same household; and any person who donates $15 or more to the Elevations Foundation. Elevations' Colorado footprint is also reflected in who it considers to be its competitors. Elevations identifies its primary competitors as JP Morgan Chase, Wells Fargo, US Bank, 1st Bank, First National Bank, Key Bank, Bank of the West; its secondary competitors as Canvas Credit Union, Bellco Credit Union, Premier Credit Union; and its tertiary competitors as Alpine Bank and Blue Federal Credit Union. Elevations has not included EFCU in this list as a primary, secondary, or even tertiary competitor.

Based on the most recent data produced, Elevations has approximately 151,150 active members, just 16 of whom reside in the three Utah counties. During its entire 70-year existence, Elevations has had only 500 past or present members, joint account holders, beneficiaries, account trustees, cosigners, authorized signers, persons with power of attorney, with a mailing address in the entire state of Utah.

As of December 2020, Elevations had made approximately $1.6 billion in total loans, approximately $708 million in cash and equivalents, and approximately $201 million in investments. There is no evidence on record that any of this money was held in Box Elder, Cache, or Rich Counties, Utah. EFCU and Elevations offer their consumers highly similar services commonly offered to credit union customers, including banking, loans, and credit cards. Elevations' debit and credit cards indicate they are part of a "co-op network," and Elevations uses card marketing to acquire members by competing for internet users searching for a new credit card on Google.

Between January 1, 2017 and November 24, 2020, Elevations members – constituting approximately 41,000 unique Elevations accounts – used Elevations' services within the state of Utah. This number could be higher since multiple people may be associated with each account. In the same time period, Elevations members transacted approximately 350,000 separate card transactions; 5,000 ATM transactions; and 2,700 shared branching transactions within the state of Utah.

*Elevations' Marketing*

Elevations has a marketing budget of approximately $4 million annually. Elevations' traditional marketing targets its geographic footprint in Colorado. Elevations' marketing occasionally may reach beyond Colorado's borders via digital marketing (such as its website, internet advertisements, social media accounts, and emails), sponsorship of the University of Colorado at PAC-12 sporting events, and outreach to the University of Colorado student and alumni network. However, Elevations' digital marketing is guided by its membership criteria. Specifically, Elevations limits its digital marketing to those located in Colorado, those internet users that have shown interest in Elevations (by visiting its website in the past), or those

11

individual names provided to it by the University of Colorado. Elevations' online following reflects its focus on Colorado. For example, on Facebook, Elevations has zero followers from Utah. The same is true of LinkedIn.

*Consumer Confusion*

After 18 months of coexistence, there is no evidence of actual confusion between the subject marks that has resulted in any completed consumer transaction. Elevations is only aware of five instances where some consumer confusion was documented. After EFCU rebranded, three different individuals contacted EFCU who may have been seeking information about Elevations. One of these individuals was attempting to sign up with Elevations, but on his own realized he had the wrong credit union. These individuals were directed to Elevations or informed that EFCU does not have branches in Colorado. During the same time period, two inquiries were made to Elevations which were intended for EFCU. One of these was an EFCU employee who completed an on-line loan application with Elevations before it was discovered that the individual was an EFCU employee. There is no evidence that any mistaken memberships, products, or services have been provided based on these instances. Elevations could not identify or describe an actual specific instance of anyone who intended to become a member of Elevations but was unable to do so because of confusion with EFCU. Elevations receives more than 10,000 applications for loan transactions from its members each year.

*Third Parties Using "Elevations Marks"*

A search of the term "Elevations" in the Colorado business entity database yields 157 results. A search of the term "Elevations" in the Utah business entity database yields 6 results. A search of the term "Elevation" in the Utah business entity database yields 169 results. A search of the term "Elevation" in the Colorado business entity database exceeds the record count and

requires refining of the search term. A search of the term "Elevate in the Utah business entity database yields 763 results. A search of the term "Elevate" in the Colorado business entity database exceeds the record count and requires refining of the search term.

A search of the USPTO database reveals a significant number of trademarks containing terms with the base letters "ELEVAT" – this includes trademarks registered or applied for, by credit unions, banks, financial institutions, and other companies offering similar or identical services to EFCU and Elevations (or to one another).[1]

A search of NCUA's credit union database reveals that there is a credit union named Elevator Federal Credit Union operating in Mississippi, and that Notre Dame Federal Credit Union uses the term "ELEVATE" (Reg. No. 5,020,137) in connection with its credit union

---

[1] These include, but are not limited to: (a) ELEVATE NOTRE DAME FCU (Reg. No. 5020137), in connection with credit union services; (b) BANKING, ELEVATED (Reg. No. 4511728), in connection with ATM and banking services (was held by *Alpine Bank of Colorado* – one of Elevations' self-proclaimed competitors; (c) PEDESTAL BANK ELEVATE YOUR BANKING (Reg. No. 5639260), in connection with banking services; (d) CITI ELEVATE (Reg. No. 6131193, in connection with banking services; (e) ELEVATE MORTGAGE CROUP (Reg. No. 5549866), in connection with mortgage lending services; (f) ELEVATING OPPORTUNITY (Reg. No. 5830003), in connection with educational loan services; (g) ELEVATE PROFITS (Serial Number 88598195) (abandoned), in connection with business finance procurement services; (h) ELEVATE PAYMENTS (Reg. No. 5898554), by Elevate Payment Alliance, LLC, a Colorado limited liability company, in connection with credit card and debit card transaction processing services, etc.; (i) ELEVATION PAYMENTS POWERED BY NACHA (Reg. No. 5495268), in connection with electronic credit card payments; (j) ELEVATION (Reg. No. 5495267), also in connection with electronic credit card payments; (k) ELEVATE PAYMENT ALLIANCE (Serial Number 88100476) (abandoned), in connection with credit card and/or debit card transaction processing services in Colorado; (l) ELEVATION PARTNERS (Reg. No. 3093393), held by Elevation Management, LLC in connection with investment services; (m) ELEVATED GLOBAL INVESTING (Reg. No. 5117129), in connection with financial advisory services, which coexists with ELEVATING ADVISORS (Reg. No. 5426769), also in connection with financial planning and investment advisory services, ELEVATE YOUR SUCCESS (Reg. No. 4697264), also in connection with financial planning and advisory services, WEALTH ELEVATED (Reg. No. 5694732), also in connection with financial planning and investment advisory services, and ASSETS ELEVATED (Reg. No. 5948369), in connection with financial investment brokerage services; (n) ELEVATE YOUR PLAN (Reg. No. 6086220), in connection with financial services; (o) ELEVATE (Reg. No. 5172099), in connection with issuance of administration of annuities; (p) ELEV8TE (Ser. No. 86794694) (abandoned), in connection with capital investment; (q) ELEVATED (Reg. No. 4541723), in connection with real estate services; (r) ELEVATE REAL ESTATE GROUP (Reg. No. 3940897), in connection with real estate development services, which coexists with ELEVATION (Ser. No. 4500355), in connection with land development services; (s) ELEVATED CHICAGO (Reg. No. 5752459), in connection with real estate financing and developing services; (t) ELEVATE GROWTH PARTNERS (Reg. No. 6157545), in connection with real estate brokerage; (u) ELEVATE IQ (Ser. No. 90086730), in connection with real estate brokerage; and (v) ELEVATE LIVING (Reg. No. 5772921), in connection with real estate property management services.

services. In addition, True Sky Credit Union uses ELEVATE for its online financial education application. Notwithstanding these various registrations involving marks that include "ELEVAT," Elevations has sought only to enforce its mark against EFCU and one other non-credit union institution using the word Elevate. In addition, the terms "elevations" or "elevate" are used as the names of various financial institutions.[2]

*Expert Witness Hal Poret*

For the present action, Elevations engaged Hal Poret as an expert to conduct a survey to determine if EFCU's marks create a likelihood of confusion with Elevations' marks and prepare a report. Elevations disclosed Hal Poret as an expert witness and produced his report on March 31, 2021.

Hal Poret has a bachelor's and a master's degree in mathematics and a J.D. from Harvard Law School. Mr. Poret has personally designed, supervised, and implemented over 1,000 surveys regarding the perceptions and opinions of consumers, with over 500 involving consumer perception of trademarks. He has designed studies that have been admitted as evidence in legal proceedings and has been accepted as an expert in survey research by U.S. District Courts, the Trademark Trial and Appeal Board, and the National Advertising Division of the Council of Better Business Bureaus ("NAD"). Mr. Poret is a member of the American Association of Public Opinion Research; the International Trademark Association; and NAD. He has spoken at major

---

[2] A small sample of the financial institutions using a version of the base "elevat" is as follows: (a) Elevation Financial, a socially conscious financial planning and ESG Investing company – https://www.elevationfinancial.com/about; (b) Elevation Financial Group, LLC, a real estate company headquartered in Florida – https://elevationfinancialgroup.com/; (c) Elevate Financial, a company offering financial planning, investment advisory services, and employer retirement plans consulting based in Arizona – https://elevatefin.com/; (d) Elevate Capital Advisers, an SEC registered investment advisor headquartered in Eagle, Colorado since 2017 – https://www.elevatecapitaladvisors.com/; (e) Elevate Wealth Management, a financial planning team located in Denver, Colorado – https://www.elevatewealth.com/; (f) Elevate Credit, Inc. (which calls itself, Elevate), a Delaware Corporation since 2014 that provides financial tools and lending brands – https://www.elevate.com/[2]

intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability. During his deposition, Mr. Poret could only recall two instances where his surveys were rejected by a court, and, in those instances, the appeals court reversed the lower court or a subsequent Supreme Court decision would have allowed the survey.

For his survey in this case, Mr. Poret recruited a total of 300 respondents (150 in the test group and 150 in the control) of actual and prospective consumers of credit union services in Northern Utah, including over 100 individuals living in Box Elder, Cache, and Rich counties. Mr. Poret used a version of the *Squirt* survey methodology, which Mr. Poret claims "properly replicates realistic marketplace conditions in scenarios where the overall proximity of the parties' services and marks is sufficient for it to be realistic to present both the parties' products/marks in close proximity in the survey." Mr. Poret testified that there are a number of aspects to "proximity" relevant to a *Squirt* survey, including competitive and physical proximity. For the purposes of this survey, Mr. Poret defined the marketplace as "individuals who are p[ro]spective customers of credit union services in the area surveyed and who use the Internet, and, therefor[e] might be in a position to do a search like this."

In determining whether a *Squirt* survey was appropriate, Mr. Poret found there was competitive proximity between the respective marks because "they are largely identical or highly comparable types of services, since both parties use their respective marks in connection with many of the same services, and both are credit unions." With respect to physical proximity, Mr. Poret noted that although the parties have branches in different locations, "the parties primarily operate in neighboring states and can and do have members from the states and counties where the other is based." Mr. Poret also "conducted numerous internet searches for the terms

15

ELEVATE, ELEVATE CREDIT UNION, ELEVATIONS, and ELEVATIONS CREDIT UNION," and found that "the parties' marks are reasonably likely to be found in close physical proximity in internet searches." He then provided a Bing screenshot to demonstrate that the names of the parties are frequently listed on the first page of search results in a search for "Elevate Credit Union." He claims to have found similar results by searching on the iPhone app store. Thus, Mr. Poret determined that there was "sufficient proximity for a Squirt methodology to be appropriate." However, absent from the report are the following: (1) the dates of each search; (2) the precise search terms used; (3) the search engine used for each search; (4) the type of hardware on which he ran each search; and (5) records of the actual results.

With respect to the survey itself, respondents were asked to imagine they are searching for "Elevate Credit Union"[3] and were then given a Bing search result, along with the following direction:

> Please click on the image below to highlight each search result that you think is for the credit union that you searched for, if any. You may select one or more search results by clicking on a search result to highlight it. Or you may also select the none or don't know option at the bottom of the page.

Of the eleven different search results shown to the survey participants, only two were credit unions – EFCU and Elevations. EFCU was shown to the participant six times in the results list, along with appearing in the search box above the results as well as in the box to the right.

Next, respondents were shown the same search and asked "Do you think that any of the other search results are for organizations or companies that are affiliated with the credit union that you searched for?" and were allowed to answer "Yes, I do," "No, I do not," or "Don't know/no opinion." For those who selected yes, they again were shown the search and asked,

---

[3] For the control group, the "Elevations Credit Union" result was replaced with "UofC Federal Credit Union."

"Please click on the image below to highlight every other search result that is for an organization or company that is affiliated with the credit union that you searched for."

*Expert Witness Scott Hampton*

On May 14, 2021, EFCU provided an expert report laying out the opinions of Scott Hampton, who was retained as an expert witness on "trademark infringement damages, monetary remedies, and financial issues." Mr. Hampton has a degree in accounting and is a certified public accountant in California, Washington, and Utah. He has also received special training with examination on selected valuation theory and procedures from the American Institute of Certified Public Accountants ("AICPA"), and he is certified in Financial Forensics and Accredited in Business Valuation by the AICPA. Mr. Hampton has owned and operated Hampton IP & Economic Consulting, LLC since 2009, which is a firm providing investigative accounting, economic analyses, market research, and valuation services, including analysis in the areas of economic damages and monetary remedies arising from intellectual property infringement.

Mr. Hampton began his career working as a staff auditor with KPMG Peat Marwick, and as a forensic accountant on complex commercial litigation. He later joined Arthur Andersen & Company's litigation support group and spent the next three years analyzing oil spill claims and calculating economic damages. In 1994, he left to establish his forensic accounting practice, which is focused on the valuation of intellectual property and the analysis of economic damages arising from, among other things, trademark infringement. He has consulted on an assortment of issues, including damage-related studies in a wide variety of industries – including, but not limited to, banking. He has calculated economic damages in more than 350 intellectual property litigation matters in jurisdictions across the United States dealing with trademark, and other

17

commercial litigation. He has testified as an expert concerning intellectual property infringement damages in deposition and trial on more than 120 occasions in 26 states and Washington D.C.

The focus of Mr. Hampton's report was to analyze the basis for EFCU's revenue streams beginning on January 1, 2020. While working on his report, Mr. Hampton reviewed the pleadings, deposition transcripts, and the Expert Report of Hal Poret. He also had telephone calls with two of EFCU's executives. Mr. Hampton's report includes Mr. Hampton's Revenue Opinions and Mr. Hampton's Cost Opinions. With respect to Mr. Hampton's Revenue Opinions, he stated he was "not aware of evidence that any of [EFCU]'s revenues are attributable to the Elevation Claimed Service Marks." Before providing his conclusions, Mr. Hampton noted "I assume it is Elevations' burden to establish revenue [EFCU] made that is attributable to its alleged trademark infringement," and then noted that as of the date of his report he was not aware that Elevations had established this.

Mr. Hampton concluded that EFCU "would have generated all of the 2020 revenue identified in [EFCU's] 2020 P&L had it remained Box Elder Credit Union." Mr. Hampton then went through each of the revenue streams identified in EFCU's 2020 P&L and stated that EFCU would have generated the revenue without the name change, noting that he could not find any evidence to the contrary. The report does not contain further analysis or state a methodology for how Mr. Hampton reached his conclusions.

*Expert Witness Justin R. Anderson*

EFCU retained Mr. Anderson as an expert to provide rebuttal opinions regarding the Poret Report and the Poret Survey. Mr. Anderson has both an MBA and a PhD in business administration with a concentration in marketing. He has conducted hundreds of surveys, including litigation surveys in intellectual property cases. He has published peer-reviewed

articles in academic journals relating to, among other things, survey research. Mr. Anderson claims to have "training in survey research methods, statistics, marketing, and consumer psychology," as well as an "[e]xpertise in marketing and survey research."

In his report, Mr. Anderson asserts that the Poret Survey "suffers from significant flaws," in part, because Mr. Poret used Bing instead of Google to show proximity between the parties' marks. Citing to the SEMS Website, Mr. Anderson opined that because the majority of searches are conducted on Google instead of Bing (88.8% vs. 5.5%, according to the SEMS Website), Mr. Poret failed to show sufficient proximity between EFCU's and Elevations' marks to represent a typical marketplace context. Mr. Anderson also conducted his own search on Google and used those results to bolster his conclusions. He is not an expert on internet search engines, but he stated that he relied on his "knowledge in fields such as surveys, consumer behavior, and marketing" to reach his conclusions. Mr. Anderson admitted that he did not test the veracity of the information contained on the SEMS Website.

Mr. Anderson also asserts in his report that the Poret Survey is improper because, in the instructions to the respondents, Mr. Poret failed to ask a "filter question" for the measurement of confusion as to source, making this question leading.

## DISCUSSION

### I.  Exclusion Motions and Evidentiary Disputes

#### a.  Hal Poret

EFCU has filed a motion to exclude the opinions of Elevations' expert witness Hal Poret. The court grants this motion, based on the following analysis.

*Rule 26(a)(2)(B)(ii) obligations*

Rule 26(a)(2)(B) requires that an expert's report contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). "[F]acts or data" are interpreted to mean any factual ingredients that the expert considered "in forming the opinions to be expressed, not only those [they] relied upon." Fed. R. Civ. P. 26, advisory comm. notes (2010). Rule 37(c) ensures compliance with Rule 26(a)(2)(B). A noncompliant party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co*., the Tenth Circuit set forth four factors to guide the district court's analysis into whether a nondisclosure was substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of that party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) whether the untimely disclosure was a result of 'bad faith or willfulness.'" 170 F.3d 985, 993 (10th Cir. 1999) (citation omitted).

Elevations retained Mr. Poret as an expert to design and administer a survey to assess the likelihood of confusion between the parties' different trademarks. To do this, Mr. Poret claims to have used a form of a *Squirt* survey. This format requires that he carefully replicate the real-world internet marketplace, which is done by having the survey reflect "a significant number of real world situations in which both marks are likely to be seen in the marketplace side-by-side." 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:174.50 (5th ed. June 2021 Update). Accordingly, in order for the court to evaluate the sufficiency of his report, Mr. Poret must provide documentation of the real-world situations he used to establish proximity the marketplace.

In his report, Mr. Poret states that he "conducted numerous internet searches" from different locations "and examined the results." He ran these searches so that he would have "some solid basis for believing that what I'm showing in the survey in terms of search results is a – real valid consumer experience" or a "reasonably realistic situation" in the marketplace. The Poret Report also states that he searched for the terms "Elevate, Elevate Credit Union, Elevations, and Elevations Credit Union," but does not give more specifics as to search terms he used. The only documented search results included in the Poret Report are a Bing internet search and an Apple app store search. Mr. Poret admitted that his searches influenced his opinion in creating his survey, but has also asserted that he did not document every search he did because he believes he is not required to do so.

By not disclosing the search terms and results of the numerous internet searches he performed, which searches influenced his opinion on the appropriateness of the Poret Survey, the court finds that Mr. Poret failed to meet his Rule 26(a)(2)(B)(ii) obligations. These internet searches are not minor pieces of information or unnecessarily specific details. *See United States v. 8.11 Acres of Land*, 2019 U.S. Dist. LEXIS 126751, at *17-18 (D. Colo. July 30, 2019); *McCoy v. Whirlpool Corp*., 214 F.R.D. 646, 652 (D. Kan. 2003). Rather, these internet searches are an important basis for Mr. Poret's opinion that his survey accurately reflects the marketplace – a conclusion that the court and EFCU cannot properly evaluate without the facts and data available to examine.

Based on the following analysis of the *Woodworker's Supply* factors, the court also finds that Mr. Poret's failure to disclose these searches was not substantially justified or harmless. First, this nondisclosure is prejudicial to EFCU because it prevents EFCU and the trier of fact from evaluating Mr. Poret's opinion based on what he actually searched and reviewed. Providing

only one Bing search and one Apple app store search is not enough for meaningful inquiry into Mr. Poret's opinions regarding marketplace and proximity. EFCU would need significantly more information on where and how Mr. Poret ran his searches (as well as the content of the results) in order to effectively cross-examine him. Second, Elevations cannot cure this prejudice because Mr. Poret did not keep track of what he considered, and he was unable to remember or provide more details about his searches during his deposition. Even if he were to remember his search terms and method, it would be impossible to recreate exactly his past results. Third, if Mr. Poret were to remember these details by trial, his testimony on the matter would lengthen the trial. Fourth, Mr. Poret's nondisclosure indicates a possibility of bad faith here since he is an experienced, professional expert witness who should be well-aware of his Rule 26(a)(2) requirements. Thus, these factors support the court's finding that Mr. Poret's failure to disclose the internet search terms and results that he considered when forming his opinion was not substantially justified or harmless. Accordingly, the court excludes Mr. Poret's testimony under Rule 37(c)(1).

*The Poret Report reliability*

The court also excludes Mr. Poret's testimony because the Poret Report is unreliable. Assuming that an expert witness is sufficiently qualified, the court must "determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*). In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court suggests four kinds of factors that a court may consider while making gatekeeping determinations, but that list is not definitive nor exhaustive and "a trial judge has wide discretion both in deciding how to assess an expert's reliability and in

making a determination of that reliability." *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1233 (10th Cir. 2004).

Here, Mr. Poret is qualified to perform his role as expert witness. The facts on record clearly support this. However, the court now also strikes Mr. Poret's testimony because the court finds that, based on the methodology and application, the Poret Report is unreliable. *See* Fed. R. Evid. 702; *Schulenberg v. BNSF Railway Co.*, 911 F.3d 1276, 1282-83 (10th Cir. 2018).

The Poret Survey is a form of a *Squirt* survey – a format where products are placed side-by-side, along with controls, "and participants are asked questions to determine if confusion exists as to the source of the products." *Parks LLC v. Tyson Foods, Inc*., 863 F.3d 220, 233 (3rd Cir. 2017) (citing Jerry B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 749-50 (2008)). While the Tenth Circuit does not prohibit *Squirt* surveys, it does prohibit placing trademarks side-by-side in a survey if doing so would create an artificial situation that does not reflect the marketplace. *Jordache Enter., Inc. v. Hogg Wyld, Ltd*., 828 F.2d 1482, 1487-88 (10th Cir. 1987) (citation omitted).

In the Poret Survey, the parties' marks appeared side-by-side in the survey internet search results provided to the participants. Mr. Poret based this structure on the results of a real search. However, this is problematic considering that Mr. Poret only disclosed one of his internet search engine results (the Bing search result) to show that proximity between the parties' marks actually exists in the internet marketplace.[4] Thus, Mr. Poret's nondisclosure of the rest of his internet search results makes it practically impossible to determine if he created an artificial marketplace in his survey.

---

[4] Mr. Poret disclosed an Apple app store search as well, but that is different from an internet search engine result. Moreover, it is the Bing search result that Mr. Poret used as the basis for the structure of his survey.

In addition to that integral, potential flaw, there are other methodological issues in the Poret Survey. The first few are that there are more proximity and marketplace issues. While the parties operate in neighboring states, each credit union specifically targets and has physical locations only in its respective geographic region. That does not create much physical proximity. In addition – while the court recognizes that Mr. Poret only included participant responses from those who indicated they would search the internet for information regarding a credit union they were considering – the court is still concerned that Mr. Poret may have artificially manufactured competitive proximity, in order to use a *Squirt* survey, by constructing the survey under the assumption that it is reasonably common for people to select a financial institution based only on internet search results. That issue may have made the survey sample overinclusive as well. Regarding the relevant marketplace, EFCU only operates, advertises, and has a presence in three counties in Utah. However, the Poret Survey included participants from other counties in Utah. Moreover, Mr. Poret has conceded that there was very little brand awareness of EFCU at the time of his survey because EFCU had only been operating under that name for about a year.

Finally, there is a large methodological issue in that Mr. Poret did not follow an appropriate method for testing any specific type of confusion. All types of confusion recognized in the Tenth Circuit – forward, reverse, and initial interest confusion – are actionable under the Lanham Act. However, a survey testing for confusion must follow proper methodology to test for a specific type, or types, of confusion. The Poret Report is silent as to what type of confusion was tested, but instead states that Mr. Poret "used a Squirt methodology that simulates an internet search for ELEVATE CREDIT UNION and tests for confusion in the context of the search results[.]" Later, Mr. Poret testified that his survey "fits very squarely with reverse confusion," and then Elevations argued in its opposition to this exclusion motion that initial

interest, forward, and reverse confusion were all measured in the Poret Survey. The court disagrees, based on the following analysis.

"Initial interest confusion results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006). Mr. Poret never claimed that his survey measured initial interest confusion, and Elevations did not allege initial interest confusion in its pleading. Elevations first claimed that the Poret Survey measured initial interest confusion in its opposition to this exclusion motion by stating that the survey undoubtedly measured this because "consumers were clearly confused at the initial point of commercial impression." However, that is a conclusion, not an explanation. Elevations has not explained how the survey methodology is appropriate for, or how it measured, initial interest confusion.

Forward confusion occurs when consumers "develop the mistaken belief that the [senior user] is the origin of the [junior user's] goods or services – so that the [junior user] capitalizes on the [senior user's] good name." *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1234 (10th Cir. 2013). A survey testing forward confusion surveys the junior user's universe, and tests and controls for the junior mark. (ECF No. 47; Exh. 2 at ¶ 60). In his survey, Mr. Poret tested the senior mark, Elevations, and controlled for the senior mark by replacing Elevations with UofC Credit Union. Thus, Mr. Poret did not follow the accepted methodology for testing forward confusion.

Reverse confusion occurs when consumers believe "that the [junior user] is the source of the [senior user's] products or services." *Australian Gold*, 436, F.3d at 1238. "Reverse confusion typically occurs when the [junior mark's] advertising and promotion so swamps the [senior

25

mark's] reputation in the market that customers purchase the [senior mark's] goods under the mistaken impression that they are getting the goods of the [junior mark]." *1-800 Contacts*, 722 F.3d at 1238-39. To test reverse confusion, "it is appropriate to survey the senior user's customers." *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at *3 (S.D.N.Y. Aug. 6, 2007).

Mr. Poret did not survey the correct population because he tested EFCU's audience in Northern Utah, not Elevations' audience in Colorado. The court finds Elevations' argument that the correct population was tested because the parties have the same prospective customers – users or potential users of credit unions – to be unavailing. The record clearly shows that these parties target their own geographic areas and that there are very few members of either credit union that list residences in the other party's geographic region. Mr. Poret should have tested Elevations' potential consumers, but he did not do so. Moreover, there is no "swamping" effect here.

"When few of the senior user's customers will be exposed to or familiar with the junior user's mark, there will be no 'overwhelming' or 'swamping' effect on the smaller senior user's good will and mark. In that case, reverse confusion will be unlikely." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed., Sept. 2021 update). Elevations is much larger than EFCU; Elevations is obviously the dominant credit union between the parties in Colorado; and Elevations has no branches, presence, advertising, or reputation in the EFCU counties. Thus, even if the correct population were tested, Elevations failed a prerequisite for "swamping" by not having a presence in Northern Utah. This lack of "swamping" indicates a high likelihood that reverse confusion actually does not exist here.

Based on the above analysis, the court concludes that there are enough methodological issues with the Poret Survey that the court finds it unreliable. Accordingly, Mr. Poret's testimony is excluded on this basis as well.

### b.  Justin R. Anderson

EFCU retained Mr. Anderson as an expert to provide rebuttal opinions regarding the Poret Report and the Poret Survey. Elevations has moved to exclude the opinions of Mr. Anderson. However, the court is excluding the opinions of Mr. Poret, which makes Mr. Anderson's opinions irrelevant. Accordingly, the court rules that this motion is moot.

### c.  Scott Hampton

Elevations filed a motion to exclude revenue opinions that EFCU's expert witness Scott Hampton expressed in this case. Based on the following reasoning, the court denies this motion.

Fed. R. Evid. 702 is the rule that governs whether the testimony of an expert witness is permissible in federal court. To make this admissibility determination, the court considers whether the expert is qualified and whether the expert testimony is reliable and relevant. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). An expert is qualified in a particular field if they "possess such skill, experience or knowledge in that particular field as to make it appear that [their] opinion would rest on substantial foundation and would tend to aid the trier of fact in [their] search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 918 (10th Cir. 2004) (citation omitted). It is further required that the proffered expert must stay "within the confines of [their] subject area." *Ralston v. Smith & Nephew Richards, Inc*. 275 F.3d 965, 970 (10th Cir. 2001).

In order for the court to make a reliability determination, the expert witness must disclose the underlying facts and methodology they used in forming their opinions. *See U.S. v. Nacchio*,

555 F.3d at 1241. To assess reliability, courts consider the *Daubert* factors. Additionally, a district court does not have to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and may exclude expert opinions if there is "too great an analytical gap between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997).

The court finds that Mr. Hampton is qualified to have given his revenue opinions in this case. Elevations has argued that Mr. Hampton is not qualified to render opinions about the market effect of trademarks on EFCU's revenue, and that EFCU needed to demonstrate that Mr. Hampton is qualified to understand the banking or credit union market, the market or economic impact of trademarks used in that industry, or consumer habits and choices in the banking industry. This is incorrect. To be qualified to express his revenue opinions in this case, Mr. Hampton needed to have sufficient knowledge, skill, experience, training, or education in analyzing financial information, including revenue streams and their sources. As demonstrated in the background facts, Mr. Hampton has these proper qualifications.

Next, the court determines that Mr. Hampton's revenue opinions here are sufficiently reliable and will assist a trier of fact to understand the evidence. Elevations' critique goes to the weight of the evidence.

Mr. Hampton used his forensic accounting expertise and experience as a damages expert in trademark infringement cases to examine the facts of the present case, determine whether each EFCU revenue source is attributable to the allegedly infringing marks, and to calculate each line-item as a percentage of revenue. In this process of analyzing EFCU's revenue, he reviewed the documents produced in this case, he spoke with EFCU's Chief Financial Officer and Chief Marketing Officer regarding each source of EFCU's revenues, and he applied his expertise line-by-line to the underlying revenue sources in order to produce his conclusions. Considering also

28

that credit union revenue streams largely derive from investments and customer memberships – largely pre-existing memberships with EFCU in this case – the court finds that Mr. Hampton's methodology is sufficient to meet the reliability threshold. *See Hays v. Park City Sch. Dist.*, 214 F. Supp. 3d 1162, 1189 (D. Utah 2016). Elevations' concerns here regarding Mr. Hampton's qualifications, methodology, conclusions, and correctness or completeness of information go to the weight of his opinions and are the proper subject of cross-examination, not exclusion. *See Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 2021 WL 673290, at *8 (D. Utah Feb. 22, 2021); *Hays*, 214 F. Supp. at 1189.

Finally, there is a dispute in this motion about the burden when a trademark owner seeks disgorgement of profits as its remedy under 15 U.S.C.A. § 1117(a). The court will not address this dispute over the law here, but instead notes that competing views of the law do not justify exclusion. *Vox Mktg. Grp., LLC*, 2021 WL 673290, at *3. Thus, Elevations' critiques here go again to the weight of Mr. Hampton's opinions, not exclusion.

Based on the above analysis, the court denies Elevations' motion to exclude the opinions of Mr. Hampton.

### d.  Other Evidentiary Objections and Judicial Notice Requests

#### i.  Evidence of actual confusion

The parties dispute whether the details of the five instances of "confusion" are admissible. EFCU included these five instances in its undisputed facts – in the section addressing confusion – but did not include much detail. It is thus clearly proper for Elevations to use this as evidence. As for the details not included by EFCU, the evidence speaks for itself. There is no speculation here. The court finds that this evidence is admissible. Accordingly, the court is permitted to include and discuss details from these instances on record throughout this Order.

### ii.   The article

EFCU objects to the use of the substance of the article "Top 50 Most Distinctive Credit Union Names." The evidence on record shows that this link was sent in an email, but that no one read the article. Thus, the court finds that this article is admissible only for the purpose to show that the article was linked in an email. The court may only use this evidence accordingly in the summary judgment motions later in this Order.

### iii.   Ms. Parson's testimony

Despite EFCU's objection, the court finds that Ms. Parson's testimony regarding the similarity of Elevations' marks and EFCU's marks is admissible under Fed. R. Evid. 701 because she testified about her perception of the similarity between the marks and this testimony is relevant to the case. Thus, the court concludes it is appropriate to consider Ms. Parson's testimony while determining the present summary judgment motions.

### iv.   Ms. Baugh's declaration

Elevations objects to the admissibility of Ms. Baugh's declaration, but these objections are without merit. EFCU disclosed Ms. Baugh as its CFO and as being able to testify and having information including, but not limited to, "the costs associated with Plaintiff's rebrand, and Plaintiff's claim in the Complaint and defenses to the Counterclaim and amendments thereto," and yet Elevations did not depose Ms. Baugh regarding the scope of her knowledge and information. Furthermore, the testimony that Ms. Baugh gave is clearly within the scope of her disclosed knowledge regarding EFCU's membership and financial performance because it goes directly to Elevations' demand for disgorgement in its Counterclaim by demonstrating that the gross revenue claimed by Elevations was not attributable to EFCU's use of its marks. Therefore,

the court finds that Ms. Baugh's declaration is admissible, and the court is thus permitted to consider it when deciding the summary judgment motions.

### v.  Discussion of Notre Dame

The discussion of the co-existence of the registered trademarks "Elevate" for Notre Dame Federal Credit Union and Elevations' marks is clearly supported by the record and is relevant to analyzing likelihood of confusion in this case. Accordingly, the court finds that this evidence and discussion is admissible. The court is therefore permitted to use this information and discussion while making its summary judgment determinations.

### vi.  Mr. Suttle's testimony

Mr. Suttle's deposition testimony regarding geographic significance of Elevations' marks is not a personal opinion and it is binding on Elevations because it was the subject of a 30(b)(6) topic – the nature and features of the marks and the reasons for selecting these features. (ECF No. 103 at 9). Thus, the court may consider it when making the summary judgment decisions.

### vii.  Judicial notice – PAC-12

It is an indisputable fact that the University of Utah and the University of Colorado are in the PAC-12. Accordingly, as requested by Elevations, the court takes judicial notice that both of these universities are in the PAC-12.

### viii.  Judicial notice – websites in material fact 71

EFCU has requested that the court take judicial notice of the information provided on six websites (as listed in material fact 71) that demonstrates that these institutions provide financial services. Courts regularly take judicial notice of factual information found on the internet, and EFCU has provided the complete website addresses for these publicly available websites. That information sufficiently indicates the accuracy and reliability of the relevant information on the

websites. Accordingly, the court finds that it can take judicial notice that the institutions listed in material fact 71 are financial institutions, and the court takes this judicial notice now.

### ix.   Judicial notice – Members First and EFCU websites

EFCU provided a web address for the Members First Credit Union's publicly available website and asked that the court take judicial notice of the locations of its branches that are listed on its websites. EFCU also provided its own web address for its own publicly available website and asked that the court take judicial notice of the requirements to join EFCU. This information on these websites is reliable because these businesses have their respective invested interests in listing correct locations and providing accurate joining requirement information to prospective members. It is also reliable because each website contains a copyright 2021 note at the bottom, indicating that the websites are regularly maintained. Thus, the court takes judicial notice of the branch locations of Members First Credit Union and of the joining requirements for EFCU – as listed on their respective websites that EFCU provided to the court.

### II.   Plaintiff's Motion for Summary Judgment

EFCU brings this motion for summary judgment, arguing that it is entitled to judgment as a matter of law on all claims.

*Standard of Review*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2003)

(citation omitted). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. The court "must examine the evidence in the light most favorable to the nonmoving party." *Murphy v. Facet 58, Inc*., 329 F. Supp. 2d 1260, 1266 (D. Utah 2004) (citation omitted).

Once the movant has met its initial burden of showing an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In deciding such a motion, courts should keep in mind that summary judgment is a drastic form of relief and is improper if "an issue turns on credibility." *Nat'l Aviation Underwriters, Inc. v. Altus Flying Serv., Inc*., 555 F.2d 778, 784 (10th Cir. 1977).

### a.   Lanham Act Claims – Likelihood of Confusion

The analysis of the Lanham Act claims in this case hinges on the likelihood of confusion between the subject marks. *See* 15 U.S.C. § 1114(a); 15 U.S.C. § 1125(a)(1)(A). Elevations, as the party alleging infringement, has the burden of establishing that EFCU's use of its trademark is likely to cause confusion among consumers. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 194 (2014).

The Tenth Circuit utilizes the following six-factor test for determining whether a likelihood of confusion exists: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Sally Beauty Co. v. Beautyco, Inc*., 304 F.3d 964, 972 (10th Cir. 2002). "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Heartsprings, Inc. v.*

*Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998). Likelihood of confusion is a question that is "amenable to summary judgment." *Sally Beauty Co.*, 304 F.3d at 972. However, a few strong factors weighing towards the nonmoving party can be sufficient to survive such a motion. *See id.* at 976.

### i.  Degree of Similarity

The similarity of the marks is the "first and most important factor." *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 1001 (10th Cir. 2014). The degree of similarity between marks is tested on three levels, as encountered in the marketplace: sight, sound, and meaning. *Id*. The marks should not be compared side-by-side unless consumers actually view the marks that way in the marketplace. *See Beer Nuts, Inc. v. Clover Club Foods Co*., 711 F.2d 934, 941 (10th Cir. 1983).  Instead, "the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *King of the Mt. Sports, Inc. v. Chrysler Corp*., 185 F.3d 1084, 1090 (10th Cir. 1999).

As a preliminary matter, the court finds that a side-by-side comparison is not appropriate here. The only evidence that Elevations cites to support its assertion that consumers actually view the parties' marks side-by-side in the marketplace is the Poret Report. The court has excluded this evidence, so there is no need for further discussion on this matter. There is no exception here to the ban on side-by-side comparisons of the trademarks at issue.

The court will now analyze the degree of visual similarity between the parties' marks to determine whether the public would be confused by EFCU's marks when singly presented. First, Elevations' marks all prominently feature the word "Elevations" while EFCU's marks all prominently feature the word "Elevate." These two words share identical beginnings – "elevat". Both parties' marks also feature the words "credit union" since that is the nature of both parties'

businesses. On its own, the phrase "credit union" is not very significant because it merely describes the services that the parties' provide. It is noteworthy though that both parties' marks include "elevat" and "credit union". However, "elevations" and "elevate" are still visually distinct words with different endings. The court thinks it highly unlikely that people would not notice the distinctive endings while reading these words. Considering all this, the court believes that people would not be visually confused by the words involved if the marks were singly presented.

Second, the court analyzes the parties' logo marks for degree of visual similarity. EFCU's logo contains two different fonts, a combination of upper- and lower-case letters, and a symmetrical, triangular mountain logo placed directly over the two lines of written words. Elevations' logo is written in an italicized, uniform font, with the words in all caps (also written in two lines), and an asymmetrical stylized image on the left that projects upward to the right and looks somewhat like a ladder or a backwards "E". While both of the parties' logos use green and blue, the type and shade of greens and blues used are different, with Elevations' being lighter than EFCU's. Based on the visuals of the parties' logos, the court does not think that the public, when singly presented with the marks, would be visually confused by the parties' logos – even in combination with the word elements.

Next, the court evaluates the sounds of the parties' marks. Obviously, "credit union" sounds the same because they are the exact same words. However, that phrase is descriptive, and the focus here is between "elevations" and "elevate". The first five letters – "eleva" – are pronounced the same in both words. However, the emphasis in this portion of the word is different between the marks. In "elevate" there is an emphasis on the first syllable "el" and then the word ends with a hard "a" sound followed by a sharp "t" sound. In total, "elevate" has three

syllables. In "elevations" the emphasis is on the third syllable, that sounds like "vey". This is followed by a fourth syllable pronounced "shuhn" (followed by an "s"). These are clearly distinct pronunciations that the court does not think would confuse the public if the marks were heard (singly) over the radio or television, and so on.

Finally, the court analyzes the meanings of the parties' marks. "Elevations" is a noun, meaning a height to which something is elevated. "Elevate" is a verb, meaning to lift up or make higher. Elevations is clearly the noun form of the word elevate. Thus, the word meanings are related, but also distinct in that they are a noun and verb respectively. Ms. Parsons noted the similarity here in her deposition, which indicates to the court that if the public were comparing these marks side-by-side they would find significant similarity here. However, these marks should not be compared side-by-side for present purposes. The court assumes that the vast majority of people know the difference between a noun and a verb and that the public would not be confused between the meanings of "elevations" and "elevate" if the marks were singly presented.

Based on the above reasoning, the court finds that – when not evaluated side-by-side – the public is unlikely to be confused between the parties' marks. Considering the above analysis, the court finds this first factor to heavily favor EFCU in the likelihood of confusion analysis.

### ii. Intent of EFCU in Adopting Mark

Under this second factor, the court must consider whether EFCU "had the intent to derive benefit from the reputation or goodwill" of Elevations. *King of the Mtn. Sports*, 185 F.3d at 1091 (citation omitted). Mere knowledge of a mark is not sufficient to establish such intent; rather, the court must consider "the larger factual context of the case." *Western Diversified Servs. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005).

Based on the following analysis, the court finds that the undisputed facts and evidence support a conclusion that EFCU did not have infringing intent when rebranding, and that Elevations has not provided affirmative evidence of infringing intent on EFCU's part to demonstrate that there may remain a genuine issue of material fact here.

First, the undisputed facts demonstrate that EFCU put much time and care into its rebranding process. EFCU ran many trademark searches, sought and received confirmation from the NCUA that the name "Elevate" was available for use, eliminated from its possible rebranding options multiple names that the NCUA deemed to be taken or confusingly similar to existing unions, and had a conversation with a lawyer about due diligence. "Elevate" was then presented to EFCU's board as one of several options, albeit the likely favored option, and the board selected it by majority vote. Lack of ill-intent here is further supported by the fact that EFCU spent hundreds of thousands of dollars to develop, promote, and advertise its own business – a business that is located in an area that Elevations does not target at all.

Elevations takes issue with the fact that Ms. Lucas-Smith – EFCU's Chief Marketing Officer who was in charge of the rebrand – was generally aware of Elevations early on in EFCU's rebranding process. Elevations argues that this provides a strong inference that EFCU intended to trade off of Elevations' marks and goodwill. The court disagrees.

The record shows that Ms. Lucas-Smith was generally aware of Elevations and its Colorado location, and that she viewed at least one of Elevations' trademark registrations while conducting due diligence on the USPTO database.[5] However, Ms. Lucas-Smith has testified that

---

[5] Ms. Parsons did send Ms. Lucas-Smith an article that listed existing distinct credit union names, but as discussed earlier in this Order the substance of this article is not admissible so the court will not include this factor in its analysis. Ms. Lucas-Smith was also told by Ms. Parsons, "I really like Elevate. I wish we could use it but I guess we could settle for Elevare." The record demonstrates that Ms. Parsons made this statement under the mistaken belief that a Utah company's use of their "elevate" mark in a different industry would prohibit EFCU from using "elevate" in its own rebrand.

she never viewed Elevations' website, never saw Elevations' logo, and affirmatively avoided (as directed) proposing a name too similar to an existing credit union. Elevations has provided no evidence to the contrary, but rather speculates as to her actions. Further, the NCUA gave Ms. Lucas-Smith preliminary permission to use "Elevate" and Ms. Lucas-Smith then concluded, after doing her own due diligence, that there was no conflict if EFCU chose to rebrand as "Elevate". Ms. Lucas-Smith even testified that she did not intend to benefit from Elevations' goodwill and reputation and that she would not have selected "Elevate" and presented it to the EFCU board had she believed that there would be confusion with Elevations' mark. This intention is further supported by the fact that EFCU's customer base is three northern Utah counties, not Colorado.

Considering all of the above, the court concludes that the record supports the court's conclusion that Ms. Lucas-Smith had good intentions in the rebranding to "Elevate". Furthermore, Elevations has not provided affirmative evidence to show that there remains a genuine dispute of material fact as to Ms. Lucas-Smith's intentions, and the court is not obligated to speculate in Elevations' favor. *See Sunward Corp. v. Dun & Bradstreet, Inc*., 811 F.2d 511, 521 (10th Cir. 1987). Accordingly, the court finds that there is no evidence of bad intent here and that this factor weighs strongly in EFCU's favor.

### iii. Evidence of Actual Confusion

In a trademark infringement action, actual confusion is recognized as the best evidence of likelihood of confusion. *Icon Health & Fitness, Inc. v. Nautilus Group, Inc*., 2004 U.S. Dist. LEXIS 31511, at *14 (D. Utah Dec. 21, 2004). Actual confusion is typically only found if there are mistaken purchasing decisions, however actual confusion can also be found if there is evidence of "genuine consumer confusion as to the source" of the services consumers are seeking. *Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Clinic, LLC*, 861 F.

38

Supp. 2d 1293, 1305 (D. Kan. 2012). In the Tenth Circuit, this type of actual confusion – initial interest confusion – has been recognized when low-cost goods or services have been involved. *See id.*; *see also Australian Gold*, 436 F.3d at 1238. Regardless, "because evidence of actual confusion can be difficult to obtain, its absence is generally unnoteworthy and is given little probative weight." *Icon Health*, 2004 U.S. Dist. LEXIS 31511, at *14.

The Poret Report has been excluded. Thus, the only evidence on record to support Elevations' assertions of actual confusion between the parties' trademarks are five documented instances of confusion. The court now analyzes these instances and their significance.

The five instances are as follows. One, an EFCU employee mistook Elevations for EFCU and attempted to apply for a loan online. During the underwriting process this mistake was discovered. Two, there was an instance where a title for an automobile was meant for EFCU and was instead mistakenly sent to Elevations. Finally, there are three documented instances of individuals attempting to sign up with Elevations, but instead contacting EFCU to ask about membership information or branch locations. In one of those instances, the individual realized on his own that he had the wrong credit union.

After a year and a half of co-existence between the parties' marks, only these five instances have been documented. Five instances – none of which resulted in a completed transaction – is a very small number when compared to the size of either EFCU or Elevations. Elevations does argue that there were likely more instances of confusion that were not caught. However, the court finds this unlikely. Transactions, especially membership or loan applications, with credit unions require much greater detail and care than regular retail transactions. The court thinks it highly likely therefore that legally-significant confusion amongst credit union

consumers would virtually always be caught. Hence, the absence of more documented instances of confusion is striking.

Elevations also makes an initial interest confusion argument – that these instances of initial interest confusion qualify as evidence of actual confusion and should be given great weight. The Tenth Circuit has found initial interest confusion to qualify as evidence of actual confusion when low-cost goods are involved. *See Australian Gold*, 436 F.3d at 1238. The facts of this case are different because utilizing credit union services requires much more care. It is difficult for the court to imagine a consumer being genuinely confused as to the source of their credit union services at the point that they would be just about to complete a transaction. However, regardless of whether initial interest confusion here qualifies as actual confusion, the numbers involved are still problematic. The court concludes that the isolated five instances here are *de minimis* numbers of confusion, and they accordingly do not support a finding of a genuine issue of material fact as to likelihood of confusion. Thus, the court determines that this factor weighs heavily in EFCU's favor.

### iv.  Similarity of Products and Manner of Marketing

"The greater the similarity between the [parties'] products, the greater the likelihood of confusion." *Sally Beauty Co.*, 304 F.3d at 974. This factor is analyzed by considering (1) the similarity of products, and (2) the similarity in how the products are marketed. *Id.* "The issue is not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both." *Playnation Play Sys. v. Velex Corp.*, 924 F.3d 1159, 1168 (11th Cir. 2019).

The parties offer virtually identical products because they are both credit unions. This factor alone would not signify that the parties are direct competitors. In fact, Elevations' own list

of competitors did not include EFCU. However, in this summary judgment motion Elevations argued that EFCU actually is a direct competitor. Still, the undisputed facts on record support the court's conclusion that these parties are not direct competitors, that they have separate markets, consumer bases, and memberships. Thus, the court finds it highly unlikely that consumers would believe that one entity is providing both EFCU's and Elevations' services.

All of EFCU's marketing is tied to the three small rural Utah counties in which it operates. EFCU hosts local events and utilizes billboards, signage, internet marketing targeted to the Utah counties' zip codes, Utah-specific internet posts, social media posts that require an active "follow" or "like" to experience, and a mobile app to advertise to and communicate with its members. Consumers must first apply for membership and create a user profile before utilizing EFCU's online and mobile banking services.

In contrast, Elevations focuses its attention on Colorado. It ties its marketing to Colorado through advertising in local newspapers, radio, and television. Elevations has not targeted Utah, and in fact all of its internet marketing uses geo-targeting to target its Colorado base. Additionally, Elevations targets internet users who have already viewed its website. While Elevations does advertise to University of Colorado alumni and sponsors the University of Colorado at PAC-12 events – a conference that includes the University of Utah – Elevations has provided no affirmative evidence that these actions specifically led to people in Utah (let alone EFCU's counties) experiencing Elevations' mark.

Elevations has provided evidence that 41,000 different Elevations accounts used Elevations' services within the state of Utah, including 350,000 separate card transactions; 5,000 ATM transactions; and 2,700 shared branching transactions. Elevations asserts that this activity has exposed consumers in Utah to Elevations' branding through Elevations' name and logo

present on its cards while business is transacted. Perhaps. Although, there is no affirmative evidence making that connection, and the court finds that, on its own, that is weak evidence of brand exposure considering how these transactions typically occur and the nature of modern-day travel.

The most compelling evidence that Elevations puts forth is that there are members of each credit union who reside in the other credit union's state. Neither credit union prohibits this – although the parties' membership criteria is primarily tied to their respective geographic locations – and for whatever undeclared reasons it has occurred. However, a few members residing in another state does not mean that EFCU and Elevations share a customer base. Approximately 92% of EFCU's customers reside in the three small northern Utah counties in which it operates. That is its customer base. Only sixteen of Elevations' member reside in those same counties. EFCU's counties are not Elevations' customer base.

The court finds it highly unlikely, based on the undisputed evidence, that consumers would believe that one entity is providing both EFCU's and Elevations' services. Moreover, the court finds no genuine dispute of material fact here. Thus, the court concludes that this factor weighs in favor of EFCU.

### v.  Degree of Care

"A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar trade claims." *King of the Mtn. Sports*, 185 F.3d at 1091. "The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase." *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc*., 402 F. Supp. 2d 1312, 1335 (D. Kan. 2005).

The only Tenth Circuit infringement case that specifically mentions the degree of care consumers exercise in choosing a banking service provider is *First Sav. Bank, F.S.B. v. First*

*Bank Sys.*, 101 F.3d 645 (10th Cir. 1996). In that case, the Tenth Circuit said – without any further elaboration – that it found "no evidence in the record with respect to the degree of care exercised by consumers choosing between providers of banking services." *Id*. at 656. However, many courts throughout other circuits have held that consumers exercise a high degree of care in selecting their financial service – making confusion unlikely. *See First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*, 153 F.3d 885, 889-90 (8th Cir. 1998); *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 831 (C.D. Ill. 2009); *Peoples Fed. Sav. Bank v. People's United Bank*, 750 F. Supp. 2d 217, 225-26 (D. Mass. 2010), *aff'd*, 672 F.3d 1 (1st Cir. 2012); *Comerica Inc. v. Fifth Third Bankcorp*, 282 F. Supp. 2d 557, 571 (E.D. Mich. 2003).

The court now relies on the holdings of these courts in other circuits, as well as common knowledge, to conclude that consumers do exercise a high degree of care when selecting credit union services. Furthermore, selecting a credit union service is akin to making an expensive purchase, which qualifies as involving a high degree of care in the Tenth Circuit. *See Heartsprings, Inc.*, 143 F.3d at 557. Accordingly, there is a high degree of care involved in the present case and this factor weighs substantially in favor of EFCU.

### vi.  Strength of marks

"The stronger the mark, the greater the likelihood that encroachment on the mark will produce confusion." *Sally Beauty*, 304 F.3d at 976. In determining strength, courts must assess both conceptual and commercial strength. *See King of the Mtn. Sports*, 185 F.3d at 1093.

As to conceptual strength, marks are placed in one of five categories, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, and fanciful. *Donchez v. Coors Brewing Co*., 392 F.3d 1211, 1216 (10th Cir. 2004). A descriptive mark only receives protection if "it has acquired a secondary meaning by becoming distinctive of the applicant's goods in

commerce." *Sally Beauty Co*., 304 F.3d at 976 (citation omitted). When there is a specific, descriptive geographic component to a name, courts do not readily find it to have acquired a secondary meaning. *See Poison Spider Bicycles, Inc. v. TAP Mfg., LLC*, 2018 WL 836364, at *6 (D. Utah Feb. 12, 2018) (citation omitted). If a mark is suggestive, the mark "suggests rather than describes a characteristic of the product and requires the consumer to use imagination and perception to determine the product's nature." *Sally Beauty Co*., 304 F.3d at 976 (citation omitted).

Here, the court finds that Elevations' marks are entitled to the presumption that they are suggestive. Although "elevations" could arguably be a geographic reference to Colorado's mountains, the word is not specific or descriptive enough of those mountains to warrant a finding that Elevations' marks are merely descriptive. However, "elevations," as well as the upwardly projecting logo in Elevations' design mark, do suggest characteristics of rising up, increasing, excelling, profiting, and so on – all characteristics that a consumer would want from a credit union. Thus, the court finds that Elevations' marks are suggestive – medium-strong marks, conceptually. However, "extensive third-party use of a component of a disputed term undermines the strength of the term as a whole." *Water Pik, Inc*., 726 F.3d at 1152 (citation omitted). As listed in the facts, there are many businesses offering various financial services that have registered marks containing "elevate," "elevations," and "elevation." There are also a couple credit unions specifically that use "elevate" in their design marks, albeit in more visually creative ways. This third-party use somewhat weakens the overall strength of Elevations' marks.

Commercial strength is "the marketplace recognition of the value of the mark." *King of the Mtn. Sports*, 185 F.3d at 1093. To evaluate commercial strength, courts consider "(1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of

the mark, and (3) the efforts made to promote a conscious connection, in the public's mind, between the mark and a particular product." *Hornady Mfg. Co.*, 746 F.3d at 1007.

In Colorado, the undisputed facts demonstrate that Elevations is commercially strong. It has been providing its services there since 2006 and using its design mark since 2007. It has billions of dollars through loans, cash, and investments. Its marketing budget last year was approximately $4 million. In addition, articles have been published about Elevations and it has received several national and state awards. However, it is unclear how exactly this commercial strength in Colorado would translate to commercial strength in EFCU's counties in Utah.[6]

The relevant, undisputed evidence on record is as follows: some national recognition of Elevations through articles and awards, evidence of a few Elevations members residing in EFCU's counties, transactions involving Elevations' cards in EFCU's counties, a general marketing budget that might indirectly lead to strengthened Elevations marks in Utah, advertising to University of Colorado alumni who might live in or travel to Utah, and sponsorship of the University of Colorado which may have exposed people in Utah to Elevations' marks since both the University of Colorado and the University of Utah are in the PAC-12. On the other hand, Elevations has no locations in Utah, Elevations has expressed no past or current plans to expand into Utah, and the evidence on record shows that Elevations does not target Utah in its marketing or take other direct steps to specifically strengthen its mark there.

Based on the undisputed evidence on record, the court concludes that Elevations' marks only have a small amount of commercial strength in the relevant market for the present action. This, in combination with the conceptual strength analysis leads the court to the determination

---

[6] Inherent to successful trademark infringement cases is the need for the parties to be operating in the same or significantly overlapping market, such that a junior user taking on a senior user's mark would weaken the senior user's mark. Accordingly, in regards to commercial strength, the relevant inquiry is whether the senior user's mark is strong in the junior user's market.

that Elevations' marks are weak in the relevant market. Since the undisputed facts have led to the

court's reasonable conclusion on this factor, and Elevations has not raised affirmative evidence

here to demonstrate that there remains a genuine issue of material fact here, the court finds that

this factor weighs in favor of EFCU.

### vii.   Conclusion

As analyzed above, the court finds that each likelihood of confusion factor weighs in

favor of EFCU, and that taken together the factors substantially favor EFCU. Furthermore, there

are no genuine issues of material fact here that would impede a grant of summary judgment.

Consequently, the court finds that a likelihood of confusion does not exist between EFCU's and

Elevations' marks, and accordingly grants EFCU summary judgment on the Lanham Act claims.

### b.   Common-Law Infringement Claims

EFCU also seeks summary judgment as to Elevations' unfair competition and service

mark infringement claims under Utah common law. Under Utah common law, unfair

competition includes passing off, palming off, imitating, and causing or likely causing confusion

or deception. *See Overstock.com, Inc. v. SmartBargains, Inc*., 192 P.3d 858, 859-60 (Utah 2008);

*Skullcandy, Inc. v. Filter USA, Inc.*, 2019 WL 2568010, at *4 (D. Utah June 21, 2019). Similarly,

common-law trademark infringement requires that the "same elements [as federal trademark

infringement] must be shown to establish a claim for common law trademark infringement."

*Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co*., 434 F. Supp. 3d 1227, 1240 (D.

Utah 2020) (citation omitted). Thus, likelihood of confusion is a requirement of the Utah

common-law claims in this case. Since the court has found that likelihood of confusion does not

exist between the parties' marks in this case, the court grants EFCU's motion for summary

judgment as to Elevations' unfair competition and service mark infringement claims under Utah common law.

### c. Cyberpiracy Claim

Elevations has brought a cyberpiracy claim against EFCU, pursuant to 15 U.S.C. § 1125(d). In order to prevail on summary judgement, EFCU must demonstrate that there is no genuine issue of material fact with regard to this claim.

"Congress enacted the Anti-Cybersquatting Protection Act (ACPA), 15 U.S.C. § 1125(d), to address a new form of piracy on the Internet caused by acts of cybersquatting, which refers to the deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." *Utah Lighthouse Ministry v. Foundation for Apologetic info. & Res.*, 527 F.3d 1045, 1057 (10th Cir. 2008) (citations and quotations omitted). "To prevail on a cybersquatting claim, [Elevations] must show (1) that its trademark . . . was distinctive at the time of registration of the domain name, (2) that the domain names registered by [EFCU] . . . are identical or confusingly similar to the trademark, and (3) that [EFCU] used or registered the domain names with a bad faith intent to profit." *Utah Lighthouse Ministry*, 527 F.3d at 1057.

All of EFCU's domain names are versions of "elevate" credit union and none of them include the word "elevations". Thus, all of EFCU's domains remain in the sphere of its marks – not Elevations' marks. Since the court has already found that likelihood of confusion does not exist between the parties' marks, Elevations' ACPA claim must fail. Even if this were not so, the court finds no genuine issue of material fact regarding EFCU's intent in registering its domain names. The undisputed facts demonstrate that EFCU registered these domains as part of its rebranding. This is a typical action to take in such a process. Further, as previously analyzed, the court has found no evidence to reasonably support a finding of ill intent on EFCU's part during

the rebranding process. Accordingly, there is no proof of bad faith here and Elevations' ACPA claim fails for that reason as well. The court therefore grants EFCU's motion for summary judgment as to the ACPA claim.

### d. UTAA Claim

Utah's Truth in Advertising Act ("UTAA"), Utah Code Ann. §§ 13-11a-1 through 13-11a-6, prohibits deceptive trade practices in Utah. All of Elevations' allegations under this statute rest on the claimed likelihood of confusion between the parties' marks. (ECF No. 21 at ¶¶ 74-75). The court has determined that this likelihood of confusion does not exist between the parties' marks. Accordingly, the court grants EFCU's motion for summary judgment as to the UTAA claim.

### III.   Defendant's Motion for Partial Summary Judgment

As analyzed and held above, the court is granting EFCU's motion for summary judgment in its entirety. This renders Elevations' motion for partial summary judgment moot. Accordingly, the court denies this motion as moot.

### CONCLUSION

Based on the foregoing reasoning, the court GRANTS EFCU's motion to exclude the opinions of Hal Poret [ECF 55]; DENIES AS MOOT Elevations' motion to exclude the opinions of Justin Anderson [ECF 47]; DENIES Elevations' motion to exclude the opinions of Scott Hampton [ECF 48]; GRANTS EFCU's motion for summary judgment in its entirety [ECF 53]; and DENIES AS MOOT Elevations' motion for partial summary judgment [ECF 51]. Accordingly, the court declares that EFCU's use of its marks ELEVATE FEDERAL CREDIT UNION, ELEVATE CREDIT UNION, and ELEVATE does not infringe on Elevations' trademarks under federal, state, or common law. Consequently, Elevations' motion to strike jury

demand and elect damages is now moot, and as such the court DENIES AS MOOT this last

pending motion [ECF 107]. Because this Order has addressed all issues and claims in this case,

the court directs the clerk of court to enter judgment and close the case.[7]

DATED this 16th day of March, 2022.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

---

[7] EFCU has requested an award of its costs, expenses, and attorneys' fees in this action. After this case has closed, the parties are permitted to brief this matter.